**Nos. 25-5004, 25-5020**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

and

OSAGE MINERALS COUNCIL,

*Intervenor Plaintiff-Appellee*,

v.

OSAGE WIND, LLC; ENEL KANSAS, LLC; and
ENEL GREEN POWER NORTH AMERICA, INC.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Oklahoma
The Honorable Jennifer Choe-Groves, United States District Judge*
No. 14-CV-704-JCG-JFJ

### APPELLANTS' OPENING BRIEF

Bryston C. Gallegos
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
(214) 698-3100

Lloyd S. Marshall
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, Texas 77002
(346) 718-6600

Miguel A. Estrada
  *Counsel of Record*
Peter M. Wade
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
*mestrada@gibsondunn.com*

*Counsel for Appellants Osage Wind, LLC; Enel Kansas, LLC; and
Enel Green Power North America, Inc.*

Oral Argument Requested

*Judge of the United States Court of International Trade, sitting by designation

# TABLE OF CONTENTS

Page

GLOSSARY ...................................................................................1

STATEMENT OF PRIOR OR RELATED APPEALS ...............................2

JURISDICTIONAL STATEMENT ...........................................................2

INTRODUCTION ................................................................................3

ISSUES PRESENTED..........................................................................6

STATEMENT OF THE CASE................................................................8

    I.    Legal and Regulatory Framework.........................................8

    II.   Enel Operates an 84-turbine Wind Farm in Osage County, Oklahoma, That Provides Substantial Benefits to the Local Community. ......................................................................10

    III.  Before Construction Begins, the Project's Experienced Indian Law Counsel Concludes that No Mining Lease Is Required. .............11

    IV.  After Construction Begins, BIA Asserts for the First Time that Enel's Rock Crushing Requires a "Sandy Soil Permit."....................13

    V.   At BIA's Request, Enel Attempts to Engage with BIA Solicitor's Office.............................................................................14

    VI.  The District Court Grants Summary Judgment for Enel, but this Court Reverses. ..............................................................17

    VII.  On Remand, the District Court Grants Summary Judgment for OMC and the United States and Orders Removal of the Osage Wind Project. ....................................................................19

SUMMARY OF THE ARGUMENT ......................................................21

STANDARD OF REVIEW ..................................................................24

ARGUMENT ....................................................................................24

    I.    The District Court Erred in Finding Enel Liable for Continuing Trespass. ..............................................................................24

II.    Because the District Court's Finding of Continuing Trespass Was Legal Error, So Too Was Its Award of Continuing Trespass Damages. ............................................................................29

III.   OMC and the United States Failed to Establish the Prerequisites for Permanent Injunctive Relief. .........................................................30

    A.    OMC and the United States Failed to Establish Irreparable Harm.............................................................................31

    B.    The Balance of Harms Weighs Decisively Against the Injunction. ...................................................................39

    C.    The Injunction Will Adversely Affect the Public Interest. .......42

IV.    The Injunction Is Not Narrowly Tailored to Remedy the Harm Found. ..................................................................................43

V.     The District Court Erred in Awarding OMC and the United States Attorneys' Fees and Costs. ...................................................45

CONCLUSION ...................................................................................50

STATEMENT REGARDING ORAL ARGUMENT ...............................................52

CERTIFICATE OF DIGITAL SUBMISSION .........................................................53

CERTIFICATE OF COMPLIANCE ........................................................................53

CERTIFICATE OF SERVICE .................................................................................54

ADDENDUM PURSUANT TO RULE 28.2(A)......................................................55

*United States v. Osage Wind, LLC*, Case No. 4:14-CV-00704-JCG-JFJ Summary Judgment Opinion and Order.......................................Add.1

*United States v. Osage Wind, LLC*, Case No. 4:14-CV-00704-JCG-JFJ Post-Trial Opinion and Order.....................................................Add.49

*United States v. Osage Wind, LLC*, Case No. 4:14-CV-00704-JCG-JFJ Judgment ...................................................................................Add.141

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alyeska Pipeline Servs. Co. v. Wilderness Soc'y*,
   421 U.S. 240 (1975)..................................................................45

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
   480 U.S. 531 (1987)..................................................................41

*Argo v. Blue Cross & Blue Shield of Kan., Inc.*,
   452 F.3d 1193 (10th Cir. 2006) .................................................24

*Barnes v. Okla. Farm Bureau Mut. Ins. Co.*,
   11 P.3d 162 (Okla. 2000).........................................................46

*Carter Oil Co. v. McCasland*,
   190 F.2d 887 (10th Cir. 1951) .................................................27

*Chaparral Energy v. Pioneer Exploration*,
   241 P.3d 1161 (Okla. Civ. App. 2010)......................................27

*Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of
   U.S. Dep't of Transp*,
   843 F.3d 886 (10th Cir. 2016) .................................................41

*Combs v. Shelter Mut. Ins. Co.*,
   551 F.3d 991 (10th Cir. 2008) .................................................46

*Crandall v. City & Cnty. of Denver*,
   594 F.3d 1231 (10th Cir. 2010) ..........................................24, 31

*Davila v. Enable Midstream Partners L.P.*,
   913 F.3d 959 (10th Cir. 2019) .....................................25, 27, 29, 31

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
   356 F.3d 1256 (10th Cir. 2004) ...............................................32

*Fallon Paiute-Shoshone Tribe v. U.S. Dep't of the Interior*,
   2022 WL 3031583 (9th Cir. Aug. 1, 2022) ...............................43

*Garrison v. Baker Hughes Oilfield Operations, Inc.*,
   287 F.3d 955 (10th Cir. 2002) .........................6, 7, 23, 43, 45

*Gen. Motors Corp. v. Harry Brown's, LLC*,
   563 F.3d 312 (8th Cir. 2009) ....................................................42

*Holly Sugar Corp. v. Goshen Co. Coop. Beet Growers Ass'n*,
   725 F.2d 564 (10th Cir. 1984) ..........................................4, 32, 33

*Kiowa Tribe of Oklahoma v. Hoover*,
   150 F.3d 1163 (10th Cir. 1998) ...............................................37

*Lewis v. Steward*,
 230 P.2d 455 (Okla. 1951) ................................................................27, 28

*N.L.R.B. v. Pueblo of San Juan*,
 276 F.3d 1186 (10th Cir. 2002) ..........................................................34, 35

*N.M. Dep't of Game & Fish v. United States Dep't of the Interior*,
 854 F.3d 1236 (10th Cir. 2017) ...................................................4, 31, 33

*Nat'l Livestock Credit Corp. v. Schultz*,
 653 P.2d 1243 (Okla. Ct. App. 1982) ...............................................48, 49

*Norton v. Ute Indian Tribe of the Uintah and Ouray Rsrv.*,
 862 F.3d 1236 (10th Cir. 2017) ................................................................34

*Osage Nation ex rel. Osage Mins. Council v. Wind Cap. Grp., LLC*,
 2011 WL 6371384 (N.D. Okla. Dec. 20, 2011) ......................................10

*Osage Nation v. Irby*,
 597 F.3d 1117 (10th Cir. 2010) .........................................................8, 36

*Parks v. Am. Warrior, Inc.*,
 44 F.3d 889 (10th Cir. 1995) ...................................................................47

*Pelican Prod. Corp. v. Wishbone Oil & Gas, Inc.*,
 746 P.2d 209 (Okla. Ct. App. 1987) ........................................................48

*Peter v. Nantkwest, Inc.*,
 589 U.S. 23 (2019)....................................................................................45

*Plains Commerce Bank v. Long Family Land and Cattle Co.*,
 554 U.S. 316 (2008)............................................................................34, 36

*Port City Properties v. Union Pac. R. Co.*,
 518 F.3d 1186 (10th Cir. 2008) ...............................................................31

*Prairie Band of Potawatomi Indians v. Pierce*,
 253 F.3d 1234 (10th Cir. 2001) .........................................................36, 37

*R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.*,
 835 F.2d 1306 (10th Cir. 1987) ...............................................................46

*Seneca-Cayuga Tribe of Okla. v. State of Okla. ex rel. Thompson*,
 874 F.2d 709 (10th Cir. 1989) .................................................................37

*Sierra Club, Inc. v. Bostick*,
 539 Fed. App'x 885 (10th Cir. 2013) .......................................................41

*Stites v. Duit Const. Co.*,
 992 P.2d 913 (Okla. App. Ct. 1999) ........................................................48

*Strate v. A-1 Contractors*,
 520 U.S. 438 (1997).................................................................................36

iv

*Tarrant Reg. Water Dist. v. Herrmann*,
  656 F.3d 1222 (10th Cir. 2011) ........................................................24

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River
  Power, Inc.*, 874 F.2d 1346 (10th Cir. 1989)..................................31, 33

*Turner Roofing & Sheet Metal, Inc. v. Stapleton*,
  872 P.2d 926 (Okla. 1994)................................................................47

*United States v. Ahidley*,
  486 F.3d 1184 (10th Cir. 2007) ........................................................40

*United States v. Osage Wind, LLC*,
  871 F.3d 1078 (10th Cir. 2017) ....... 3, 8, 9, 10, 11, 18, 19, 21, 25, 26, 28, 36, 38

*Utah Env't Cong. v. U.S. Bureau of Land Mgmt.*,
  119 F. App'x 218 (10th Cir. 2004) ...............................................42, 43

*Valley Cmty. Pres. Comm'n v. Mineta*,
  373 F.3d 1078 (10th Cir. 2004) ........................................................42

*Vill. of Logan v. U.S. Dep't of Interior*,
  577 F. App'x 760 (10th Cir. 2014) ...............................................41, 42

*W. Watersheds Project v. Salazar*,
  692 F.3d 921 (9th Cir. 2012) ............................................................43

*Welty v. Martinaire of Okla., Inc.*,
  867 P.2d 1273 (Okla. 1994)...............................................................27

*Weyerhaeuser Co. v. Brantley*,
  510 F.3d 1256 (10th Cir. 2007) ..................................................47, 48, 49

*Whittington v. Durant H.M.A., LLC*,
  521 P.3d 1281 (Okla. 2022)...............................................................46

*Williamson v. Fowler Toyota, Inc.*,
  956 P.2d 858 (Okla. 1998)................................................................25

*Woods Petroleum Corp. v. Delhi Gas Pipeline Corp.*,
  700 P.2d 1011 (Okla. 1984)........................................................47, 48, 49

*Wyandotte Nation v. Sebelius*,
  443 F.3d 1247 (10th Cir. 2006) ........................................................37

## Statutes

12 Okla. Stat. § 940(A) ...........................................................8, 45, 46, 47

23 Okla. Stat. § 64................................................................................46

Act of June 28, 1906, ch. 3572, 34 Stat. 539 .............................................8

## Other Authorities

BUREAU OF INDIAN AFFAIRS - OSAGE AGENCY, NON-OSAGE
   HEADRIGHT HOLDERS, located at
   *https://www.bia.gov/sites/default/files/media_document/bia_osage
   _agency_non-osage_headright_holders_foia%29_03.12.24.pdf* .........................9

*Frequently Asked Questions*, OSAGE NATION,
   *https://www.osagenation-nsn.gov/who-we-are/minerals-
   council/frequently-asked-questions* .......................................................9

## Treatises

Restatement (Second) of Torts § 162 cmt. E (1965) ..........................................25, 26

## Regulations

25 C.F.R. Part 211 ................................................................................9, 17

25 C.F.R. Part 214 ................................................................................9, 17

25 C.F.R. § 211.3 ................................................................................9, 17

25 C.F.R. § 214.7 ..................................................................................10

25 C.F.R. § 214.9 ................................................................................29, 30

25 C.F.R. § 214.10 .................................................................................10

25 C.F.R. § 214.12 .................................................................................10

## Constitutional Provisions

Okla. Const., art. XVII, § 8 ........................................................................8

Osage Nation Const. art. XV, §§ 3–4 .................................................................9

# GLOSSARY

| | |
|---|---|
| **1-App.** | Appellants' Appendix, Volume 1 of 7 |
| **2-App.** | Appellants' Appendix, Volume 2 of 7 |
| **3-App.** | Appellants' Appendix, Volume 3 of 7 |
| **4-App.** | Appellants' Appendix, Volume 4 of 7 |
| **5-App.** | Appellants' Appendix, Volume 5 of 7 |
| **6-App.** | Appellants' Appendix, Volume 6 of 7 |
| **7-App.** | Appellants' Appendix, Volume 7 of 7 |
| **Add.** | Addendum bound with this brief |
| **2017 Decision** | *United States v. Osage Wind, LLC*, 871 F.3d 1078 (10th Cir. 2017) |
| **BIA** | The Bureau of Indian Affairs, an agency within the United States Department of the Interior |
| **Enel** | Appellants Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc., collectively |
| **Injunction** | The permanent injunction ordered by the district court on December 18, 2024, requiring that Enel decommission and remove the Osage Wind Project by December 1, 2025 |
| **Mineral Estate** | The mineral estate underlying Osage County, Oklahoma, which was severed from the privately owned surface estate by the Osage Act |
| **OMC** | Appellee Osage Minerals Council |
| **Osage Act** | The Osage Allotment Act of 1906 |

**STATEMENT OF PRIOR OR RELATED APPEALS**

Osage Minerals Council ("OMC") has twice filed appeals before this Court in this matter.  OMC appealed from the award of summary judgment to Osage Wind, LLC; Enel Kansas, LLC; and Enel Green Power North America, Inc. (collectively, "Enel").  *United States v. Osage Wind, et al.*, No. 15-5121 (10th Cir. Dec. 2, 2015). OMC also appealed from a separate order denying its motion to intervene in the district court.  *United States v. Osage Wind, et al.*, No. 16-5022 (10th Cir. Mar. 2, 2016).  This Court dismissed as moot Appeal No. 16-5022 and reversed the award of summary judgment for Enel in Appeal No. 15-5121.  *United States v. Osage Wind, LLC*, 871 F.3d 1078 (10th Cir. 2017).  The United States cross-appealed the district court's post-trial order and final judgment on February 18, 2025. *United States v. Osage Wind, et al.*, No. 25-5020 (10th Cir. Feb. 18, 2025).

**JURISDICTIONAL STATEMENT**

The district court granted summary judgment for Appellees on December 23, 2023.  Add.1–48.  On December 18, 2024, the district court issued a post-trial decision and order and entered final judgment against Enel.  Add.49–142.  Enel filed a timely notice of appeal on January 10, 2025.  5-App.1416.  The district court had jurisdiction over Appellees' claims under 28 U.S.C. § 1345, which provides that the district courts have original jurisdiction of all civil actions commenced by the United States or any agency thereof.  This Court has jurisdiction under 28 U.S.C. § 1291.

**INTRODUCTION**

In a sweeping and unprecedented ruling, the district court ordered the complete destruction of the Osage Wind Project—an 84-turbine, 150-megawatt wind generation project built entirely on private land in Osage County, Oklahoma— because *more than a decade ago* less than $245,000 worth of dirt and rock was extracted from the underground mineral estate, which the United States holds in trust for the benefit of the Osage Nation, and used in the construction of the wind turbines as backfill. Because this Court held in *United States v. Osage Wind, LLC*, 871 F.3d 1078 (10th Cir. 2017)—three years after the end of construction—that Enel engaged in "mining" of the dirt and rocks under federal regulations, it is common ground that under those regulations a lease should have been obtained and a royalty paid for the dirt and rocks (based on the volume of those materials). The district court thus was entitled to conclude that the 2014 use of the Mineral Estate without a lease was a trespass, and to calculate damages for the conversion that occurred when Enel took the rocks. After a trial, the court fixed the value of the property taken during the trespass at less than $245,000.

That should have been the end of the case. But the district court went further, concluding that Enel's continued *retention* of the rocks as part of the backfill that supports each of the 84 turbines in the Osage Wind Project amounts to a "continuing trespass" that requires the complete destruction of a wind farm built entirely on

3

private land, and the payment of additional "trespass" damages that will continue to accrue until the project is destroyed. That order is unprecedented and illogical. It erroneously conflates the possession of converted *personal property* (for which damages were awarded) with an ongoing physical invasion of *real estate*, and would negate the legitimate property rights of third-party landowners by expelling Enel from land OMC does not own.

In sum, Enel's continued possession of converted personalty—for which it has been ordered to (and will) pay OMC—cannot *also* somehow be an ongoing trespass of realty. The district court's conflation of these fundamental concepts led it to the absurd and internally inconsistent conclusion that Enel will both have to purchase the extracted minerals from OMC *and* then also destroy the Project built using those minerals. The district court thus fundamentally erred in finding any "continuing trespass."

Even if a continuing trespass were legally or factually possible here, however, the Injunction still must be vacated because OMC and the United States did not, and cannot, establish the prerequisites for permanent injunctive relief. There is no irreparable harm because a legal remedy for both past trespass *and* any continuing trespass—money damages—is both readily available and has already been awarded by the district court. *See N.M. Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017); *Holly Sugar Corp. v. Goshen Co.*

*Coop. Beet Growers Ass'n*, 725 F.2d 564, 570 (10th Cir. 1984) ("[If] damages can compensate a plaintiff an injunction will not lie.").  That dispositive hurdle cannot be overcome by invoking ill-defined notions of "Osage sovereignty," as the district court sought to do, because the Project is not built on "tribal land," and according to the district court's own final decision, could never have been prevented by the Osage.  As the district court recognized, Enel easily could have purchased the rock and dirt used to construct the Project from other commercial sources.  Moreover, the mineral rights at issue here are administered and commercially marketed by OMC, which is constitutionally independent from the governing political branches of the Osage government, solely for the benefit of "headright" holders, many of whom are not Osage.  Neither a past (and now concluded) trespass on those proprietary interests nor the Project's continued presence on privately owned land interferes with tribal self-government or implicates any tribal sovereign interest.

Beyond the lack of irreparable harm, both the balance of harms and the public interest weigh heavily against injunctive relief.  Removal of the Osage Wind Project will inflict massive economic harm on Enel, adversely and irreversibly impact a community that derives substantial benefits from the Osage Wind Project, and deprive 50,000 households of a source of clean energy.

Finally, *even* if there were a continuing trespass, and *even* if OMC had been able to meet the high standard for permanent injunctive relief, there is yet a third

independent reason the Injunction must be vacated:  it is impermissibly overbroad and violates the well-settled principle that injunctive relief must be "narrowly tailored" to redress the specific harm found.  *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002).  Here, that harm was the continued use of excavated minerals as backfill, which counsel for the United States conceded could be fully remedied by removing and returning the backfill but leaving the wind turbines in place.  The district court rejected that option and instead ordered the full ejectment of the entire Project from land in which OMC has no interest.  That goes well beyond remedying any harm to OMC, and in effect permits OMC to expel Enel from land belonging to, and properly leased from, third-party landowners that do not object to the Project.

Accordingly, for the reasons herein, the district court's finding of continuing trespass and grant of a facially overbroad Injunction must be reversed and vacated.

## ISSUES PRESENTED

1.    Whether, having found that Enel was liable for conversion for extracting, developing, and using minerals from the Mineral Estate without first procuring a required mining lease, and ordering Enel to compensate OMC for those minerals, the district court erred in concluding that Enel's ongoing use of that converted personal property as backfill could also constitute a "continuing trespass"

of realty sufficient to warrant equitable relief and additional "continuing trespass" damages.

2.    Whether the district court erred in calculating purported trespass damages not on the basis of the mining of the Mineral Estate that occurred (and ended) in 2014, but as an ongoing payment stream that would continue to accrue each year that Enel remains in possession of minerals that were converted from the Mineral Estate.

3.    Whether, assuming there was a "continuing trespass," the district court nevertheless erred in concluding that OMC and the United States met their burden of establishing the prerequisites for permanent injunctive relief, including because any past and future harm to OMC can and will be redressed by monetary damages and is therefore not "irreparable," and because the balance of harms and public interest weigh heavily against such relief.

4.    Whether the district court's injunction mandating removal of the entire Osage Wind Project violated this Court's mandate that "an injunction must be narrowly tailored to remedy the harm shown," *Garrison*, 287 F.3d at 962, where more limited remedies are available that indisputably would remedy the only "continuing trespass" found without unduly harming Enel, surface landowners, and the local community and without curtailing lawful conduct confirmed by this Court and the district court not to be a trespass.

5.      Whether the district court erred in awarding OMC and the United States attorneys' fees and costs under an Oklahoma state statute that applies only in "action[s] to recover damages for the negligent or willful injury to property," 12 Okla. Stat. § 940(A), where neither OMC nor United States pled, sought, or were awarded damages for physical injury to the Osage Mineral Estate.

## STATEMENT OF THE CASE

## I.      Legal and Regulatory Framework

Osage County, Oklahoma incorporates the area originally designated by Congress as the reservation for the Osage Nation.  Okla. Const., art. XVII, § 8; *United States v. Osage Wind, LLC*, 871 F.3d 1078, 1082 (10th Cir. 2017) (the "2017 Decision").  In 1906, Congress severed the Osage County surface estate from the underlying mineral estate (the "Mineral Estate").  Act of June 28, 1906 ("Osage Act"), ch. 3572, 34 Stat. 539, §§ 2–3.  Except for designated "homestead" parcels not at issue here, the Osage Act allotted the surface estate out of reservation status, granting it to individuals with rights "to manage, control, and dispose of his or her lands the same as any citizen of the United States" for "any … purpose not otherwise specifically provided" by the Act.  *Id.* §§ 2, 7; *see Osage Wind*, 871 F.3d at 1082; *Osage Nation v. Irby*, 597 F.3d 1117, 1120 (10th Cir. 2010).

The Mineral Estate is held in trust by the United States and administered by OMC, *Osage Wind*, 871 F.3d at 1082, for the benefit of the holders of "headrights"—

the exclusive rights to the distributions of royalties derived from the Mineral Estate, *see Frequently Asked Questions*, OSAGE NATION, *https://www.osagenation-nsn.gov/who-we-are/minerals-council/frequently-asked-questions* (last visited Apr. 16, 2025). Not all Osage Nation members have headright interests—and in fact, 25% of headright holders are non-Osage individuals, corporations, churches, and other institutions. *Id.*[1] OMC is elected solely by the headright holders and is constitutionally independent from the executive and legislative branches of the Osage tribal government, neither of which has any role in managing the Mineral Estate. *Id.*; *see* Osage Nation Const. art. XV, §§ 3–4.

The Bureau of Indian Affairs—the agency within the Department of the Interior responsible for overseeing Indian trust property—has promulgated regulations governing the development of solid mineral resources in the Mineral Estate, *Osage Wind*, 871 F.3d at 1082; *see* 25 C.F.R. Part 214, and generally applicable BIA regulations also apply, 25 C.F.R. Part 211. Those regulations define "mining" to mean "the science, technique, and business of mineral development,"

---

[1] According to a 2022 list publicly available on the website of the Bureau of Indian Affairs' ("BIA"), the more than 60 non-Osage headright holders include the University of Texas, the Masonic Homes of California, Stanford University, Tenneco Oil Company, and the Archbishop of New York. *See* BUREAU OF INDIAN AFFAIRS – OSAGE AGENCY, NON-OSAGE HEADRIGHT HOLDERS, located at *https://www.bia.gov/sites/default/files/media_document/bia_osage_agency_non-osage_headright_holders_foia%29_03.12.24.pdf* (last visited Apr. 16, 2025).

and require anyone engaged in "mining" of the Mineral Estate to obtain from the Osage a lease approved by the Secretary of the Interior. 25 C.F.R. §§ 211.3, 214.7. Under that lease, the lessee purchases the minerals extracted with royalties calculated by applying a royalty rate to the quantity of minerals "mined." 25 C.F.R. §§ 214.10, 214.12; Add.72, 85, 92.

## II. Enel Operates an 84-turbine Wind Farm in Osage County, Oklahoma, That Provides Substantial Benefits to the Local Community.

Enel currently operates the Osage Wind Project, a 150-megawatt, 84-turbine wind power generation project in Osage County, Oklahoma. Add.56. The Project was initially developed by Appellant Osage Wind, LLC under the ownership of Wind Capital Group. *Id.*

In 2010, Osage Wind, LLC obtained leases for the surface rights to the approximately 8,400 acres of private fee land on which the Osage Wind Project is built. Add.56; *see Osage Wind*, 871 F.3d at 1083. In 2011, OMC sought, but was denied, an injunction to prevent the construction of the Osage Wind Project. *Osage Wind*, 871 F.3d at 1083; *see also Osage Nation ex rel. Osage Mins. Council v. Wind Cap. Grp., LLC*, 2011 WL 6371384, at *11 (N.D. Okla. Dec. 20, 2011). Osage Wind, LLC was acquired in 2013 by TradeWind Energy, which, aided by a loan from Enel, started developing the Osage Wind Project until September 2014, when Enel purchased it outright. Add.56; *see also* Add.9.

Enel completed construction of the Osage Wind Project a few months later, and the Project began commercial operation in 2015.  Add.11.  Since then, the Osage Wind Project has provided numerous public benefits, including millions of dollars in tax revenues to fund Osage County public schools, good jobs for County residents, and a stable source of renewable energy for over 50,000 homes.  Add.43; 2-App.397 ¶¶ 3, 7; 3-App.811–18.

### III.    Before Construction Begins, the Project's Experienced Indian Law Counsel Concludes that No Mining Lease Is Required.

In October 2013, OMC wrote to Wind Capital Group and TradeWind Energy requesting information "to determine the federal permitting, leasing and other regulatory requirements that could apply," and suggesting that the Project "may be subject to a range of federal regulatory requirements, including the need to secure a federal permit or lease."  Add.61; 6-App.1670.  The letter copied several BIA officials.  6-App.1670.  The letter did not affirmatively state that a mineral lease or permit was needed for the Project, though it was the first time either OMC or BIA ever raised the possibility.

Wind Capital Group and TradeWind Energy retained attorneys from Modrall Sperling due to their significant experience with Indian law and mineral rights.  Add.62.  They provided information concerning their construction plan to Modrall Sperling, including that installing turbine foundations would require excavation to ten feet below the surface, and that the material excavated would remain onsite to

11

be used "as backfill which will be compacted." 7-App.1759 (draft letter reflecting information provided to Modrall Sperling). Modrall Sperling then analyzed federal regulations, case law, and other authority (including the Osage Act and state case law concerning the rights of surface owners made relevant by that Act), and concluded that construction of the Osage Wind Project would not involve "mining" (and thus did not require a permit or lease) because any excavation of subsurface material was merely "incidental" to construction consistent with Enel's surface rights, and no minerals would be removed from the Project site or sold. Add.62–63; 6-App.1717–26.

Wind Capital Group responded to OMC on October 28, 2013, copying BIA. 6-App.1675–76. In that response, Wind Capital Group noted that substantial information concerning the Project had already been provided to OMC (and BIA), and incorporated Modrall Sperling's advice that no lease or permit was required because "[t]he Project will not remove or sell any minerals from the Project site." 6-App.1675. Neither OMC nor BIA responded to Wind Capital Group's letter, including its rationale for why no permit was required. Nor would either OMC or BIA claim a permit *was* required until nearly a year later, in October 2014, after construction of the Osage Wind Project was already underway. Add.61; 6-App.1677.

**IV.    After Construction Begins, BIA Asserts for the First Time that Enel's Rock Crushing Requires a "Sandy Soil Permit."**

Between October 2013 and September 2014, Modrall Sperling made minor updates and revisions to its analysis, including to "expressly reference excavation." Add.63–65.  Modrall Sperling's core conclusion and advice, however, remained the same:   no mining lease or permit was required for construction of the Project. Add.63–65; *see* 6-App.1727–34 (September 2014 memo); 6-App.1660–66 (October 2014 memo).

In September 2014, Enel purchased the Osage Wind Project outright and excavation work began, which included excavating holes at each of the 84 turbine sites approximately ten feet deep to pour concrete foundations anchoring the wind turbine towers.  Add.52, 56, 58, 97.  Due to the composition of the rock at most of the turbine sites, "blasting" with explosive charges was "conducted as a normal part of the construction process."  Add.57, 101.  Many of the rocks that were excavated were then crushed onsite and returned to the ground to be "used as backfill on the surface" supporting the concrete turbine foundations.  Add.52, 57; *see Osage Wind*, 871 F.3d at 1083, 1087.

Although using excavated material as backfill on the surface is standard practice in wind energy project construction, Enel "could have secured minerals for backfill from local quarries" and avoided using minerals from the Mineral Estate (and "the need for [a] mineral lease") entirely.  Add.84.  Enel chose not to use

13

replacement backfill, however, because the "typical practice" for Enel wind projects was simply to recycle and reuse excavated material onsite, and because Enel did not think doing so required a permit or lease.  6-App.1480–81, 1493.  Enel completed excavation work and rock crushing in 2014.  Add.10.

On October 9, 2014, BIA Superintendent Robin Phillips wrote to Enel, stating that a BIA inspector had visited the Project and observed "[l]imestone … crushed into small rocks and piled around the wind turbine foundation" at one of the excavation sites.  6-App.1677; Add.61.  That letter claimed for the first time that Enel needed a "Sandy Soil Permit" to excavate and crush limestone, although it did not cite any legal basis for that claim.  6-App.1677.  This was the first time BIA (or anyone else) had asserted that a lease or permit was required to crush excavated minerals as part of construction of the Osage Wind Project.

## V.    At BIA's Request, Enel Attempts to Engage with BIA Solicitor's Office.

As several Enel executives and its outside Indian law counsel testified (and contemporaneous emails reflect), Enel was surprised at the claim in BIA's letter because neither BIA nor OMC had ever raised anything called a "Sandy Soil permit" or taken the position that rock crushing required any other lease or permit.  *See* 6-App.1678 ("BIA never once brought this up in the lengthy history we have with BIA on this project."); 6-App.1738 ("[T]here have been conversations with the BIA over the last three years and [it had] never mentioned the need for this Sandy

14

Soil Permit."); *see also* 5-App.1430–32; 6-App.1452–53. Accordingly, Enel immediately reached out to BIA to understand the basis for its assertion, and asked its counsel at Modrall Sperling to further investigate whether a "Sandy Soil Permit" might apply to the Project. 6-App.1678–81, 1683–84, 1697; 5-App.1430, 1435; 6-App.1453–54. Modrall determined that a Sandy Soil permit was not required and reaffirmed its advice that Enel's construction activities did not constitute mining. 6-App.1678–81; *see* 6-App.1700 ("[T]he legal team can find no reason for a permit requirement."); *see also* 6-App.1453–54, 1465, 1484–86, 1655–56, 1658–66.

A few days later, Enel's head of regulatory affairs, Joan Heredia, spoke to BIA Superintendent Phillips. 6-App.1697–98. On that call, Heredia clarified what Enel was doing (and not doing) with the rock crushed onsite, and Phillips instructed Enel to raise the permitting issue with the BIA Solicitor's Office. 6-App.1697–98; *see also* 5-App.1443; 6-App.1449–50, 1456–57.

As requested by Phillips, and on behalf of Enel, Modrall Sperling then contacted BIA Solicitor Alan Woodcock. Modrall Sperling explained "what Osage Wind [was] doing, and not doing, … outlined the law [Enel] believe[d] … authorize[d] [its] activities," and offered to provide Woodcock with "a memo outlining the facts and law" that "we believe supports the right of the surface owner to authorize [Enel's] construction activity." 7-App.1744; *see also* 6-App.1449–51. Woodcock informed Enel's counsel that he was meeting the next week with BIA and

15

Osage officials, and that it would be "helpful" to receive the memo in advance of that meeting.  7-App.1744; *see also* 6-App.1460–61.

Modrall Sperling worked with Enel's in-house counsel and construction team to update its prior analyses, now with a "factual background" detailing Enel's excavation and construction activities, specifically including rock crushing.  6-App.1741–43; *see also* 6-App.1461–66.  Consistent with the prior analyses provided to Enel, Modrall Sperling concluded that crushing and using excavated materials as backfill as part of surface construction—where none of the material is removed from the site, sold, or "used for any purpose other than to backfill the excavation from which it came"—did not constitute "mining" or require a mining lease or permit.  6-App.1660–66.  Modrall Sperling provided its analysis to Woodcock and BIA on October 20, 2014.  6-App.1450–51, 1465–67, 1658–66.  It then followed up with Woodcock on several occasions, providing further information concerning Enel's construction and offering "to meet to discuss any questions or concerns you, Superintendent Phillips, or the Nation may have."  6-App.1735–36.  In the meantime, Osage Wind was "continuing its construction operations" based "on the conclusion that no lease or permit [was] required and the extreme cost of deferring operations" unnecessarily.  6-App.1735.  BIA did not respond.  6-App.1472.

A few weeks later, Modrall Sperling contacted Woodcock by telephone.  6-App.1473, 1737.  Woodcock informed Enel's counsel that the matter was still "under

16

consideration," and asked whether construction was continuing. 6-App.1737. Modrall Sperling acknowledged that it was, for the "reasons set forth in our memos sent to him and Superintendent Phillips," and asked "to be advised of any matters that the agency believes Osage Wind should address." 6-App.1473, 1737. Woodcock confirmed that "he would advise [Modrall Sperling] if there [was] any decision or request." 6-App.1737. Modrall Sperling did not receive any further response—from Woodcock or anyone else at BIA—until the complaint was filed in this action on November 21, 2014. 6-App.1474.

## VI. The District Court Grants Summary Judgment for Enel, but this Court Reverses.

In its First Amended Complaint, the United States claimed that Enel's construction activities constituted "unauthorized mining and excavation" under 25 C.F.R. Parts 211 and 214, and that construction of the Osage Wind Project without a federally approved mining lease constituted trespass and continuing trespass into, and conversion of, the Mineral Estate. 1-App.41–54; Add.52–53.[2] On September 30, 2015, the district court granted summary judgment for Enel, agreeing with the position Modrall Sperling and Enel had taken since 2013: Enel had not engaged in

---

[2] The United States initially sought preliminary injunctive relief, but withdrew that request after excavation for the towers was completed. This is consistent with the reality that it was the *excavation* that was then claimed to be the interference with the Mineral Estate, *not* the ongoing use of backfilled materials after completion.

"mining" because "mining" as contemplated by the relevant regulation means only "mineral development for commercial purposes"—*i.e.*, sale or use elsewhere—and "not … an entity that incidentally encounters minerals in connection with surface construction activities." 1-App.63–65. The United States, as trustee for the Mineral Estate, did not appeal, but OMC did. *Osage Wind*, 871 F.3d at 1084.

On appeal, this Court first explained that BIA's asserted "Sandy Soil Lease requirement"—the sole stated basis for BIA's October 2014 letter to Enel—lacked "the power to persuade" because OMC could not point to any agency "interpretation" "or anything else that explain[ed] or even mention[ed]" such a requirement. *Osage Wind*, 871 F.3d at 1087–88. Rather, the Court determined that the key term in 25 C.F.R. § 211.3—"mineral development"—"is ambiguous," and acknowledged that Enel's interpretation of the phrase as requiring some form of "commercialization" was "reasonable" and in accord with "the traditional and commonly shared understanding of mining." *Id.* at 1089–92. The Court also affirmed that "merely encountering or incidentally disrupting mineral materials would not" be "mining"— because "there is simply no sense in which the word 'mineral development' means only the removal of dirt without some further manipulation, commercialization, or offsite relocation"—and emphasized that surface owners (and their lessees) retain "expansive authority … to use and develop their land" even where it "involves digging a hole in the ground, displacing rock and soil in the process." *Id.*

18

Applying the Indian canon of construction to resolve the ambiguity in favor of OMC, however, the Court held that "mineral development" can include "acting upon the minerals to exploit the minerals themselves," and that Enel "acted upon" minerals and engaged in "mineral development" when it "*sorted* the rocks, *crushed* the rocks into smaller pieces, and then *exploited* the crushed rocks as structural support for each wind turbine." *Osage Wind*, 871 F.3d at 1091–92. As a result, the Court held that "Osage Wind was required to procure a lease" before undertaking excavation work in 2014. *Id.* at 1093.

## VII. On Remand, the District Court Grants Summary Judgment for OMC and the United States and Orders Removal of the Osage Wind Project.

On remand, and in light of this Court's 2017 Decision, Enel conceded liability for simple trespass and conversion, but disputed there was a "continuing trespass" because the "act[ion] upon" the minerals that this Court held to be "mining" had ended with the end of excavation in 2014. 1-App.206–35. In December 2023, the district court concluded, consistent with the Court's 2017 Decision, that the "presence of foundations for the wind turbines . . . below ground" was not a trespass, Add.26, and that mere "passive support provided by the surrounding mineral estate" did not give rise to trespass liability, Add.31. Nevertheless, the court determined that Enel's ongoing use of previously extracted and developed minerals "as backfill" in the turbine foundation holes from which they were excavated was a continuing

19

trespass because the turbines "continue to receive the benefit of that backfill support." Add.32–33.

Based on that finding of a continuous trespass, the district court concluded that ejectment of the entire Osage Wind Project was required and ordered a trial to determine "damages . . . on the claims of trespass and conversion" of the minerals extracted from the Mineral Estate.  Add.38–46.  In response to the district court's request for further briefing on a plan and schedule for removal of the wind turbines, Enel outlined two alternative paths:  (1) a plan for complete removal of the Osage Wind Project; and (2) a "Replacement Option" whereby Enel would remove the backfill that had been deemed the continuing trespass and replace it with substitute material sourced from a quarry offsite.  4-App.1016–025.  The purpose of the Replacement Option was to remedy the harm found while permitting the Osage Wind Project to continue operating.  *Id.*

A damages trial was held from May 20 to May 31, 2024, with closing argument on July 9, 2024.  On December 18, 2024, the district court issued an order and opinion and final judgment, awarding OMC and the United States (i) $242,652.28 in conversion damages; (ii) $66,780 in continuing trespass damages up to the date of judgment; (iii) $3,887,687.88 in attorneys' fees and costs; and (iv) a permanent injunction ordering Enel to "remove the wind farm . . . and return the Osage Mineral Estate to its pre-trespass condition on or before December 1, 2025"

(the "Injunction"). Add.115, 140, 142. Additionally, the district court determined that "the fair rental value of the mineral estate occupied by [Enel]" is $8,400 per year and ordered that $8,400 in additional ongoing trespass damages would accrue each year until the wind towers are removed. Add.96–97.

On January 10, 2025, Enel timely appealed. 5-App.1416.

## SUMMARY OF THE ARGUMENT

**I.** The district court erred in finding that continued use of minerals extracted from the Mineral Estate during excavation and construction of the Osage Wind Project in 2014 is a "continuing trespass" under Oklahoma law. The sole basis for the district court's finding of any trespass was this Court's 2017 determination that Enel had engaged in "mineral development" (and thus mining) as part of its "excavation work" when building the wind turbines. *Osage Wind*, 871 F.3d at 1091–92. That work ended in 2014, at which point the minerals extracted were converted personal property. And the conversion of that resulting personal property—for which Enel accepted liability and has been ordered to compensate OMC—cannot also be an ongoing trespass of real estate, or justify an order requiring Enel to both pay for the converted property and destroy the Project using it. The finding of continuing trespass liability must be reversed and, because that finding was the only grounds for granting equitable relief, the Injunction must be vacated.

**II.**    Due to its erroneous determination that continued possession of converted *personalty* (which has legally been purchased through a forced sale) can also be an ongoing trespass to *realty*, the district court also erred in how it calculated trespass damages.   Instead of calculating trespass damages based on the mining activity that occurred (and concluded) in 2014, the district court relied on an inapposite federal regulation to find Enel liable for continuing annual "trespass" damages for every year it maintained possession of the converted minerals for which Enel will separately compensate OMC.   For the same reason that its finding of continuing trespass was legal error, the district court's award of continuing trespass damages must be vacated.

**III.**    In the alternative, even if there were a separately actionable "continuing trespass," the district court still erred in awarding injunctive relief because OMC and the United States failed to establish the prerequisites for such relief.  Appellees did not, and cannot, establish irreparable harm because any alleged harm can and will be remedied by monetary damages, as confirmed by the district court's award of past damages for trespass and conversion and future damages for so long as the purported trespass continues.  Moreover, both the balance of the harms and the public interest decisively weigh against the wholesale destruction of a clean energy project that provides numerous public benefits and that is built on a surface estate that OMC does not own.

**IV.**    Even assuming the prerequisites for injunctive relief were established here, the district court's order that the entire Osage Wind Project be ejected—even from land that does not belong to OMC and on which Enel is not trespassing—is grossly overbroad and violates the well-settled rule that injunctive relief must be "narrowly tailored" to the specific harm which gives rise to the order. *Garrison*, 287 F.3d at 962.  Here, the district court ignored the undisputed availability of far narrower remedies that would cure the continuing trespass found without requiring the destruction of the entire Project, including an order that Enel remove the backfill supporting the turbines and replace it with alternate material sourced offsite.

**V.**    Finally, the district court erred in finding that an Oklahoma statute that applies only to claims for damages for *physical injury to property*, and not damage to property rights more broadly, afforded a basis to award OMC and the United States attorneys' fees and costs for a conversion claim.  Neither OMC nor the United States have ever claimed damages derived from any physical injury to the Mineral Estate, as the district court previously recognized, nor were they awarded damages for physical injury to the Mineral Estate.  Moreover, Oklahoma law is clear that the statute relied upon by the district court to depart from the "American Rule" cannot apply to conversion claims.

## STANDARD OF REVIEW

This Court reviews the grant "of a permanent injunction for abuse of discretion," but it reviews all "underlying questions of law de novo." *Crandall v. City & Cnty. of Denver*, 594 F.3d 1231, 1236 (10th Cir. 2010). This Court also reviews decisions on motions for summary judgment de novo, applying the same standard as the district court. *Tarrant Reg. Water Dist. v. Herrmann*, 656 F.3d 1222, 1232 (10th Cir. 2011). "Summary judgment is warranted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

## ARGUMENT

### I.    The District Court Erred in Finding Enel Liable for Continuing Trespass.

The only basis for the district court's award of injunctive relief was its finding that Enel's continued use of minerals excavated and converted in 2014 constitutes a "continuing trespass." Add.22–23, 35–36, 38, 44–45, 50, 116. That finding was premised on this Court's determination that "mineral development" under applicable federal regulations "includes acting upon the minerals to exploit the minerals themselves," and that Enel had engaged in "mineral development" (and thus mining) by "act[ing] upon the minerals by altering their natural size and shape in order to

take advantage of them." *Osage Wind*, 871 F.3d at 1091–92. Citing that decision, the district court held that Enel committed simple trespass and conversion by "entering the mineral estate" and engaging in "mineral development" "without first obtaining the necessary lease." Add.20. But the district court then went further, holding that Enel's continued "use of crushed rocks as backfill" also constituted a *continuing* trespass. Add.35.

The district court's finding of a continuing trespass is contrary to this Court's 2017 Decision and well-established Oklahoma law and should be reversed. Continuing trespass requires proof of an *ongoing* "actual physical invasion of the real estate of another without the permission of the person lawfully entitled to possession." *Williamson v. Fowler Toyota, Inc.*, 956 P.2d 858, 862 (Okla. 1998); *see also Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 966 (10th Cir. 2019) ("[A] trespass occurs when . . . 'one enters upon the property of another without any right, lawful authority, or express or implied invitation, permission, or license.'" (quoting *Williamson*, 956 P.2d at 862)). Here, the only "action upon the minerals" that this Court found to be "mining"—the sorting and crushing of rocks to make them suitable as backfill—indisputably occurred (and concluded) more than a decade ago. Any trespass thus concluded at that time. "A continuing trespass must be distinguished from a trespass which permanently changes the physical condition of the land." Restatement (Second) of Torts § 162 cmt. E (1965). And where, as

25

here, Enel "enter[ed] land of which another is in possession and . . . remove[d] earth or some other substance from the land, the fact that the harm thus occasioned on the land is a continuing harm does not subject [Enel] to liability for a continuing trespass." *Id.* Rather, OMC's only right is to "redress in a single action for the trespass." *Id.*

There simply cannot be an ongoing invasion of *realty* here. Enel was and is entitled to build and operate the Osage Wind Project on the surface estate, which Enel lawfully leases and is not property of OMC (or the Osage Nation). As this Court explained in 2017, Enel, as surface lessee, has "expansive authority" to use and develop the surface estate, which necessarily includes "disrupt[ing] the mineral estate," such as by "digging a hole in the ground, displacing rock and soil" during surface construction. *Osage Wind*, 871 F.3d at 1092; *see id.* at 1091 ("[M]erely encountering or incidentally disrupting mineral materials would not trigger § 211.3's definition."). Thus, as even the district court recognized, the mere "presence of foundations for the wind turbines" in the subsurface is not an ongoing trespass because "disruption to the mineral estate" incidental to surface construction is not "mining," even where "construction extend[s] below the ground's surface." Add.26 (citing *Osage Wind*, 871 F.3d at 1092). To hold otherwise "would result in an unreasonable limitation on the 'expansive authority' of surface owners to develop and use their land." *Id.*

Rather than a continued invasion of real estate—a prerequisite for a finding of continuing trespass—Enel's retention of minerals from the Mineral Estate constituted, according to the district court, *conversion* of OMC's *personal* property. *See* Add.85 (citing *Welty v. Martinaire of Okla., Inc.*, 867 P.2d 1273, 1275 (Okla. 1994)); *see also Carter Oil Co. v. McCasland*, 190 F.2d 887, 892 (10th Cir. 1951) (holding that defendant that entered oil pool without authorization and took oil was liable under Oklahoma law for conversion and damages based on the volume of oil extracted). Appellees conceded as much: "While in situ, the [minerals were] considered part of the realty, but after production, the minerals produced became 'tangible personal property.'" 5-App.1165 (quoting *Chaparral Energy v. Pioneer Exploration*, 241 P.3d 1161, 1164 (Okla. Civ. App. 2010)). Accordingly, the district court ordered Enel to compensate OMC for that converted property by paying the royalty value of the minerals extracted that would have been owed under a mineral lease. Add.85–92.

Enel's use of converted *personal* property cannot also be a continued invasion of *realty*. *See, e.g.*, *Lewis v. Steward*, 230 P.2d 455, 459 (Okla. 1951) (holding that removal of coal in violation of mining lease was conversion); *see also Davilla*, 913 F.3d at 966 (explaining that trespass exists where "one person actually physically invades the real estate of another" (cleaned up)). The district court's contrary holding leads to the irreconcilable conclusion that although Enel has been ordered

to pay (and will pay) for the converted minerals, it is also somehow still trespassing on those same minerals and must tear down the Project that uses them. That cannot be correct.

Consider if Enel had extracted minerals from the Mineral Estate without the required lease and transported them out of state for use in building a road. Enel could be liable for trespass (for mining from the Mineral Estate without a lease) and conversion (for taking the minerals without paying the royalty), *see Lewis*, 230 P.2d at 459, but the continued existence of that road would not also be a trespass, let alone a "continuing trespass" that must be destroyed. So too here, where the only difference—and the apparent basis for the district court's erroneous continuous trespass finding—is that the use of the converted minerals remained onsite, though as part of the development of the surface estate that Enel had every right to undertake through the surface owners' exercise of rights under the Osage Act. *Osage Wind*, 871 F.3d at 1092.

The district court's determination that the same conduct that constitutes conversion is also a continuing trespass also improperly conflates the act that, under this Court's 2017 Decision, constituted "mineral development" ("action upon" minerals by "altering" them via "sorting" and "crushing") with the purpose of that act (use as backfill for support). *See* Add.32–33. The mere fact that the minerals continue to serve that purpose long after mining has concluded does not mean that

28

Enel is still "actually physically invad[ing] the real estate of another" on an ongoing basis. *Davilla*, 913 F.3d at 966 (cleaned up). On the contrary, the district court's conflation of these concepts has resulted in an Injunction ejects Enel and the Osage Wind Project from realty—the surface estate—that *OMC does not own and in which the United States has no trust interest*.

For these reasons, the district court's finding of continuous trespass liability, and thus the Injunction, cannot stand.

## II. Because the District Court's Finding of Continuing Trespass Was Legal Error, So Too Was Its Award of Continuing Trespass Damages.

The fundamentally flawed premise underlying the district court's continuing trespass finding—the conflation of possession of converted personalty with physical invasion of realty—also infected its calculation of trespass damages.

As established above, the only mining activity that could constitute a trespass here occurred in 2014. The minerals severed from the Mineral Estate then became converted personal property which Enel used to construct the Osage Wind Project, and for which Enel has been ordered to compensate OMC. But the district court did not calculate trespass damages based on what happened in 2014. Instead, citing an inapposite provision in the federal regulations and adopting a position that was not advanced by any party, the court ordered continuing trespass damages in the form of an annual "advance rental" payment of $8,400 per year that the Osage Wind Project remains operating. Add.48–49 (citing 25 C.F.R. § 214.9).

This was error.  The "advance rentals" provided for in the cited regulation, 25 C.F.R. § 214.9, are not a true "reasonable rental rate," *see* 5-App.1369–70, as one might pay to lease an apartment or a car.  They are instead simply "credits" against the "royalties on production" that will come due as a result of "mining operations" during the life of the mining lease.  *Id.*  After 2014, however, Enel was not engaged in mining operations and was not continuing to produce minerals for which it would have had to pay royalties.  It was merely continuing to possess the minerals that it extracted in 2014, for which it will pay OMC "royalties" as ordered by the district court.  *See* Add.92 (calculating conversion damages as the "royalties for the mineral material excavated during construction of the wind farm" in 2014).

Stated another way, because there was no ongoing mining and thus no continuing trespass, there can be no continuing trespass damages.  Accordingly, the district court's calculation of continuing trespass damages must be vacated for the same reason as its erroneous finding of continuing trespass.

## III.    OMC and the United States Failed to Establish the Prerequisites for Permanent Injunctive Relief.

Even if there were a continuing trespass here (there is not), the district court's grant of permanent injunctive relief requiring removal of the entire Osage Wind Project was still reversible error.  To obtain such an extraordinary remedy, OMC and the United States were required to show irreparable harm (*i.e.*, an injury that cannot simply be remedied by money damages), that the balance of hardships tips in their

30

favor, and that the injunction does not adversely affect the public interest.  *Crandall*, 594 F.3d at 1235–36; *see also Davilla*, 913 F.3d at 973–74 (noting "the sheer right to exclude simply cannot begin and end the equitable analysis," even in cases that, unlike here, involve "continuing trespass on allotted land").  They failed to do so.

## A.    OMC and the United States Failed to Establish Irreparable Harm.

Permanent injunctive relief is an extraordinary equitable remedy available *only* when necessary to prevent "irreparable injury."  *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1354 (10th Cir. 1989).  Appellees have not shown they will suffer irreparable injury absent a permanent injunction.  That alone compels reversal.[3]

### 1.    Any Continuing Trespass Can and Will Be Remedied with Monetary Damages.

Harms that can be remedied by damages cannot constitute irreparable harm, because by definition "irreparable harm . . . cannot be compensated after the fact by money damages."  *N.M. Dep't of Game & Fish*, 854 F.3d at 1250; *see also Port City Properties v. Union Pac. R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) (same);

---

[3] The other injunction factors, including both the balance of harms and impact on compelling public interests, also weigh decidedly in Enel's favor.  *See Crandall*, 594 F.3d at 1235–36.  As addressed further below, *infra* at pp. 39–43, the Injunction will cause Enel to incur hundreds of millions of dollars in total financial loss and eliminate substantial public benefits.

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260–66 (10th Cir. 2004) (same). Thus, if "damages can compensate a plaintiff an injunction will not lie." *Holly Sugar Corp.*, 725 F.2d at 570.

Here, OMC and the United States asserted at trial, and the district court's post-trial decision reflects, that any harm suffered *can* be remedied by money damages. Indeed, both sides presented experts advancing rival calculations of monetary damages calculated from estimated volumes of excavated material, unambiguous regulatory provisions, and concrete contractual terms. Add.65–85. After trial, OMC and the United States also claimed an entitlement to ongoing money damages to compensate for Enel's purported *ongoing* trespass—the continued used of crushed rock as backfill—and asserted that their expert had calculated those damages for the entire life of the Osage Wind Project. 5-App.1260, 1262–64, 1285, 1287–89.

The district court excluded the Appellees' expert's opinion testimony on the grounds that his method of calculating both past and future trespass damages was "at odds with both accepted valuation standards and common sense." Add.83; *see also id.* at 85. Yet the district court still awarded, in addition to monetary damages for Enel's past trespass and conversion, separate *continuing* damages for any continuing trespass "until the wind towers are removed." Add.96–97. By directing additional trespass damages that accrue annually for as long as the alleged trespass continues and until the turbines are removed, the district court plainly held there is

a quantifiable legal remedy for any continuing trespass. *Id.* at 97. As noted above, Enel maintains that the district court's calculation of continuing trespass damages was wrong as a matter of law for the same reason as its finding of continuing trespass liability. Nevertheless, if the Court disagrees and accepts the district court's finding of continuing trespass, Enel respectfully submits that the availability of ascertainable continuing trespass damages forecloses the finding of irreparable harm that is a prerequisite of injunctive relief.

At bottom, the positions taken by both sides and the district court confirm that this is not a case where damages—whether for trespass, conversion, or continuing trespass—"cannot be calculated with a reasonable degree of accuracy" or are "so speculative that any award would be inadequate." *Tri-State Generation*, 874 F.2d at 1362 (holding damages were calculable and denial of injunctive relief was proper based on expert testimony that "a reasonable estimate could be made"). Because the district court ordered OMC to be fully compensated with monetary damages—both for Enel's past trespass and any trespass that extends into the future—the harm alleged is not "irreparable" and cannot support injunctive relief. *See N.M. Dep't of Game & Fish*, 854 F.3d at 1250; *Holly Sugar Corp.*, 725 F.2d at 570.

### 2. The Osage Wind Project Does Not Interfere with Osage Sovereignty.

Despite its award of ongoing trespass damages, the district court determined that continued operation of the Osage Wind Project would inflict irreparable harm

33

in the form of "interference with the Osage Nation's sovereignty." Add.113. Its stated rationale was that "tribal sovereignty . . . includes the power of the tribal government to exclude outsiders" from "tribal land," including "via licensing requirements." Add.41 (quoting *Norton v. Ute Indian Tribe of the Uintah and Ouray Rsrv.*, 862 F.3d 1236, 1244–45 (10th Cir. 2017), and *Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 335 (2008)).

The district court's conclusion was erroneous on several fronts. First and foremost, the rights at issue are proprietary mineral rights administered by OMC for the benefit of the headright holders (many of whom are not Osage), not any sovereign interest of the Osage Nation as a whole. OMC is constitutionally independent from the governing political branches of the Osage Nation government, none of which, according to OMC, has any role in managing the Mineral Estate. And while OMC and the headright holders have a proprietary interest in the Mineral Estate and are entitled to payment for minerals extracted from the Mineral Estate, "[p]roprietary interests and sovereign interests are separate." *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1198–99 (10th Cir. 2002). This case concerns only OMC's "possessory interest" in minerals. *Id.* That interest is administered by OMC, which is not the Osage Nation, for the economic benefit of private beneficiaries, including non-Osage individuals and institutions, according to federal regulations that contemplate a specific system of royalty payments for minerals extracted from the

Mineral Estate. None of that implicates any internal affair of the Osage Nation or any tribe's "sovereign authority to govern" itself. *Id.*[4]

The district court's post-trial decision confirms this fact. OMC *never* had the power to "exclude" the Osage Wind Project—just the authority to compel Enel either to pay OMC for the minerals extracted or else obtain replacement backfill from offsite. Add.84. In fact, the district court rejected the damages calculation of Appellees' expert specifically because he "ignore[d] that [Enel] could have secured minerals for backfill from local quarries, potentially avoiding the need for the mineral lease in its entirety" and foreclosing OMC from "imposing" unreasonable conditions "on an unwanted transaction." *See id.* ("It would have been unreasonable for Defendants to have accepted a lease imposing tens of millions of dollars in obligations when a significantly cheaper alternative was available."). In other words, the availability of alternative backfill—a key issue at trial—meant that while OMC could have negotiated royalty payments within a certain range (necessarily limited by replacement cost), it could not have prevented construction of the Project on the privately owned surface estate by refusing a mineral lease.

----

[4] Neither the district court, nor OMC or the United States have identified *any* decision by *any* court holding that tribal ownership of property alone means that any *private* trespass on that property irreparably harms sovereign interests. Enel is aware of none. And in any event, the ultimate owners of the mineral rights here are the headright holders, not the Osage Nation. *See supra* at pp. 8–9.

Moreover, the Project is not built on "tribal land."  What was previously the Osage Reservation was disestablished with the passage of the Osage Act and the allotment and transfer of the surface estate to private landowners.  *See Irby*, 597 F.3d at 1125.  Unlike in the cases relied upon by the district court, Add.40–41, no treaty or act of Congress confers on the Osage Nation or OMC the power to exclude nonmembers from a surface estate that is privately owned and leased to Enel, and the Osage Nation is not a party to this action.  *See Strate v. A-1 Contractors*, 520 U.S. 438, 456 (1997) (tribes lack power to "assert [over non-Indian fee land] a landowner's right to occupy and exclude"); *Plains Commerce Bank*, 554 U.S. at 336 ("[N]on-Indian fee parcels have ceased to *be* tribal land.").

On the contrary, as this Court confirmed, surface estate owners have "expansive authority" under the Osage Act to develop their land, and the mere presence of the Osage Wind Project, including the degree to which the wind turbine foundations purportedly encroach on the Mineral Estate, is not itself wrongful or a trespass.  *See Osage Wind*, 871 F.3d at 1092; *see also* Add.26–28.  Ejecting the Project from a surface estate that OMC does not own does not vindicate any sovereign interest of the Osage Nation.

Put simply, the Osage Wind Project's continued presence on the surface estate—which Enel lawfully leases from its owners—does not "interfer[e] with [tribal] self-government."  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d

36

1234, 1250 (10th Cir. 2001) (second brackets in original).  This is not a case, as in the decisions cited by the district court, where state actors interfered with a tribe's sovereign authority to legislate or govern, such as by refusing to recognize tribal law, *see id.*; *Kiowa Tribe of Oklahoma v. Hoover*, 150 F.3d 1163, 1171–72 (10th Cir. 1998), or trying to enforce state law on tribal land, *see Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1248 (10th Cir. 2006); *Seneca-Cayuga Tribe of Okla. v. State of Okla. ex rel. Thompson*, 874 F.2d 709, 710–11 (10th Cir. 1989).  Here, due to this Court's resolution of a close question concerning an ambiguous regulation, *private* actors were deemed to have infringed on a purely proprietary interest in 2014.  But that proprietary interest, which OMC regularly markets for the royalties prescribed by federal regulation for the benefit of private owners, many of whom are not Osage, is not "sovereign" in the least.  The wrong found here can and will be remedied by payment of damages equivalent to those same royalties, *see* Add.92, just as monetary payments would adequately compensate any non-Indian owner of converted property.

### 3.    Enel Is Not Currently "Mining," and Thus Does Not Currently Need a "Mining Lease."

In finding irreparable harm, the district court has repeatedly invoked Enel's supposed "continued refusal to obtain a lease," characterizing this Court's 2017 Decision as an affirmative directive to "obtain a lease" even today.  Add.42 (finding

that "avoiding the leasing requirement" established by "the appellate court's ruling" interfered with "the sovereignty of the Osage Nation"). This too is clearly erroneous.

In 2017, the only issue before this Court was Enel's "excavation, modification, and use of rock and soil during the installation of wind turbines" in 2014, and whether Enel "*engaged* in 'mining'" at that time. *Osage Wind*, 871 F.3d at 1081 (emphasis added); *see also id.* at 1084, 1087, 1090 (characterizing suit as concerning the "excavation activities"—including "digging, sorting, crushing, and backfilling"—that had occurred in 2014). This Court held that because that "excavation work" included "action upon the minerals" via sorting and crushing, *id.* at 1091, Enel had engaged in "mining" and thus "*was* required to procure a lease," *id.* at 1093 (emphasis added). But this Court made no holding as to any continuing trespass or prospective need for a lease in 2017 or beyond, and any suggestion that a lease is required *now*—a decade after all "excavation work" has concluded—is fundamentally inconsistent with this Court's definition of "mining." *Id.* at 1092.

In any event, Enel is not aware of any mechanism—and OMC has never proposed one—by which it could obtain the required mineral lease today, or how that lease would operate given that the minerals have already been extracted (and will be paid for). So it blinks reality to say, as Appellees and the district court have, that Enel's decision not to obtain a lease following the 2017 Decision somehow *continues* to irreparably harm Osage sovereignty. It does not.

\*    \*    \*

OMC's only injury here is the royalties that Enel should have paid to extract, develop, and use the minerals from the Mineral Estate.  Because it will be fully compensated for that injury via the conversion damages ordered by the district court, there is no basis for *any* injunction, let alone an injunction requiring the destruction of the entire Osage Wind Project, which sits on land that *OMC does not own*.  The district court's Injunction must be vacated.

### B.    The Balance of Harms Weighs Decisively Against the Injunction.

In contrast to the lack of irreparable harm to OMC, the Injunction will inflict massive economic costs on Enel and various third parties.  The balance of harms thus tips decidedly against the Injunction, which should be vacated on that ground alone.

The Injunction will inflict substantial financial losses on Enel—tens of millions just to dismantle the entire 150 MW wind generation facility and altogether hundreds of millions in total economic loss.  2-App.397 ¶ 2.[5]  That total includes not

---

[5] In connection with the parties' motions for summary judgment, Enel submitted a declaration from a senior executive overseeing its wind projects, which estimated dismantling costs to be $22 million and other economic costs, including lost revenues and payments that would have to be made to certain contractual counterparties (including tax partners and the surface lessors) should the Project be decommissioned early, to be well over $230 million.  *See* 2-App.397–403.  In the course of proceedings following the final judgment, including in connection with Enel's request for a stay pending appeal, Enel commissioned and submitted an

just the cost of dismantling, removing and disposing of the Project's 84 wind turbines, but also the loss of substantial revenues for the life of the Project and liquidated damages and other payments that will be owed to third parties under various contracts associated with the Project. *Id.* Such costs to Enel are immense and irreversible, as is the loss of the Osage Wind Project itself.

On the other side of the ledger, OMC has not and will not suffer *any* loss of revenue or other opportunity due to the continued use of extracted minerals already being passively used as backfill, the only basis for the continuing trespass found by the district court. The district court has found that the mere presence and continued operation of the Project in and above the Mineral Estate "does not constitute a continuing trespass" and will not inhibit OMC's future development of the Mineral Estate. Add.26–27. And the district court has already awarded OMC damages to remedy Enel's simple trespass and conversion and compensate OMC for the minerals extracted from the Mineral Estate.

---

updated cost analysis in which the total estimated cost was lower than the 2021 estimate due to a number of factors, but still more than $160 million dollars. *See United States v. Osage Wind, LLC*, Case No. 4:14-CV-00704-JCG-JFJ, Dkt. 520-1 ¶¶ 5–13; *see also United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) (explaining that this Court may "take judicial notice of publicly-filed records in [this] court and certain other courts concerning matters that bear directly upon the disposition of the case at hand").

Moreover, as discussed above, the continued presence of the Osage Wind Project does *nothing* to implicate, let alone infringe, "Osage sovereignty." *See supra* at pp. 33–37. The Osage Wind Project rests on land lawfully leased from the surface owners, OMC never had any ability to exclude Enel or prevent the Project's construction, and the harms to OMC's proprietary interest in the minerals are being fully compensated by money damages. *Id.*

The balance of harms therefore tips decidedly against the Injunction ordered by the district court. *See Sierra Club, Inc. v. Bostick*, 539 Fed. App'x 885, 889–90 (10th Cir. 2013) (affirming denial of injunction against pipeline where TransCanada Corporation and its project company would lose "hundreds of thousands of dollars each day," which "outweigh[ed]" plaintiff's "threatened environmental injuries"); *see also Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) (concluding balance of harms weighed against injunction where "oil company petitioners had committed approximately $70 million to exploration . . . which they would have lost . . . had exploration been enjoined"); *Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transp.*, 843 F.3d 886, 914 (10th Cir. 2016) (affirming denial of injunction where defendant "would lose $7,500 per day in contractual damages if an injunction were issued"); *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 767–68 (10th Cir. 2014) (concluding balance of harms weighed against injunction where defendants "would suffer . . . construction

41

related delays if an injunction issues . . . [with] the probable monthly cost of delaying the Project at $745,592"); *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1086 (10th Cir. 2004) (concluding balance of harms tipped against injunction where the defendant had "already invested a substantial amount of money in [the] construction project" and "permanent termination of the project would cost $11,537,000").

## C.   The Injunction Will Adversely Affect the Public Interest.

Finally, the Injunction will harm very real public interests, including by adversely and irreversibly impacting Osage County, two local school districts, landowners, and individuals employed by the Osage Wind Project.

Two local public-school districts receive millions of dollars in annual payments attributable to taxes paid by Enel because of the Osage Wind Project, a significant source of revenue for both districts. 3-App.811–18. The Osage Wind Project also generates lease payments to local landowners and provides full-time, well-paying employment to individuals whose jobs would be lost if the Project were removed. 2-App.397 ¶¶ 2, 3; 4-App.1030 ¶ 5; *see Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009) (holding that "public interest in maintaining nineteen jobs . . . weighed against an injunction"). And it provides a stable source of clean, renewable energy to more than 50,000 homes. 2-App.397 ¶ 7; 4-App.1030 ¶ 4; *see Utah Env't Cong. v. U.S. Bureau of Land Mgmt.*, 119 F. App'x

218, 220 (10th Cir. 2004) (holding public interest would be adversely affected where injunction "would prevent the mining of enough coal to provide electricity to nearly a half million households for an entire year"); *see also W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (affirming denial of injunction against solar project on similar grounds); *Fallon Paiute-Shoshone Tribe v. U.S. Dep't of the Interior*, 2022 WL 3031583, at \*4 (9th Cir. Aug. 1, 2022) (affirming denial of injunctive relief against geothermal project, recognizing "the public interest in 'a source of carbon-free baseload electricity,' royalty returns to [landowners], and state and local taxes which would be collected as a result of the [p]roject").

Each of these public benefits will be lost if the Osage Wind Project is destroyed. Moreover, ejectment will have negative environmental consequences, as it will generate voluminous waste material to be deposited in a landfill (more so than a less destructive, more narrowly tailored option). Proper consideration of the public interest weighs heavily against the Injunction.

## IV.    The Injunction Is Not Narrowly Tailored to Remedy the Harm Found.

Even if injunctive relief were warranted, requiring the complete destruction of the Osage Wind Project is impermissibly overbroad. A permanent injunction is an extraordinary remedy that must be "narrowly tailored" to the specific harm which gives rise to the order. *Garrison*, 287 F.3d at 962. An injunction is necessarily overbroad when it exceeds the extent of the violation. *Id.* at 962–63.

43

Here, the Injunction is anything but "narrowly tailored," and far exceeds the violation found. If nothing else, the district court's decision was clear about what did, and did *not*, constitute "continuing trespass." *See supra* at pp. 19–20. Relying on this Court's 2017 Decision, the district court rightly rejected the assertion that the presence of the wind towers "below ground level" or the "passive support" provided by the surrounding Mineral Estate constituted a continuing trespass. Add.26, 31. Instead, its finding of liability was based solely on the finding that the wind turbines "continue to receive the benefit of th[e] backfill" created from minerals extracted, sorted, and crushed in 2014. Add.32–33. But the Injunction—which requires Enel to do far more than simply halt its use of the backfill, and ejects Enel from land OMC does not own and on which Enel is not trespassing—goes well beyond remedying that specific harm.

Enel previously proposed a far more "narrowly tailored" remedy whereby it would remove the offending backfill, replace it with alternate material sourced from quarries offsite, and restore the surrounding lands. 4-App.1022–25, 1035–37. Enel would then return the converted minerals to OMC at a location of its choosing. 4-App.1025. That approach would remediate the harm found by the district court— continued use of the backfill to support the wind turbines—without also requiring the destruction of aspects of the Osage Wind Project that this Court already decided are not wrongful. So even if the district court's findings of continuing trespass and

44

irreparable harm could withstand scrutiny, they still cannot justify the facially

overbroad Injunction. *See Garrison*, 287 F.3d at 962.[6]

## V. The District Court Erred in Awarding OMC and the United States Attorneys' Fees and Costs.

Finally, the district court also erred in departing from the "American Rule"

and awarding OMC and the United States attorneys' fees and costs based on an

Oklahoma statute, 12 Okla. Stat. § 940(A), that does not authorize any such award

in this case.

Under the American Rule—the well-settled presumption that each party pays

its own fees and litigation costs—attorneys' fees and costs are not recoverable absent

explicit statutory authorization or contractual provision. *Alyeska Pipeline Servs. Co.*

*v. Wilderness Soc'y*, 421 U.S. 240, 260–63 (1975) (rejecting judicial deviation from

the traditional rule without Congressional authorization); *see also Peter v. Nantkwest,*

*Inc.*, 589 U.S. 23, 370 (2019) ("Each litigant pays his own attorney's fees, win or

lose, unless a statute or contract provides otherwise."). The American Rule is

"firmly established in Oklahoma," where it prohibits fee shifting "in the absence of

a specific statute or a contractual provision allowing the recovery of such fees."

---

[6] Notably, during oral argument on the parties' summary judgment motions, counsel for the United States repeatedly conceded that "pull[ing] the backfill out and return[ing] it to the OMC" would fully remedy the continuing trespass alleged. *See* 7-App.1764–65.

*Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 178–79 (Okla. 2000);
*see Combs v. Shelter Mut. Ins. Co.*, 551 F.3d 991, 1001 (10th Cir. 2008) ("Oklahoma
strictly adheres to the American rule concerning attorney's fees." (internal quotation
omitted)); *see also Whittington v. Durant H.M.A., LLC*, 521 P.3d 1281, 1287 (Okla.
2022) ("[E]xceptions to the American Rule are narrowly defined.").

Throughout this litigation and in the parties' Pre-Trial Order, OMC and the
United States claimed an entitlement to fees under just one statute, 23 Okla. Stat.
§ 64, which permits successful parties to recover certain costs incurred in connection
with the recovery of converted property. 4-App.1061–62. But after Enel pointed
out that this statute does not authorize fee shifting under settled Oklahoma law, *see*
4-App.1103–04; Add.117–18 (confirming that recovery of attorneys' fees not
available under 23 Okla. Stat. § 64), OMC and the United States improperly
jettisoned the Pre-Trial Order and asserted a smattering of alternate bases for fee
shifting not previously invoked. That alone precludes recovery under any of these
new theories. *See R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d
1306, 1308 (10th Cir. 1987) ("A pretrial order . . . is the result of a process in which
counsel define the issues of fact and law to be decided at trial, and it binds counsel
to that definition.").

The district court rejected all but one of those new theories, but ultimately
erroneously awarded fees under 12 Okla. Stat. § 940(A). Add.120. Section 940(A)

provides for the recovery of attorneys' fees only in a "civil action to recover damages for the negligent or willful injury to property." 12 Okla. Stat. § 940(A). The district court originally and correctly determined pre-trial that Section 940(A) could not apply here because OMC and the United States "have not claimed damages based on physical injury to the mineral estate." 4-App.1104 (citing *Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1268 (10th Cir. 2007)). But after trial, the court inexplicably reversed course. Citing "general reference to damages resulting from . . . trespass and conversion" in the amended complaint, as well as a damage award "based on the value of minerals removed from the mineral estate," the district court concluded that the "conversion claim"—but not the trespass claim—"is sufficient under Section 940(A)" to justify fee-shifting. Add.119–20.

That is wrong. Section 940(A) is a narrow statute that "does not apply to all property rights, but is strictly construed to apply to claims for *physical injury* to tangible property." *Parks v. Am. Warrior, Inc.*, 44 F.3d 889, 892 (10th Cir. 1995) (emphasis added); *see Woods Petroleum Corp. v. Delhi Gas Pipeline Corp.*, 700 P.2d 1011, 1012–13 (Okla. 1984) (holding that Section 940(A) "contemplate[s] only those actions for damages for the negligent or willful *physical* injury to property," and not merely "*damage to property rights*"); *see also Turner Roofing & Sheet Metal, Inc. v. Stapleton*, 872 P.2d 926, 927–28 (Okla. 1994) (discussing *Woods*). As such, Oklahoma courts have categorically held that Section 940(A) "*does not apply* in

47

conversion actions." *Stites v. Duit Const. Co.*, 992 P.2d 913, 916 (Okla. App. Ct. 1999) (emphasis added); *see Pelican Prod. Corp. v. Wishbone Oil & Gas, Inc.*, 746 P.2d 209, 212 (Okla. Ct. App. 1987) (affirming denial of fee application by conversion plaintiff); *see also Woods*, 700 P.2d at 1013 (reversing award of fees). That is because conversion stems from the "unauthorized dominion over property, rather than a negligent or willful injury" to that property, making conversion "a tort not contemplated by § 940(A)." *Nat'l Livestock Credit Corp. v. Schultz*, 653 P.2d 1243, 1248 (Okla. Ct. App. 1982) (affirming denial of fees under Section 940(A) to conversion plaintiff). The district court ignored this settled Oklahoma precedent.

This Court's decision in *Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256 (10th Cir. 2007), though not involving a conversion claim, is also instructive. There, a plaintiff successfully sued a defendant for allowing cattle to graze on his property without authorization and sought fees under Section 940(A). *Id.* at 1259–60. This Court, recognizing that "a prevailing party must recover actual damages for physical injury to property to recover attorney's fees under § 940(A)," held that the plaintiff was not entitled to fees because he "only recovered damages for lost profits" and not for any physical property damage caused by the cattle. *Id.* at 1268–69.

The Oklahoma cases cited above—which strongly adhere to the American Rule—are in accord. In *Woods*, for example, a buyer of natural gas negligently under-calculated the amount of gas flowing into its pipeline, causing economic harm

to the seller. 700 P.2d at 1012. The seller sued, was awarded damages based on the volume of gas that had flowed to the buyer, and as the prevailing party sought attorneys' fees under Section 940(A). *Id.* The Oklahoma Supreme Court held that Section 940(A) could not apply, because the damages did not arise from any physical injury to property. *Id.* at 1013. Likewise, in *Schultz*, the court rejected Section 940(A)'s application to an action arising from the unauthorized sale of cattle, reasoning that Section 940(A) "is restricted to actions seeking damages for the physical destruction of tangible property," and that "the thrust of [plaintiff's] complaint [was] not that the defendants injured the cattle, but that in ignoring [plaintiff's] interest in the cattle, defendants exercised unauthorized dominion over them." *Schultz*, 653 P.2d at 1248.

So too here. OMC has been awarded conversion damages equivalent to the "royalty amount for the minerals extracted" that OMC would have received under a mining lease, *not* on the basis of any physical damage to the Mineral Estate itself. Add.85–92; *see Weyerhaeuser*, 510 F.3d at 1268 ("[A] party must recover actual damages for physical injury to property to recover attorney's fees under § 940(A)."); *see also* 4-App.1104 (Section 940(A) "does not provide an avenue for recovery of attorneys' fees in this case because [OMC and the United States] have not claimed damages based on physical injury to the mineral estate."). Because Section 940(A)

49

cannot apply in these circumstances under settled law, the district court's award of fees and costs under that provision must be reversed.

## CONCLUSION

For all these reasons, the Court should reverse the district court's grant of summary judgment to OMC and the United States on their continuing trespass claim, vacate the Injunction, render judgment in favor of Enel on both the continuing trespass claim and the request for injunctive relief, and reverse the district court's award of attorneys' fees and costs.

Dated: April 16, 2025                Respectfully submitted,

                                     /s/ Miguel A. Estrada

Bryston C. Gallegos                  Miguel A. Estrada
Gibson, Dunn & Crutcher LLP              *Counsel of Record*
2001 Ross Avenue, Suite 2100         Peter M. Wade
Dallas, Texas 75201                  Gibson, Dunn & Crutcher LLP
(214) 698-3100                       1050 Connecticut Avenue, NW
bgallegos@gibsondunn.com             Washington, D.C. 20036
                                     (202) 955-8257
Lloyd S. Marshall                    mestrada@gibsondunn.com
Gibson, Dunn & Crutcher LLP          pwade@gibsondunn.com
811 Main Street, Suite 3000
Houston, Texas 77002
(346) 718-6600
lmarshall@gibsondunn.com

Ryan A. Ray, OBA # 22281
Norman Wohlgemuth, LLP
3200 Mid-Continent Tower
401 South Boston Avenue
Tulsa, Oklahoma 74103
(918) 583-7571
(918) 584-7846 (facsimile)
RRay@NWLawOK.com

*Counsel for Appellants Osage Wind, LLC; Enel Kansas, LLC; and Enel Green Power North America, Inc.*

## **STATEMENT REGARDING ORAL ARGUMENT**

Appellants respectfully request oral argument.  This case presents important questions arising under both state and federal law, and concerns an injunction that imposes substantial, irreparable harm on Appellants and the broader public.  Oral argument will aid the Court's decision-making process by permitting Appellants to properly set forth the issues presented by this appeal and allowing the Court to examine the issues thoroughly.

## **CERTIFICATE OF DIGITAL SUBMISSION**

Pursuant to Section II(J) of the Court's CM/ECF User's Manual, the undersigned certifies that: (1) this document contains no information requiring privacy redactions; (2) hard copies, if required to be submitted by the Court, will be exact copies of the ECF filing; and (3) the ECF submission was scanned for viruses and is virus free.

*/s/ Miguel A. Estrada*

Miguel A. Estrada
Counsel for Appellants

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. of App. P. 32(a)(7)(b) because it contains 11,742 words, excluding parts of the brief exempted by Fed. R. of App. P. 32(f) and 10th Cir. R. 32(B), as indicated by the word-processing program used to prepare this brief.

The brief complies with the typeface requirements of Fed. R. of App. P. 32(a)(5) and the type-style requirements of Fed. R. of App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman, a proportionally spaced font.

*/s/ Miguel A. Estrada*

Miguel A. Estrada
Counsel for Appellants

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2025, I electronically transmitted the foregoing Appellants' Opening Brief, which was electronically filed with the Clerk of the Tenth Circuit Court via the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Miguel A. Estrada*
Miguel A. Estrada
Counsel for Appellants

## **ADDENDUM PURSUANT TO RULE 28.2(A)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**and**

**OSAGE MINERALS COUNCIL,**

    **Plaintiff-Intervenor,**

**v.**

**OSAGE WIND, LLC, ENEL KANSAS, LLC, AND ENEL GREEN POWER NORTH AMERICA, INC.,**

    **Defendants.**

**Court No. 4:14-cv-00704-JCG-JFJ**

### <u>OPINION AND ORDER</u>

The United States and the Osage Nation have litigated against the private developers of a wind turbine farm in Osage County, Oklahoma for more than ten years. For the reasons discussed below, the Court will award permanent injunctive relief to the Osage Nation and the United States in the form of ejectment of the wind turbine farm for continuing trespass. The Court will hold a damages trial to assess the amount of monetary damages for trespass and conversion.

# Add. 1

The U.S. Court of Appeals for the Tenth Circuit ("Tenth Circuit Court of Appeals") determined that construction of the wind farm project constituted mining and required a lease under 25 C.F.R. §§ 211 and 214.  United States v. Osage Wind, LLC, 871 F.3d 1078 (10th Cir. 2017).  The developers failed to acquire a mining lease during or after construction, as well as after issuance of the Tenth Circuit Court of Appeals' decision holding that a mining lease was required. This case presents questions of whether the wind farm developers' continued lack of a lease and presence of the wind farm constitute continuing trespass and whether permanent injunctive relief and damages are appropriate.

Plaintiff United States ("Plaintiff") asserts five counts in its Amended Complaint: (1) violation of 25 C.F.R. § 211; (2) violation of 25 C.F.R. § 214; (3) trespass; (4) continuing trespass; and (5) conversion.  Pl.'s Am. Compl. [Doc. 20].  Plaintiff-Intervenor Osage Mineral Council ("Plaintiff-Intervenor") alleges the same first four counts but does not raise a claim for conversion in its Amended Complaint in Intervention.  Pl.-Interv.'s Am. Compl. Interv. ("Pl.-Interv.'s Am. Compl.") [Doc. 164].

Before the Court are motions for summary judgment filed by Plaintiff, Plaintiff-Intervenor, and Defendants Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc. (collectively, "Defendants").  Pl.-Interv.'s Mot. Summary J. [Doc. 294]; Defs.' Mot. Part. Summary J. Opening Br. ("Defs.'

2

**Add. 2**

Br.") [Doc. 297]; Pl.'s Mot. Summary J. ("Pl.'s Br.") [Doc. 300].  Plaintiff and

Plaintiff-Intervenor ask the Court to declare that Defendants violated 25 C.F.R.

§§ 211 and 214; find Defendants jointly and severally liable for damages for

tortious trespass and conversion; award permanent injunctive relief in the form of

ejectment of Defendants' wind turbines, or alternatively, monetary damages, for

Defendants' continuing trespass; find that Defendants did not reasonably rely on

the advice of counsel in good faith to mitigate damages; and award attorneys' fees.

Pl.-Interv.'s Mot. Summary J.; Pl.-Interv.'s Br. Supp. Pl.-Interv.'s Mot. Summary

J. ("Pl.-Interv.'s Br.") [Doc. 294-1]; Pl.'s Br.  Defendants' Motion for Partial

Summary Judgment asks the Court to deny the claim of continuing trespass and not

order removal of the wind turbines.  Defs.' Br.

     Also before the Court are Plaintiff's Motion to Strike the Testimony of

Defendants' Expert Witness Kimberlee Centera ("Plaintiff's Motion to Strike" or

"Pl.'s Mot. Strike") and Defendants' Motion to Exclude the Testimony of

Plaintiff's Expert Witness Steven J. Hazel and Opening Brief in Support

("Defendants' Motion to Exclude" or "Defs.' Mot. Exclude").  Pl.'s Mot. Strike

[Doc. 290]; Defs.' Mot. Exclude [Doc. 337].

     Oral argument was held on September 20, 2023.  Min. Proceeding (Sept. 20,

2023) [Doc. 379].  For the following reasons, the Court grants in part and denies in

part Plaintiff's Motion for Summary Judgment and Plaintiff-Intervenor's Motion

# Add. 3

for Summary Judgment and concludes that Defendants have violated 25 C.F.R. §§ 211 and 214 and committed trespass, conversion, and continuing trespass. The Court concludes that declaratory relief, monetary damages, and injunctive relief are appropriate. The Court denies Defendants' Motion for Partial Summary Judgment and defers judgment on Plaintiff's Motion to Strike and Defendants' Motion to Exclude.

## BACKGROUND

### I.     Legal Background

Osage County incorporates the area designated by Congress as the Indian reservation for the Osage Nation. Okla. Const. art. XVII, § 8; Act of June 5, 1872, ch. 310, 17 Stat. 228 (1872). Congress severed the surface estate from the mineral estate in Osage County in 1906. Act of June 28, 1906 ("Osage Act") §§ 2–3, ch. 3572, 34 Stat. 539, 540–44 (1906). Under the Osage Act, the surface estate was allotted to members of the Osage Nation. Id. § 2, 34 Stat. at 540–43. The mineral estate was not allotted to individuals but was reserved for the benefit of the Osage Nation. Id. § 3, 34 Stat. at 543–44. The Osage Act authorized the Osage Nation, with the approval of the Secretary of the Interior, to issue "leases for all oil, gas, and other minerals" in the mineral estate. Id.

25 C.F.R. Part 214 regulates the leasing of resources other than oil and gas in the mineral estate. 25 C.F.R. § 214. Section 214.7 provides that "[n]o mining

# Add. 4

or work of any nature will be permitted upon any tract of land until a lease

covering such tract shall have been approved by the Secretary of the Interior and

delivered to the lessee." Id. § 214.7.  The term "mining" is defined under 25

C.F.R. § 211.3 as:

> the science, technique, and business of mineral development including,
> but not limited to: opencast work, underground work, and in-situ
> leaching directed to severance and treatment of minerals; Provided,
> when sand, gravel, pumice, cinders, granite, building stone, limestone,
> clay or silt is the subject mineral, an enterprise is considered "mining"
> only if the extraction of such a mineral exceeds 5,000 cubic yards in
> any given year.

Id. § 211.3.  The Tenth Circuit Court of Appeals held that altering the natural size

and shape of rocks in order to use the rocks for structural purposes in the

construction of wind turbines constituted mineral development and mining under

sections 211.3 and 214.7, requiring a lease.  Osage Wind, 871 F.3d at 1091–92.

## II.  Factual Background

Beginning in 2010, Defendants leased approximately 8,400 acres of surface

rights in Osage County, Oklahoma on which to construct a commercial wind farm.

Id. at 1083.  The wind farm involved the construction of 84 wind turbines,

underground electrical lines, an overhead transmission line, meteorological towers,

and access roads.  Id.  The wind towers were secured into the ground with

reinforced concrete foundations.  Id.  In 2011, Plaintiff and Plaintiff-Intervenor

# Add. 5

expressed concern that the project would block access to the mineral estate and interfere with oil and gas production.  Id. at 1083.

The Osage Nation filed a lawsuit in October 2011 to halt the construction of the proposed wind farm, alleging that the project unlawfully deprived the Osage Nation of access to and the right to develop the mineral estate.  Compl. [Doc. 2], Osage Nation v. Wind Capital Grp., LLC, Case No. 11-00643.  The Osage Nation's claims were denied and the case was dismissed on its merits.  Osage Nation v. Wind Capital Grp., LLC ("Wind Capital Grp."), 2011 U.S. Dist. LEXIS 146407 (N.D. Okla. Dec. 20, 2011).

Defendants' construction on the wind towers began in October 2013 with site preparation, and excavation work began in September 2014.  Osage Wind, 871 F.3d at 1083.  Defendants excavated holes to accommodate cement foundations measuring 10 feet by 60 feet for each tower.  Id.  Smaller excavated rocks were crushed and used as backfill for the cement foundations.  Id.  Larger rocks were positioned near the holes from which they were removed.  Id.

Plaintiff United States commenced this action on November 21, 2014, seeking a declaratory judgment that Defendants engaged in unauthorized mining and excavation in the Osage Mineral Estate without first obtaining a lease, permanent injunctive relief requiring the cessation of Defendants' activities, and monetary damages.  Pl.'s Compl. [Doc. 2]; Pl.'s Summons [Doc. 3].  Plaintiff later

# Add. 6

amended its Complaint to add claims of trespass, continuing trespass, and conversion based on Defendants' extraction of minerals during the construction of the wind tower project.  Pl.'s Am. Compl.  Plaintiff moved for partial summary judgment on its claims for declaratory relief, asking the Court to rule that Defendants' excavation of minerals during the construction of the wind towers required a lease for mining activities under 25 C.F.R. §§ 211 and 214.  Pl.'s Mot. Part. Summary J. Counts I and II Am. Compl. Request Expedited Consideration [Doc. 24].  Defendants also moved for summary judgment on Plaintiff's claims. Defs.' Mot. Dismiss Summary J. Opening Br. Supp. [Doc. 26].  The Court granted Defendants' summary judgment motion, holding that Defendants' activities did not constitute mining under 25 C.F.R. § 214 and that a lease was not required.  United States v. Osage Wind, LLC, 2015 U.S. Dist. LEXIS 132480 (N.D. Okla. Sept. 30, 2015), rev'd, 871 F.3d 1078 (10th Cir. 2017).

Plaintiff-Intervenor Osage Mineral Council appealed the District Court's opinion dismissing Plaintiff's claims.  Pl.-Interv.'s Notice Appeal [Doc. 49].  The Tenth Circuit Court of Appeals reversed the District Court's order, finding that Defendants' activities constituted mining and that a lease was required under 25 C.F.R. § 214.7.  Osage Wind, 871 F.3d at 1093.

On remand, Plaintiff-Intervenor filed Plaintiff-Intervenor's Motion for Summary Judgment.  Pl.-Interv.'s Mot. Summary J.  Defendants filed Defendants'

Add. 7

Motion for Partial Summary Judgment and Opening Brief.  Defs.' Br.  Plaintiff

filed Plaintiff's Motion for Summary Judgment.  Pl.'s Br.  Each of the three

motions for summary judgment included a statement of undisputed facts.  Pl.-

Interv.'s Br. at 1–10; Defs.' Br. at 9–11; Pl.'s Br. at 1–3.

Upon review of the Parties' statements of material facts and supporting

exhibits, the Court finds the following undisputed material facts:

The Osage Nation is a federally recognized tribal nation.  Pl.-Interv.'s Br. at

1; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 1 [Doc. 324].  Plaintiff-Intervenor

Osage Mineral Council is an independent agency within the government of the

Osage Nation "established for the sole purpose of continuing its previous duties to

administer and develop the Osage Mineral Estate in accordance with the [Osage

Act], as amended, with no legislative authority for the Osage Nation government."

Pl.-Interv.'s Br. at 1; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 1; Osage

Nation Const. art. XV, § 4.  Plaintiff United States acts as trustee for the Osage

Mineral Estate and holds the Osage Mineral Estate in trust for the benefit of the

Osage Nation.  Pl.'s Br. at 1; Defs.' Resp. Pl.'s Mot Summary J. at 2 [Doc. 321];

Pl.-Interv.'s Br. at 1; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 1; Osage Act

§ 3, 34 Stat. at 543–44.  Defendant Enel Kansas is a holding company, wholly-

owned and controlled by Defendant Enel Green Power North America, Inc.  Pl.-

Interv.'s Br. at 4; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 5.

8

**Add. 8**

Pursuant to six lease agreements, Defendants leased 8,400 acres from surface estate owners in Osage County, Oklahoma. Defs.' Resp. Pl.'s Mot. Summary J. at 6; Pl.-Interv.'s Reply Mot. Summary J. at 4 [Doc. 342]. Defendants leased only surface rights in 2010 for the construction of the wind farm. Pl.'s Br. at 1; Defs.' Resp. Pl.'s Mot. Summary J. at 2. No lease was obtained under 25 C.F.R. § 214.7 for mining activities. Pl.-Interv.'s Br. at 2–3; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 2–5.

Defendants owned the assets that constituted the wind farm in 2013 and 2014. Pl.-Interv.'s Br. at 4–5; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 6. TradeWind Energy purchased Wind Capital Group's ownership interest in Osage Wind, LLC in August 2013. Pl.-Interv.'s Br. at 4; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 5. The 2013 Membership Interest Purchase Agreement between TradeWind Energy and Wind Capital Group included a provision that excluded "Native American Tribes" from the definition of "Governmental Authorities." Pl.-Interv.'s Br. at 6; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 8. Enel Kansas purchased TradeWind Energy's ownership interest in Osage Wind in September 2014. Pl.-Interv.'s Br. at 5; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 7.

Defendants constructed 84 wind turbines on the leased surface estate. See Defs.' Br. at 9; Pl.'s Resp. Defs.' Mot. Summary J. at 1 [Doc. 319]; Pl.-Interv.'s Resp. Defs.' Mot. Summary J. at 4 [Doc. 316]. When constructing the wind

**Add. 9**

turbines, Defendants excavated sand, soil, and rock while digging holes for wind turbine foundations.  Defs.' Br. at 10; Pl.'s Resp. Defs.' Mot. Summary J. at 2; Pl.-Interv.'s Resp. Defs.' Mot. Summary J. at 4.  Pieces of excavated rock were crushed into smaller sizes and used as backfill to support the wind turbines.  Defs.' Br. at 10; Pl.'s Resp. Defs.' Mot. Summary J. at 4; Pl.-Interv.'s Resp. Defs.' Mot. Summary J. at 5.  None of the soil, sand, or rock excavated by Defendants during construction was sold.  Defs.' Br. at 10; Defs.' Resp. Pl.'s Mot. Summary J. at 4; Defs.' Resp. Pl-Interv.'s Mot. Summary J. at 13; Pl.'s Reply Mot. Summary J. at 4 [Doc. 345]; Pl.-Interv.'s Reply Mot. Summary J. at 3; Pl.'s Resp. Defs.' Mot. Summary J. at 3; Pl.-Interv.'s Resp. Defs.' Mot. Summary J. at 5.  Defendants did not purchase other minerals for use as backfill from offsite sellers.  Pl.'s Br. at 2; Defs.' Resp. Pl.'s Mot Summary J. at 3–4; Pl.-Interv.'s Br. at 9; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 10.  Defendants completed all excavation work and rock crushing in 2014.  Defs.' Br. at 10; Pl.-Interv.'s Resp. Defs.' Mot. Summary J. at 6; Defs.' Resp. Pl.'s Mot. Summary J. at 5; Pl.'s Reply Mot. Summary J. at 4; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 13; Pl.-Interv.'s Reply Mot. Summary J. at 3.

In October 2014, Robin Phillips, Superintendent of the Osage Agency, notified Enel Green Power North America that a permit was required for excavation activities related to the wind farm project and requested that excavation

Add. 10

of minerals should cease until a permit was obtained.  Pl.-Interv.'s Br. at 5–6;

Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 7; see also Pl.-Interv.'s Mot.

Summary J. at Ex. 15 [Doc. 294-10].

The wind farm entered commercial operation in 2015.  Defs.' Br. at 10; Pl.'s

Resp. Defs.' Mot. Summary J. at 3; Pl.-Interv.'s Resp. Defs.' Mot. Summary J. at

6; Defs.' Resp. Pl.'s Mot. Summary J. at 5; Defs.' Resp. Pl.-Interv.'s Mot.

Summary J. at 13; Pl.'s Reply Mot. Summary J. at 4; Pl.-Interv.'s Reply Mot.

Summary J. at 3.  The wind farm employs 10 people full-time as engineers and

technicians.  Defs.' Resp. Pl.'s Mot. Summary J. at 6; Pl.-Interv.'s Reply. Mot.

Summary. J. at 4; see Pl.'s Reply Mot. Summary J. at 6.  Two Osage County

schools receive tax revenue from the wind farm project.  Defs.' Resp. Pl.-Interv.'s

Mot. Summary J. at 14; Pl.-Interv.'s Reply at 4; Defs.' Resp. Pl.'s Mot. Summary

J. at 6; Pl.'s Reply Mot. Summary J. at 5.

**LEGAL STANDARD**

Summary judgment is appropriate if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  In determining whether a genuine issue of material fact exists, the

Court considers "the record, including depositions, documents, electronically

stored information, affidavits or declarations, stipulations (including those made

for purposes of the motion only), admissions, interrogatory answers, or other

**Add. 11**

materials." Fed. R. Civ. P. 56(c).  The essential inquiry for the Court in ruling on a

motion for summary judgment is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S.

242 (1986).  The Court views all evidence and draws all reasonable inferences in

the light most favorable to the non-moving party. Matsushita Elec. Indus., Co. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

### I.     Dismissal of Enel Kansas

Defendants concede liability on the claims of trespass and conversion as to

Defendants Osage Wind and Enel Green Power North America, but not for Enel

Kansas.  Defs.' Resp. Pl.'s Mot. Summary J. at 1; Defs.' Resp. Pl.-Interv.'s Mot.

Summary J. at 1, 25.  Defendants argue that Enel Kansas is a separate holding

company that neither owned nor constructed the wind farm project, and that

liability for Enel Kansas has not been established.  Defs.' Resp. Pl.'s Mot.

Summary J. at 1; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 1, 25.  Although

Defendants have not filed a motion to dismiss Enel Kansas from this suit, they

asserted at oral argument that the Court could dismiss Enel Kansas from this case

sua sponte.  See Transcript of Oral Argument ("Tr.") at. 162–63 [Doc. 380].  The

only attempt made by Defendants to challenge Enel Kansas' involvement in this

**Add. 12**

case was a footnote in Defendants' response to Plaintiff's Motion for Summary

Judgment and a single paragraph in Defendants' Response to Plaintiff-Intervenor's

Motion for Summary Judgment.  Defs.' Resp. Pl.'s Mot. Summary J. at 2 n.1

("Defendants incorporate by reference Part V of their response to [Plaintiff-

Intervenor's] summary judgment motion[], to further explain why the Motion

should be denied as to Enel [Kansas]."); Defs.' Resp. Pl.-Interv.'s Mot. Summary

J. at 25.

The Court observes that Enel Kansas was named as a defendant when this

case was initially filed in 2014.  See Pl.'s Compl.  Over the life of this case, a

multitude of filings were made by the Parties in the District Court, the Tenth

Circuit Court of Appeals, and the U.S. Supreme Court.  The three Defendants have

shared the same counsel during all phases of this case.  At no time during nearly

ten years of litigation did Defendants file a motion to dismiss Enel Kansas.

Defendants did not formally challenge Enel Kansas' status as a party to the

litigation before the District Court issued its earlier opinion.  Nor did they formally

challenge Enel Kansas' status on appeal.  The Tenth Circuit Court of Appeals

considered the activities of Osage Wind, LLC, Enel Kansas, LLC, and Green

Power North America, Inc. together as one entity, noting that "Osage Wind, LLC

is wholly owned by Defendant Enel Kansas, LLC, which is wholly owned by

Defendant Enel Green Power North America, Inc."  Osage Wind, 871 F.3d at 1081

**Add. 13**

n.1.  The appellate court described Defendants' activities as one entity and never

discussed Enel Kansas taking actions independently from the other Defendants.

Enel Kansas has participated in every stage of this case for almost a decade,

including filing pleadings and responding to and issuing discovery requests

seeking evidence.  Notably, Plaintiff Osage Mineral Council argued that:

> The clearest binding admission [that Defendants acted as one] was in
> their own petition for a writ of certiorari to the United States Supreme
> Court: "Petitioners [Osage Wind, LLC, *Enel Kansas, LLC* and Enel
> Green Power North American, Inc.] are business entities that have
> built and are operating a wind energy project in Osage County,
> Oklahoma."  This is a binding admission.

Pl.-Interv.'s Supp. Resp. Br. at 4 [Doc. 384] (alteration and emphasis in original)

(citing Pet. for a Writ of Certiorari ("Cert. Pet."), <u>Osage Wind, LLC v. United

States</u>, Case No. 17-1237 (S. Ct. 2017).  In addition, the Court takes judicial notice

of another statement in Defendants' petition for a writ of certiorari, when

Defendants informed the U.S. Supreme Court that, "[b]y 2014, [P]etitioners had

initiated excavation work for the planned wind turbines."  Cert. Pet. at 1 (in which

"Petitioners" were identified as Osage Wind, LLC, Enel Kansas, LLC, and Enel

Green Power North America, LLC).  The Court agrees with Plaintiff-Intervenor's

argument that statements made in briefs are to be taken as binding admissions.  <u>See</u>

Pl.-Interv.'s Supp. Resp. Br. at 4 (citing 10A CHARLES ALAN WRIGHT & ARTHUR

R. MILLER, FEDERAL PRACTICE & PROCEDURE CIVIL § 2723 (4th ed. 1990); 4

FRANCIS C. AMENDOLA ET AL., C.J.S. APPEAL AND ERROR § 746 (2023)).  In

**Add. 14**

Defendants' pleadings filed with the U.S. Supreme Court, Enel Kansas was never identified as an inappropriate party to the case, and in fact was described as a business entity that had built and operated the subject wind farm and had initiated excavation work for the planned wind turbines.  Cert. Pet. at 3.

In summary, the Court concludes that it would be improper and unfair to the opposing Parties if the Court were to sever and dismiss Enel Kansas after nearly ten years of litigation based on nothing more than an unsupported argument raised in a footnote and one paragraph in Defendants' response briefs at summary judgment.  An important function of summary judgment is to eliminate factually unsupported claims.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986).  Unsupported conclusory allegations, however, do not create an issue of fact.  Salehpoor v. Shahinpoor, 358 F.3d 782, 789 (10th Cir. 2004).

Enel Kansas' allegation that it never made decisions regarding the construction of the wind farm is unsupported by evidence, and is simply inconsistent with the admissions that it made to the U.S. Supreme Court in its petition for a writ of certiorari that it built and operates a wind farm, and that it engaged in excavation work for the wind turbines.  The unsupported allegations, when compared to Enel Kansas' contrary statements in pleadings filed with the U.S. Supreme Court, do not rise to the level of a genuine dispute of material fact.

# Add. 15

In light of the admissions in Defendants' petition for a writ of certiorari to the U.S. Supreme Court that Petitioners Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc. are business entities that have built and are operating a wind energy project in Osage County; Defendants' engagement in excavation work for the wind farm; and Defendants' failure to file any motions to dismiss Enel Kansas from the case, weighed against the mere allegation at this late stage of litigation that Enel Kansas should not be held liable as a defendant in this case, the Court finds that the facts support the conclusion that all three Defendants acted as one.

Plaintiff-Intervenor argues that Defendants are jointly and severally liable for all damages in this case.  Pl.-Interv.'s Am. Compl. at 15–19.  Liability is joint and several when the harm suffered is indivisible amongst multiple tortfeasors. The state of Oklahoma has abolished joint and several liability in favor of several liability.  23 Okla. St. § 15.  Before the federal courts, "state law is preempted if it stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." Pac. Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 220–21 (1983) (internal quotation and citations omitted). The Tenth Circuit Court of Appeals has recognized the "paramount federal policy that Indians develop independent sources of income and strong self-government." Seneca-Cayuga Tribe of Okla. v. Okla., 874 F.2d 709, 716 (10th Cir. 1989).

Add. 16

Sections 211 and 214 reflect this policy and the Congressional objective to ensure

the Osage Nation's authority over the mineral estate.  See 25 C.F.R. §§ 211, 214.

Defendants acted in concert in the performance of all relevant actions and may be

held jointly and severally liable for any resulting damages.  Enel Kansas shall

remain a defendant in this case and the Court will consider the activities of

Defendants as one entity for the purposes of deciding the pending motions for

summary judgment.

## II.     Declaratory Relief on Counts I and II

Counts I and II of both Plaintiff's Amended Complaint and Plaintiff-

Intervenor's Amended Complaint seek declarations from the Court regarding the

applicability and violation of 25 C.F.R. §§ 211 and 214.  Pl.'s Am. Compl. at 7–9;

Pl.-Interv.'s Am. Compl. at 14–15.  Section 211 contains regulatory provisions that

"govern leases and permits for the development of Indian tribal oil and gas,

geothermal, and solid mineral resources."  25 C.F.R. § 211.1.  Section 214

specifically governs the leasing of lands held by the Osage Nation for mining.  Id.

§ 214.  In Osage Wind, the Tenth Circuit Court of Appeals considered: (1) whether

Defendants' "excavation, modification, and use of rock and soil during the

installation of wind turbines" constituted "mining" under 25 C.F.R. § 211 and

(2) whether Defendants were required to obtain a lease for their activities.  Osage

Wind, 871 F.3d 1078.  The Tenth Circuit Court of Appeals answered both

**Add. 17**

questions in the affirmative.  Id. at 1089–93.  The Court is bound by the Tenth

Circuit Court of Appeals' ruling in Osage Wind and now enters declaratory

judgment that Defendants were subject to and are in violation of 25 C.F.R. §§ 211

and 214.

### III.    Trespass and Conversion

Plaintiff and Plaintiff-Intervenor move for summary judgment on the claims

of trespass and conversion.  Pl.'s Br. at 3–6; Pl.-Interv.'s Br. at 5–6; Pl.'s Am.

Compl. at 9–10, 11–12; Pl.-Interv.'s Am. Compl. at 16–17.  Defendants do not

oppose summary judgment as to liability for Osage Wind and Enel Green Power

North America on the trespass and conversion claims.  Defs.' Resp. Pl.'s Mot.

Summary J. at 1; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 1.  Defendants do

contest liability for Enel Kansas.  Defs.' Resp. Pl.'s Mot. Summary J. at 1; Defs.'

Resp. Pl.-Interv.'s Mot. Summary J. at 1.

Because no federal statute addresses the torts of trespass and conversion

against the property interests of Native American tribes, the Court looks to state

law in defining the offenses.  See Davilla v. Enable Midstream Partners, L.P., 913

F.3d 959, 965 (10th Cir. 2019).  Under Oklahoma law, a right of action in trespass

exists when a person "actual[ly] physical[ly] inva[des] . . . the real estate of another

without the permission of the person lawfully entitled to possession."  Id. at 966

(quoting Williamson v. Fowler Toyota, Inc., 956 P.2d 858, 862 (Okla. 1998)).  The

# Add. 18

court has recognized three elements to a trespass claim: (1) "the [plaintiff] must prove an entitlement to possession of the [property];" (2) "[the plaintiff] must prove [that the defendant] physically entered or remained on the [property];" and (3) the defendant must "lack[] a legal right—express or implied—to enter or remain." Id.  Conversion is an "act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." Welty v. Martinaire of Okla., Inc., 867 P.2d 1273, 1275 (Okla. 1994).  The elements of civil conversion are: "(1) that the plaintiff owns certain property at the time of its conversion; (2) that defendant converted plaintiff's property by a wrongful act of disposition of the property; and (3) that damages are suffered by the plaintiff." See Tri-State Floors, Inc. v. Old Rule Servs., LLC, 2022 U.S. Dist. LEXIS 178361, at *39 (N.D. Okla. Sept. 30, 2022).

Plaintiff's and Plaintiff-Intervenor's ownership and entitlement to the Osage Mineral Estate under the first elements of trespass and conversion are undisputed. The mineral estate was severed from the surface estate by the Osage Act and held in trust for the collective benefit of the Osage Nation.  Osage Act § 3, 34 Stat. at 543–44.  The Parties agree that Plaintiff acts as the trustee for the mineral estate. Pl.'s Br. at 1; Defs.' Resp. Pl.'s Mot Summary J. at 2; Pl.-Interv.'s Br. at 1; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 1; see also Osage Act, 34 Stat. at 543–44.

# Add. 19

As to all three Defendants Osage Wind, Enel Kansas, and Enel Green Power North America, the remaining elements of trespass and conversion were decided by the Tenth Circuit Court of Appeals' opinion in <u>Osage Wind</u>.  The appellate court held that Defendants' extraction, sorting, and crushing of rocks that were then used as backfill for support constituted mineral development and triggered the leasing requirement of 25 C.F.R. § 214.7.  <u>Osage Wind</u>, 871 F.3d at 1091–92. Based on the Tenth Circuit Court of Appeals' opinion in <u>Osage Wind</u>, there is no genuine dispute of material fact that the construction of the wind towers involved entering the mineral estate, extracting minerals, and using the extracted minerals without first obtaining the necessary lease, and the Court concludes that the second and third elements of trespass and conversion are satisfied.

As noted earlier, although the Defendants attempt in their briefs to raise questions about Enel Kansas' role in the wind project, the Court finds dispositive the Defendants' admission in their petition for a writ of certiorari to the U.S. Supreme Court that Defendants Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc. are business entities that have built and are operating a wind energy project in Osage County, weighed against the mere allegation that Enel Kansas should not be held liable as a defendant in this case. The Court finds that the facts support the conclusion that all three Defendants acted as one in their building and operating of the wind farm at issue in this litigation.

**Add. 20**

The Court grants summary judgment and holds that all three Defendants are liable for the claims of trespass and conversion.

## IV.    Continuing Trespass

Plaintiff and Plaintiff-Intervenor assert claims of continuing trespass, despite the fact that no physical digging or mineral extraction has occurred for almost a decade.  Pl.'s Am. Compl. at 10–11; Pl.-Interv.'s Am. Compl. at 18–19.  Plaintiff proffers three theories in support of its continuing trespass claim.  First, Plaintiff argues that the physical presence of the wind towers, transmission lines, and collector system within the mineral estate constitutes a continuing trespass.  Pl.'s Br. at 6.  Second, Plaintiff asserts that each wind tower creates a mining setback that inhibits use and development of the mineral estate within a certain proximity of the structure.  Id. at 7–8.  Third, Plaintiff argues that the support provided by the surrounding mineral estate and improperly extracted rocks used as backfill for support amounts to a continuing trespass.  Id. at 8–9.  Defendants contend that only the first theory was pled in the Amended Complaints and is properly before the Court.  Defs.' Resp. Pl.'s Mot. Summary J. at 6; Defs.' Reply Pl.'s Resp. Defs.' Mot. Summary J. at 7, 8 [Doc. 346]; Defs.' Reply Pl.-Interv.'s Resp. Defs.' Mot. Summary J. at 2–3 [Doc. 347].

Add. 21

## A.   Legal Standard

Because no federal body of law governs trespass against Indian property, the Court must rely on Oklahoma state law to define the elements of continuing trespass, to the extent that the state law comports with federal policy.  See Davilla, 913 F.3d at 965–66.  Trespass under Oklahoma law requires three elements: (1) the plaintiff must be entitled to possession of the property, (2) the defendant must have physically entered or remained on the property; and (3) the defendant must have lacked a legal right to enter or remain on the property.  Id. at 966.  Continuing trespass occurs when "the ongoing, unabating nature of certain trespasses continuously gives rise to causes of action that the victim can sue on, and eventually can support equitable relief."  Id. at 971 n.8 (citing Hughes v. Harden, 151 P.2d 425, 427 (Okla. 1944); Bradley v. Renfrow, 84 P.2d 430, 431 (Okla. 1938)); see also Fairlawn Cemetery Ass'n v. First Presbyterian Church, U.S.A. of Okla., 496 P.2d 1185, 1187 (Okla. 1972) (holding that an unauthorized encroachment upon property that had continued for several years and was likely to continue unless enjoined constituted a continuing trespass).  Defendants assert that the case law discussing the elements of continuing trespass should be read to impose an additional requirement that the cause of the alleged injury be abatable.  Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 16; see also Def.'s Supp. Br. at 4 [Doc. 374].  In support of this argument, Defendants rely on Hughes v. Harden,

# Add. 22

151 P.2d 425 (Okla. 1944), in which the Oklahoma Supreme Court stated, in discussing continuing trespass in the context of nuisance law, "[w]here the cause of injury may be abated by the expenditure of labor or money the same is said to be a temporary one, and successive actions may be maintained for damages resulting therefrom." Id. at 427 (citation omitted).

The Court does not read Hughes to impose the additional requirement that Defendants suggest. In Davilla v. Enable Midstream Partners L.P., 913 F.3d 959 (10th Cir. 2019), the Tenth Circuit Court of Appeals observed that under Oklahoma law, "'[c]ontinuing trespass' is not a distinct legal wrong." Id. at 971 n.8. The Court is aware of no case subsequent to Hughes that has required that the injury resulting from a continuing trespass be abatable. The relevant distinction between a temporary and continuing trespass is that the ongoing nature of a continuing trespass necessitates the need for equitable relief.

### B.    Theories Before the Court

As an initial step, the Court must determine what arguments have been properly presented for consideration. Defendants contend that the only theory of continuing trespass presented in the Amended Complaints relates to the placement of the wind tower foundations within the mineral estate. Defs.' Resp. Pl.'s Mot. Summary J. at 9; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 14–15. In general, a party is not precluded from asserting a theory of recovery that was not set forth in

## Add. 23

the initial complaint as long as the theory is not first presented so late as to prejudice the opposing party.  See Evans v. McDonald's Corp., 936 F.2d 1087, 1090–91 (10th Cir. 1991) (citing 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE CIVIL § 1219 at 194 (4th ed.1990)).  The Federal Rules of Civil Procedure require only that the pleadings articulate (1) a basis for the court's jurisdiction, (2) "a short and plain statement of the claim showing that the pleader is entitled to relief;" and (3) "a demand for the relief sought."  Fed. R. Civ. P. 8(a).  This rule ensures that defendants have fair notice of the claims alleged, but it does not require that all facts be developed and theories identified before the time of filing.

The continuing trespass claims alleged by both Plaintiff and Plaintiff-Intervenor read in almost identical language:

> By placement of the turbine foundation and other materials, Defendants trespassed on the Osage [M]ineral [E]state, in violation of law and, in doing so, caused damage to the estate.  The insertion and placement of materials or structures in the mineral estate is a continuing trespass and diminishes the estate or diminishes the use and enjoyment of the mineral estate.

Pl.'s Am. Compl. at 11; see Pl.-Interv.'s Am. Compl. at 18.  Both continuing trespass claims also reallege and incorporate by reference the preceding paragraphs of their respective Amended Complaints.  Pl.'s Am. Compl. at 10; Pl.-Interv.'s Am. Compl. at 18.  Plaintiff's Amended Complaint describes Defendants' offending actions as:

**Add. 24**

> Defendants conducted unauthorized mineral excavation activities in connection with the construction of a wind energy project on 8,400 acres in Osage County, Oklahoma.  The project consists of between 84 and 94 wind turbines and associated infrastructure.  Defendants excavated and constructed foundations for the wind turbines, as well as trenches for cables.  Defendants excavated numerous pits measuring more than 50 feet wide and more than 10 feet deep.  As part of this process, Defendants excavated sand, soil of various types, and rock encountered in place.  Defendants crushed some of these extracted materials and used them to reinforce the concrete turbine foundations.  Defendants invaded, and irreparably altered, the mineral estate by virtue of placement of turbine foundations in these pits.

Pl.'s Am. Compl. at 1–2.  Similarly, Plaintiff-Intervenor's Amended Complaint includes a paragraph stating:

> The project consists of 84 wind turbines and associated infrastructure.  Defendants excavated and constructed foundations for the wind turbines, as well as trenches for underground electrical lines.  Defendants excavated numerous pits measuring approximately 60 feet in diameter and 10 feet deep.  As part of this process, Defendants excavated soil, sand, and rock of varying sizes encountered during Defendants' excavation.  Defendants crushed some of these extracted materials and used them to reinforce the concrete turbine foundations and for associated infrastructure.

Pl.-Interv.'s Am. Compl. at 2.  These statements make clear that Plaintiff's and Plaintiff-Intervenor's allegations involved activities encompassing the entire wind farm project, not only the foundations for the wind towers.  After nearly ten years of litigation, it cannot be said that Plaintiffs are asserting new theories or facts at the eleventh hour to the detriment of Defendants in this case.  Accordingly, the Court will consider all of Plaintiff's theories of continuing trespass.

Add. 25

### C.     Wind Tower Foundations

Plaintiff's first theory of continuing trespass argues that the continued presence of the wind towers and ancillary structures constitutes a continuing trespass.  Pl.'s Br. at 6.  Defendants argue that Plaintiff's theory is inconsistent with the Tenth Circuit Court of Appeals' discussion in Osage Wind and is contrary to the rights of the surface estate owners to use and develop their land.  Defs.' Resp. Pl.'s Mot. Summary J. at 7–8 (citing Osage Wind, 871 F.3d at 1092).  As the Tenth Circuit Court of Appeals observed, construction activities such as the building of a swimming pool or basement necessarily involve a degree of disruption to the mineral estate.  Osage Wind, 871 F.3d at 1092.  Such incidental encroachment into the mineral estate by the surface estate owner does not involve the commercialization of the mineral estate or the exploitation of the minerals contained therein.  Id.  Deeming the presence of construction extending below the ground's surface to be a continuing trespass into the mineral estate would result in an unreasonable limitation on the "expansive authority" of surface owners to develop and use their land.  See id.  The Court concludes that the physical presence of foundations for the wind turbines and other structures below ground level does not constitute a continuing trespass against the mineral estate.

Add. 26

### D. Mining Setback

Plaintiff's second theory of continuing trespass is that the presence of the wind towers creates a mining setback and inhibits the development of the mineral estate within a certain radius around the structures. Pl.'s Br. at 7–9. The Court notes that this argument appears to be a redressing of arguments raised and resolved in the predecessor litigation involving the wind farm. See Wind Capital Grp., 2011 U.S. Dist. LEXIS 146407. In that case, the Osage Nation sought to enjoin the construction of the wind farm, in part because it might have interfered with oil and gas development of the mineral estate. Under Oklahoma law, the right of a mineral estate owner to use the surface is limited to what is reasonably necessary for the development of the mineral estate and must be exercised with due regard to the surface owners' competing rights. Id. at *23 (citing Roye Realty Dev. Inc. v. Watson, 791 P.2d 821, 824 (Okla. Ct. App. 1990) and Thompson v. Andover Oil Co., 691 P.2d 77, 82 (Okla. Ct. App. 1984)). The Court held that:

> [I]n general, the Wind Farm's planned surface use is lawful and reasonable. Its facilities will take up less than 1.5% of the surface of the 8,500 acres in the Wind Farm lease. The underground infrastructure of collection lines and the access roads are typical of the type of surface restrictions mineral lessees regularly encounter. The Tribe has not shown this court the presence of a specific impediment that unreasonably interferes with its use of the surface for oil and gas operations and marketing. The mere possibility that a dispute might arise in the future is insufficient to merit an injunction of the Wind Farm's construction and operation.

Id. at *25–26.

# Add. 27

The Court is aware of no new facts that require a different conclusion at this time.  The Parties disagree as to the size of the mining setback for each of the wind towers in which new construction would be inhibited.[1]  Even accepting the Plaintiff's most generous figure of a 500-foot mining setback for each tower, the total encumbered area would be a relatively small percentage of the leased surface estate.[2]  Plaintiffs have also shown no evidence that any action has been taken toward developing the relevant portions of the mineral estate.  The Court concludes that the mining setback created by the mere presence of the wind towers does not constitute a continuing trespass.

### E.    Support Provided by Backfill

Plaintiff and Plaintiff-Intervenor argue that the support provided for each wind tower by the surrounding mineral estate and the backfill created from extracted rocks is a continuing trespass.  Pl.'s Br. at 8–9; Pl.-Interv.'s Resp. Defs.'

---

[1]  The Parties disagree as to whether the mining setback encompasses a 90-foot radius or 500-foot radius for each tower.  The 90-foot radius relates to the area in which the wind towers receive structural support from the surrounding mineral estate.  The 500-foot radius relates to the area in which mineral development would be potentially unsafe.

[2]  Assuming a 500-foot mining setback and that the foundation for each tower is 10 feet by 60 feet, the area affected for each tower would be 1,070,600 square feet ($1,010 \text{ ft}^2$ x $1,060 \text{ ft}^2$).  For 84 wind towers, presuming that the setback areas do not overlap, the maximum area affected would be 89,930,400 square feet ($1,070,600 \text{ ft}^2$ x 84), which equates to approximately 2,064.52 acres ($89,930,400 \text{ ft}^2$ / $43,560 \text{ ft}^2$).  Less than 25 percent of the leased 8,400 acres of surface estate would be restricted.

Add. 28

Mot. Summary J. at 12–15.  Defendants counter that Plaintiff and Plaintiff-

Intervenor over-extend the Tenth Circuit Court of Appeals' holding in Osage

Wind.  Defs.' Resp. Pl.'s Mot. Summary J. at 9–10; Defs.' Reply Pl.-Interv.'s

Resp. Defs.' Mot. Summary J. at 3–6.  Defendants argue that Osage Wind held that

the only conduct that required a lease was the crushing of rocks for backfill, and

because the use of the backfill to provide passive support for the wind turbines

does not involve acting upon to the minerals, it is not mining.  Id. at 9–10.

Defendants also contend that surface owners have a right to support for structures

under Oklahoma law and federal regulations.  Id. at 9–10.

     In Osage Wind, the Tenth Circuit Court of Appeals adopted a broad meaning

of the terms "mining" and "mineral development" under the applicable regulations.

Section 211.3 defines "mining" as the "science, technique, and business of mineral

development[.]"  25 C.F.R. § 211.3.  The court concluded that mining

encompasses more than just the commercialization and relocation of minerals.

Osage Wind, 871 F.3d at1089–90.  The Osage Wind court explained that the

definition of § 211.3 "contemplates an activity that is aimed at *developing*

minerals."  Id. at 1090 (emphasis in original).  The court acknowledged that the

Osage Act and regulations leave ambiguous what is meant by "develop" minerals,

but found the examples provided in § 211.3 informative.  Id. at 1090–91.  The

regulation provides that mining "include[s], but [is] not limited to: opencast work,

# Add. 29

underground work, and in-situ leaching directed to severance and treatment of minerals." 25 C.F.R. § 211.3.  Considering all elements of the list, the court held that:

> "mineral development" involves some action upon the minerals to take advantage of them for some purpose.  Because it is natural to construe a definition in light of its examples, this suggests at the very least that "mineral development" includes, but is not limited to, action upon the minerals in order to exploit the minerals themselves.

Osage Wind, 871 F.3d at 1091.  Based on this reading of the regulation, the Tenth Circuit Court of Appeals concluded that Defendants "*sorted* the rocks, *crushed* the rocks into smaller pieces, and then *exploited* the crushed rocks as structural support for each wind turbine" and that these acts constituted mineral development.  Id. at 1091–92 (emphasis in original).

Defendants suggest that the Court should interpret the holding of Osage Wind narrowly.  Defs.' Resp. Pl.'s Mot. Summary J. at 7, 9–10; Defs.' Reply Pl.-Interv.'s Resp. Defs.' Mot. Summary J. at 3–6.  Defendants argue that the Tenth Circuit Court of Appeals never held that passive support constituted mining, but rather held that only the sorting and crushing of rocks were acts of mineral development.  Defs.' Reply Pl.-Interv.'s Resp. Defs.' Mot. Summary J. at 3–6; Defs.' Reply Pl.'s Resp. Defs.' Mot. Summary J. at 7.  Under this interpretation, Defendants contend that there can be no continuing trespass because the relevant acts of sorting and crushing of rocks ceased in 2014.

# Add. 30

It appears that Defendants conflate the support provided by the surrounding mineral estate and the support provided by the crushed rocks used as backfill.  As discussed above, the Court agrees that passive support provided by the surrounding mineral estate is not an act of mineral development and cannot be the basis for continuing trespass.  As the Tenth Circuit Court of Appeals noted, "surface construction activities may often implicate and disrupt the mineral estate—building a basement or swimming pool necessarily involves digging a hole in the ground, displacing rock and soil in the process" and "merely encountering or disrupting the mineral estate does not trigger the definition of 'mining' under 25 C.F.R. § 211.3." Osage Wind, 871 F.3d at 1092.  Oklahoma law also recognizes a right of surface owners to lateral and subjacent support provided by neighboring land.  See 60 Okla. St. § 66.  The Court agrees that to hold that passive support provided to a structure by the surrounding ground constituted mineral development requiring a lease would be an unreasonable restriction on the rights of surface estate owners to develop their property.

The Court does not agree with Defendants' contention that the support provided by backfill consisting of unlawfully mined minerals is equally innocuous. The Tenth Circuit Court of Appeals held that mineral development "includes, but is not limited to, action upon the minerals in order to exploit the minerals themselves." Osage Wind, 871 F.3d at 1091.  Defendants' argument attempts to

31

**Add. 31**

draw a distinction between those actions that involved some force altering the natural shape and size of the rocks and the subsequent use of the altered materials. See Tr. at. 27.  In Osage Wind, the Tenth Circuit Court of Appeals described Defendants' actions in multiple ways.  At times, the court described the project as involving excavation, modification, and use of the minerals.  See Osage Wind at 1081, 1091.  At other points in the opinion, the court only referenced the sorting and crushing of the rocks.  See id. at 1091–92.  Defendants contend that the Court should look to the common denominator between all of the descriptions—sorting and crushing—and conclude that the only activities deemed mining by the Tenth Circuit Court of Appeals were those that altered the rocks.  Tr. at 20–31, 57–60.

The Court does not read Osage Wind so narrowly to draw a distinction between actively altering the minerals and subsequently using the minerals. Defendants are correct that the Tenth Circuit Court of Appeals did not always explicitly include the use of crushed rocks as backfill to support the wind towers in its description of Defendants' conduct.  For example, the section of the Osage Wind opinion considering whether Defendants' actions constituted mining is titled "Sorting and Crushing for Backfill Constitutes 'Mineral Development.'"  Osage Wind, 871 F.3d at 1091.  A reading of the opinion in its entirety, however, makes clear that the court viewed Defendants' actions in the totality.  The final paragraph of the preceding section describes Osage Wind's mining actions as: "[i]t *sorted* the

32

**Add. 32**

rocks, *crushed* the rocks into smaller pieces, and then *exploited* the crushed rocks as structural support for each wind turbine." Id. (emphasis in original).  The Tenth Circuit Court of Appeals also observed specifically that the sorting and crushing of rocks were done with the purpose of providing structural support for the wind towers.  Id. ("Osage Wind needed to stabilize these tall wind turbines, and 'develop[ed]' the removed rock in such a way that would accomplish that goal. This constitutes "mining" as defined by § 211.3.").

The Tenth Circuit Court of Appeals observed that, "*at the very least*[,] 'mineral development' *includes, but is not limited to*, action upon the minerals in order to exploit the minerals themselves." Id. at 1091 (emphasis added).  The court did not limit the exploitation of minerals to only the instance in which an outside force is acting upon them.  In this case, exploitation of the minerals did not end with the crushing of rocks.  It is undisputed that the minerals were pushed back into the holes and actively incorporated into the construction of the wind turbines as backfill.  The structures continue to receive the benefit of that backfill support today.

In their response to the Court's request for additional information, Defendants raise for the first time the argument that the continued use of the extracted minerals as backfill falls under the exception to 25 C.F.R. § 211.3. Defs.' Resp. Pl.-Interv.'s Supp. Br. at 6–7 [Doc. 382].  25 C.F.R. § 211.3 provides

33

**Add. 33**

that "when sand, gravel, pumice, cinders, granite, building stone, limestone, clay or silt is the subject mineral, an enterprise is considered "mining" only if the extraction of such a mineral exceeds 5,000 cubic yards in any given year."

25 C.F.R. § 211.3.  Defendants argue that because no extraction has occurred since 2014 and continued use is distinct from extraction, the use of the backfill since 2014 is not mining.  Defs.' Resp. Pl.-Interv.'s Supp. Br. at 6–7.  The intent of the exception is to exclude from the scope of mining small scale projects that displace common minerals from the ground, such as the construction of a basement or swimming pool.  The exception does not operate to excuse mining activities in which the exploitation of the extracted mineral persists longer than one year.

Before the Tenth Circuit Court of Appeals, the Parties agreed that the total volume of minerals extracted from the mineral estate exceeded 5,000 cubic yards.  Osage Wind, 871 F.3d at 1089 n.9.  At the time of their extraction, the minerals did not fall under the exception, and the extraction was deemed by the Tenth Circuit Court of Appeals to be mining under 25 C.F.R. § 211.3.  The continued exploitation of the extracted minerals beyond one year does not create a situation in which Defendants can claim that their conduct became excluded under the exception merely through the passage of time, and this Court rejects Defendants' argument accordingly.

**Add. 34**

As further support for a broad interpretation of "mineral development" that includes the use of minerals as backfill for support, the Court recognizes the Indian canon of interpretation that requires the Court to liberally construe ambiguity in laws intended to benefit Indians in favor of Indians.  See Milsap v. Andrus, 717 F.2d 1326, 1329 (10th Cir. 1983).  As the Tenth Circuit Court of Appeals observed, "[w]ithout question, the regulations at issue here are designed to protect Indian mineral resources and 'maximize [Indians]' best economic interests.'" Osage Wind, 871 F.3d at 1090 (second alteration in original).  If ambiguity remains in the scope of the meaning of "mineral development" under 25 C.F.R. § 211.3 and Osage Wind, the Indian canon of interpretation requires the Court to balance its decision in favor of the Osage Nation's interests.  The Court concludes, therefore, that Defendants' use of crushed rocks as backfill for support falls within the definition of "mining" and required a lease under 25 C.F.R. §§ 211 and 214. The Court holds that Defendants are liable for continuing trespass because of the continuing use of the minerals as backfill for support.

## V.    Relief

Plaintiff claims that it is entitled to monetary damages resulting from Defendants' trespass for fair rental value, an accounting of any and all excavation and mining work performed, and equitable relief in the form of ejectment of the wind turbines.  Pl.'s Br. at 9–15.  Plaintiff-Intervenor asserts that the Court should

Add. 35

order the ejectment of the wind towers, but monetary damages are appropriate as an alternative form of relief.  Pl.-Interv.'s Br. at 13–18, 21–22.  Defendants contend that Plaintiff and Plaintiff-Intervenor have failed to demonstrate that they are entitled to injunctive relief and that the calculation of damages must await a trial.  Defs.' Br. at 18–25; Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 14–25; Defs.' Resp. Pl.'s Mot. Summary J. at 12–25.  For the reasons discussed below, the Court will grant Plaintiff's and Plaintiff-Intervenor's request for damages and injunctive relief.  The Court orders that ejectment of the wind turbine farm is an appropriate equitable remedy for continuing trespass.  The Court orders that a damages trial will be held to assess the amount of damages to be awarded for trespass and conversion.  The Court denies Plaintiff's claim for an accounting.

### A.    Damages

The Court concludes that Plaintiff and Plaintiff-Intervenor are entitled to damages on their claims for trespass and conversion.  The Parties disagree as to the proper method of calculating damages.  Plaintiff and Plaintiff-Intervenor urge the Court to adopt the figure calculated by Steven Hazel in the amount of $25,969,607.00.  Pl.-Interv.'s Br. at 21–22; Pl.'s Br. at 9–13.  Defendants ask the Court to reject Hazel's calculation and to instead adopt the calculations of either Robert Freas or John Pfahl as the total value of the extracted minerals, which are $247,979.42 and $68,993.00, respectively.  Defs.' Br. at 20–22; Defs.' Resp. Pl.-

36

**Add. 36**

Interv.'s Mot. Summary J. at 18; Defs.' Resp. Pl.'s Mot. Summary J. at 22–23.

Defendants also argue that the calculation of damages must take into consideration

Defendants' alleged good faith reliance on the advice of counsel.  Def.'s Resp. Pl.-

Interv.'s Mot. Summary J. at 19–24; Defs.' Resp. Pl.'s Mot. Summary J. at 24–25.

Plaintiff challenges Defendants' claim that they sought and relied on the advice of

counsel in deciding not to obtain the lease.  Pl.'s Br. at 15–19.  Specifically,

Plaintiff calls into question whether Defendants, or another party, solicited the

relevant advice and the scope of the question presented for counsel's opinion.  Id.

at 17–19.  Because disputes of material fact exist regarding a monetary award,

summary judgment cannot be granted and a trial shall be set to determine damages.

## B.    Accounting of Excavation and Mining Work

Plaintiff argues that it is entitled to an accounting from Defendants for the

profits derived from Defendants' trespass.  Pl.'s Br. at 13–14.  Plaintiff previously

sought to file a Second Amended Complaint to modify its Prayer for Relief to seek

an accounting of revenues attributable to the wind farm, disgorgement, and unjust

enrichment.  Pl.'s Mot. Leave File Second Am. Compl. [Doc. 98].  The Court

denied Plaintiff's motion for leave to amend and concluded that the newly

requested relief did not relate to the mining, excavation, and other work that was

the subject of Plaintiff's Amended Complaint and that permitting the amendment

Add. 37

would prejudice Defendants.  Order and Opinion (Jul. 1, 2020) at 12–13 [Doc. 161].

Though Plaintiff's renewed demand for an accounting of profits is arguably more narrowly tailored to the trespass into the mineral estate, rather than the entirety of the wind farm project, it suffers from the same defects as Plaintiff's earlier attempt to amend.  Plaintiff's Amended Complaint includes no reference to claims against Defendants' profits and Plaintiff has offered no explanation for why an accounting was not previously sought.  To allow Plaintiff to seek an accounting now when it was not demanded in the Amended Complaint would unjustly prejudice Defendants.  Plaintiff's claim for an accounting is denied.

### C.    Permanent Injunction and Ejectment

Plaintiff and Plaintiff-Intervenor seek permanent injunctive relief in the form of ejectment of the wind turbines.  Pl.-Interv.'s Br. at 13–18; Pl.'s Br. at 14–15. Defendants contend that Plaintiff and Plaintiff-Intervenor have not established that a permanent injunction is appropriate in this case.  Defs.' Resp. Pl.-Interv.'s Mot. Summary J. at 15–18; Defs.' Resp. Pl.'s Mot. Summary J. at 13–19.

The Court may grant equitable relief against a party that is found liable for a continuing trespass.  See Fairlawn Cemetery Ass'n, 496 P.2d at 1187.  Federal case law has established a standard for courts to apply when considering equitable relief.  See Davilla, 913 F.3d at 973.  It is not enough for a party to simply succeed

# Add. 38

on the merits of their claim.  Id.  A court's decision to enjoin a continuing trespass must take into consideration: (1) whether the injunction is necessary to prevent "irreparable harm;" (2) whether the harm caused by the continuing trespass outweighs the harm that might be suffered by the enjoined party; and (3) whether the injunction would adversely affect the public interest.  Kitchen v. Herbert, 755 F.3d 1193, 1208 (10th Cir. 2014).

### 1.    Irreparable Harm

Plaintiff-Intervenor contends that permitting the wind turbines to remain in place will cause the Osage Nation to suffer irreparable harm to its sovereignty and its authority to manage the mineral estate.  Pl.-Interv.'s Br. at 13–16.  Plaintiff-Intervenor contends that this harm cannot be remedied by a payment of money damages.  Id. at 15–16.  Defendants contend that the only injury suffered by Plaintiff was the loss of royalties that Plaintiff-Intervenor would have received if Defendants had purchased backfill from one of the local quarries operating under a lease.  Defs.' Resp. Pl.'s Mot. Summary J. at 14.

Irreparable harm is the type of injury that is:

certain, great, actual and not theoretical.  Merely serious or substantial harm is not irreparable harm.  The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. It is also well settled that simple economic loss usually does not in and of itself, constitute irreparable harm; such losses are compensable by monetary damages.

**Add. 39**

Schrier v. Univ. of Co., 427 F.3d 1253, 1267 (10th Cir. 2005) (citations and quotations omitted).  Economic harms that can be compensated through an award for monetary damages are not irreparable harms.  Id.

Defendants contend that the crushing of rocks for backfill without a lease is compensable through monetary damages and point to expert testimony offered by Plaintiff quantifying damages in this case.  Defs.' Br. at 20–23.  The Oklahoma courts have adopted a method of damage calculation for compensating the unauthorized extraction of minerals: market value of the minerals less the cost of extraction.  See Dilworth v. Fortier, 405 P.2d 38, 45 (Okla. 1964); Edwards v. Lachman, 534 P.2d 670, 674 (Okla. 1974).  Though this approach might be appropriate in an ordinary commercial case, the Osage Mineral Council is not a normal actor in the marketplace.  The Osage Mineral Council is an extension of the Osage Nation's government and the Court must consider the non-economic impacts of Defendants' unlawful conduct on the Osage Nation's tribal rights.

Plaintiff-Intervenor cites to multiple cases in support of its contention that injury to an Indian tribe's sovereignty can amount to irreparable harm.  Pl.-Interv.'s Br. at 13–16; see Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234 (10th Cir. 2001); Seneca-Cayuga Tribe of Okla., 874 F.2d 709; Winnebago Tribe of Neb. v. Stovall, 216 F. Supp. 2d 1226 (D. Kan. 2002), aff'd, 341 F.3d 1202 (10th Cir. 2003); Sac and Fox Nation of Mo. v. LaFaver, 905 F. Supp. 904

**Add. 40**

(D. Kan. 1995).  These cases are distinguishable from the facts before the Court in that each involved a conflict between the authority of an Indian tribe and a state government.  Defendants are private actors and did not act under state authority or in the furtherance of state policy.

The question left for the Court is whether the actions of private entities can rise to the level of contesting the sovereignty of an Indian tribe.  Courts have recognized the Federal Government's persistent policy of promoting self-government by Indian tribes.  See Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 14 (1987).  "Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty."  Id. at 17.  This includes the power of the tribal government to exclude outsiders.  See Norton v. Ute Indian Tribe of the Uintah and Ouray Rsrv., 862 F.3d 1236, 1244–45 (10th Cir. 2017).  "The tribe's 'traditional and undisputed power to exclude persons' from tribal land, for example, gives it the power to set conditions on entry to that land via licensing requirements and hunting regulations."  Plains Commerce Bank v. Long Family Land and Cattle Co., 554 U.S. 316, 335 (2008) (quoting Duro v. Reina, 495 U.S. 676, 696 (1990)).

Defendants were advised by the Bureau of Indian Affairs and the Osage Mineral Council on multiple occasions that the wind farm project required a lease related to the mineral estate.  Pl.'s Br. at Ex. 20 ("BIA Letter of Oct. 9, 2014");

Add. 41

Pl.'s Br. at Ex. 21 ("OMC Letter"); Pl.'s Br. at Ex. 22 ("BIA Letter of Jul. 19, 2012"). Defendants failed to obtain the required lease. The Tenth Circuit Court of Appeals held in 2017 that a lease was required. Osage Wind, 871 F.3d at 1087–93. Even following the appellate court's ruling, Defendants have taken no steps to obtain a lease during the years following the appellate court's opinion. On the record before the Court, it is clear that Defendants are actively avoiding the leasing requirement. Permitting such behavior would create the prospect for future interference with the Osage Mineral Council's authority by Defendants or others wishing to develop the mineral estate. The Court concludes that Defendants' past and continued refusal to obtain a lease constitutes interference with the sovereignty of the Osage Nation and is sufficient to constitute irreparable injury.

## 2.  Balance of Harms

In order for the Court to grant a permanent injunction, the harms suffered by Plaintiff as a result of Defendants' trespass must outweigh the harms that would be suffered by Defendants if the relief were to be granted. On Plaintiff's side of the scale weighs the "paramount federal policy that Indians develop independent sources of income and strong self-government." See Seneca-Cayuga Tribe of Okla., 874 F.2d at 716. This is balanced against Defendants' claim that Osage Wind would suffer the inevitable loss of hundreds of millions of dollars if the wind towers were removed. Def.'s Resp. Pl.'s Mot. Summary J. at 15–17. Though the

**Add. 42**

significant loss of money might be sufficient to outweigh a property owner's interests in a more common case of trespass, this case involves an infringement on the self-governance of Indian lands. The Court is also cognizant of Defendants' continuing trespass even after the Tenth Circuit Court of Appeals issued the Osage Wind opinion, and the fact that Defendants have ignored opportunities to address the failure to procure a lease over the last decade. Notably, the Tenth Circuit Court of Appeals held in 2017 that Defendants were required to obtain a mining lease, and the Supreme Court denied the appeal of the Tenth Circuit Court of Appeals' decision in 2019, so for at least four years between 2019 and 2023, Defendants have failed to obtain a lease in contravention of the court's order. Based on these considerations, the Court concludes that the balance of harms weighs in favor of Plaintiff.

### 3.    Impact on the Public Interest

Plaintiff-Intervenor contends that ejectment would serve the public interest by protecting the sovereignty of the Osage Nation. Pl.-Interv.'s Br. at 17–19. Defendants argue that the removal of the wind turbines would result in the loss of revenue for two local schools, jobs, income for the surface estate owners, and renewable energy for 50,000 homes. Defs.' Br. at 17–18.

The Court is not persuaded by Defendants' argument. Because construction of the wind farm has concluded, the only jobs that would be impacted by the

43

Add. 43

removal of the wind towers are the 10 permanent employees of the wind farm.

Defs.' Resp. Pl.'s Mot. Summary J. at 6; Pl.-Interv.'s Reply. Mot. Summary J. at 4;

see Pl.'s Reply Mot. Summary J. at 6; Wind Capital Grp., 2011 U.S. Dist. LEXIS

146407, at *16.  The benefit to the local schools appears to be related to

Defendants' tax obligations.  Wind Capital Grp., 2011 U.S. Dist. LEXIS 146407,

at *16.  There is no guarantee that such funding would continue or remain at

consistent levels in the future or that it would not be eclipsed by offsets or tax

benefits to Defendants.  See Pl.'s Resp. Defs.' Mot. Summary J. at 5.  Similarly, it

is possible that the income that surface owners would derive from surface leases

could be replaced by leases with other parties wishing to develop the area if the

wind towers were removed.

Even if negative effects were to result, including the significant monetary

impact of hundreds of millions of dollars, such effects would not negate the public

interest in private entities abiding by the law and respecting government

sovereignty and the decisions of courts.  Nor would those negative effects

overshadow the public interest in preserving the Osage Nation's tribal sovereignty.

### 4.    Injunctive Relief

For the foregoing reasons, the Court orders injunctive relief in the form of

ejectment of the wind towers.  The Court concludes that a permanent injunction is

appropriate relief for Defendants' continuing trespass and failure to obtain a lease

Add. 44

but the Court will allow input from the Parties as to timing of ejectment of the

wind farm.  A trial on damages will be held forthwith to determine a monetary

award for trespass and conversion.

### VI.    Motion to Strike and Motion to Exclude

Plaintiff has filed Plaintiff's Motion to Strike, arguing that Centera's

opinions are not relevant to the remaining issues in this case.  Pl.'s Mot. Strike.

Defendants have filed Defendants' Motion to Exclude, seeking to exclude Hazel's

testimony as irrelevant and unreliable.  Defs.' Mot. Exclude.

The Federal Rules of Evidence provide that a qualified expert may provide

testimony that "will help the trier of fact to understand the evidence or to

determine a fact in issue."  Fed. R. Evid. 702(a).  Hazel was retained by Plaintiff to

provide an assessment of damages suffered by the Osage Nation.  Expert Report

Steven Hazel [Doc. 338-1].  Centera was retained by Defendants to respond to the

report prepared by Hazel on the calculation of damages.  Expert Report Kimberlee

Centera [Doc. 200-1].  Her report addressed two questions: (1) "whether a

knowledgeable and experienced wind developer would have reasonably anticipated

that a lease from the mineral owner would be required prior to construction of the

project" and (2) "if a wind energy developer was clearly apprised prior to

construction commencing that a mining lease was required to engage in ordinary

turbine foundation excavation for a wind energy project, would the developer have

**Add. 45**

[a] practical and effective alternative to using minerals so 'mined' from the mineral estate in the construction of foundations for the Project." Id. at 4.

Damages remain a live issue in this case.  As the Parties have not yet presented their evidence on damages at trial, Plaintiff's Motion to Strike and Defendants' Motion to Exclude are premature.  Both motions are deferred until the damages trial.

## CONCLUSION

The Court holds that no genuine issues of material fact exist for Plaintiff's and Plaintiff-Intervenor's claims for declaratory relief regarding Defendants' violation of 25 C.F.R. §§ 211 and 214.  The Court also holds that no issues of material fact exist as to the liability of Defendants Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc. for the torts of trespass, continuing trespass, and conversion.  Summary judgment is appropriate on these claims, monetary damages shall be awarded on the claims of trespass and conversion after a damages trial, and equitable relief shall be awarded on the claim of continuing trespass.  The Court defers Defendants' Motion to Exclude and Plaintiff's Motion to Strike until the damages trial.

Add. 46

**ORDER**

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

(1)    Plaintiff-Intervenor's Motion for Summary Judgment [Doc. 294] is granted in part as it pertains to the granting of declaratory, monetary, and equitable relief against Defendants Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc. and denied in part as it pertains to the calculation of damages and fees.

(2)    Defendants' Motion for Partial Summary Judgment [Doc. 297] is denied.

(3)    Plaintiff United States' Motion for Summary Judgment [Doc. 300] is granted as it pertains to the granting of declaratory, monetary, and equitable relief against Defendants Osage Wind, LLC, Enel Kansas, LLC, and Enel Green Power North America, Inc. and denied in part as it pertains to the calculation of damages and fees and an accounting.

(4)    Plaintiff United States' Motion to Strike the Testimony of Defendants' Expert Witness Kimberlee Centera [Doc. 290] is deferred.

(5)    Defendants' Motion to Exclude the Testimony of Plaintiff United States' Expert Witness Steven J. Hazel [Doc. 337] is deferred.

**Add. 47**

(6)     Trial will be scheduled on the issue of damages.  The Court will

contact the Parties to arrange a status conference to discuss trial

scheduling and pre-trial matters.

IT IS SO ORDERED this 20th day of December, 2023.


                         /s/ Jennifer Choe-Groves
                           Jennifer Choe-Groves
                          U.S. District Court Judge[*]

---

[*]Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.

**Add. 48**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **and** | |
| **OSAGE MINERALS COUNCIL,** | |
| **Plaintiff-Intervenor,** | **Court No. 4:14-cv-00704-JCG-JFJ** |
| **v.** | |
| **OSAGE WIND, LLC, ENEL KANSAS, LLC, AND ENEL GREEN POWER NORTH AMERICA, INC.,** | |
| **Defendants.** | |

## <u>OPINION AND ORDER</u>

In this opinion, the Court addresses the final damages phase in a litigation filed over 10 years ago by the United States and the Osage Nation against the private developers of a wind turbine farm in Osage County, Oklahoma.

After years of litigation, including appeals to the U.S. Court of Appeals for the Tenth Circuit and the U.S. Supreme Court, this Court found Defendants Osage Wind, LLC ("Osage Wind"), Enel Kansas, LLC, and Enel Green Power North America, Inc. (collectively, "Defendants") liable on Plaintiff's and Plaintiff-

**Add. 49**

Intervenor Osage Minerals Council's claims of conversion, trespass, and

continuing trespass, and ordered declaratory relief, equitable relief, and monetary

damages.  United States v. Osage Wind, LLC ("Osage Wind II"), 710 F. Supp. 3d

1018, 1042–43 (N.D. Okla. 2023); see also United States v. Osage Wind, LLC

("Osage Wind I"), 871 F.3d 1078 (10th Cir. 2017).  This Court held a damages

bench trial.  Subsequently, the Parties spent several months attempting to reach a

settlement, which was unsuccessful.

For the reasons discussed below, the Court grants injunctive relief in the

form of ejectment of the wind towers by December 1, 2025 on the claim of

continuing trespass, with Defendants estimating that it will cost approximately

$259 million to remove the wind towers.  The Court awards damages on the claim

of conversion in the amount of $242,652.28, and damages on the claim of trespass

in the amount of $66,780.00.  The Court also awards to Plaintiff $1,943,666.17 for

attorneys' fees and $32,554.08 for costs, and awards to Plaintiff-Intervenor

$1,822,575.85 for attorneys' fees and $88,891.78 for costs.  The Court denies

Plaintiff's and Plaintiff-Intervenor's requests for pre-judgment interest and treble

damages.

**Add. 50**

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's damages analysis. Osage Wind II, 710 F. Supp. 3d at 1025–29; Osage Wind I, 871 F.3d at 1082–84.

Osage County, Oklahoma incorporates the area designated by Congress as the Indian reservation for the Osage Nation.  Okla. Const. art. XVII, § 8; Act of June 5, 1872, ch. 310, 17 Stat. 228 (1872).  Congress severed the surface estate from the mineral estate in Osage County ("Osage Mineral Estate") in 1906.  Act of June 28, 1906 ("Osage Act") §§ 2–3, ch. 3572, 34 Stat. 539, 540–44 (1906). Under the Osage Act, the surface estate was allotted to members of the Osage Nation.  Id. § 2, 34 Stat. at 540–43.  The Osage Mineral Estate was not allotted to individuals but was reserved for the benefit of the Osage Nation.  Id. § 3, 34 Stat. at 543–44.  The Osage Act authorized the Osage Nation, with the approval of the Secretary of the Interior, to issue "leases for all oil, gas, and other minerals" in the mineral estate.  Id.  Those wishing to engage in mining activities in the Osage Mineral Estate must obtain a lease from the Secretary of the Interior.  25 C.F.R. § 214.

Beginning in 2010, Defendants leased approximately 8,400 acres of surface rights in Osage County, Oklahoma on which to construct a commercial wind farm. Osage Wind I, 871 F.3d at 1083.  The wind farm involved the construction of 84

**Add. 51**

Case 4:14-cv-00704-JCG-JFJ    Document 515 Filed in USDC ND/OK on 12/18/24    Page 4 of
Appellate Case: 25-5020    Document: 92    Date Filed: 04/16/2025    Page: 114

Case No. 4:14-cv-00704-JCG-JFJ                                                              4

wind turbines, underground electrical lines, an overhead transmission line,
meteorological towers, and access roads.  Id.  The wind towers were secured into
the ground with reinforced concrete foundations.  Id.  In 2011, Plaintiff and
Plaintiff-Intervenor expressed concern that the project would block access to the
mineral estate and interfere with oil and gas production.  Id.

The Osage Nation filed a lawsuit in October 2011 to halt the construction of
the proposed wind farm, alleging that the project unlawfully deprived the Osage
Nation of access to and the right to develop the mineral estate.  Compl. [Doc. 2],
Osage Nation v. Wind Capital Grp., LLC, Case No. 4:11-cv-00643.  The Osage
Nation's claims were denied, and the case was dismissed on its merits.  Osage
Nation v. Wind Capital Grp., LLC, 2011 U.S. Dist. LEXIS 146407 (N.D. Okla.
Dec. 20, 2011).

Defendants' construction on the wind towers began in October 2013 with
site preparation, and excavation work began in September 2014.  Osage Wind I,
871 F.3d at 1083.  Defendants excavated holes to accommodate cement
foundations measuring ten feet by 60 feet for each tower.  Id.  Smaller excavated
rocks were crushed and used as backfill for the cement foundations.  Id.  Larger
rocks were positioned near the holes from which they were removed.  Id.

Plaintiff commenced this action on November 21, 2014, seeking a
declaratory judgment that Defendants engaged in unauthorized mining and

**Add. 52**

excavation in the Osage Mineral Estate without first obtaining a lease, permanent
injunctive relief requiring the cessation of Defendants' activities, and monetary
damages.  Compl.; Summons [Doc. 3].  Plaintiff later amended its Complaint to
add claims of trespass, continuing trespass, and conversion based on Defendants'
extraction of minerals during the construction of the wind tower project.  Am.
Compl. [Doc. 20].  Plaintiff moved for partial summary judgment on its claims for
declaratory relief, asking the Court to rule that Defendants' excavation of minerals
during the construction of the wind towers required a lease for mining activities
under 25 C.F.R. §§ 211 and 214.  Pl.'s Mot. Part. Summ. J. Counts I & II Am.
Compl. & Request Expedited Consideration [Doc. 24].  Defendants also moved for
summary judgment on Plaintiff's claims.  Defs.' Mot. Dismiss Summ. J. Opening
Br. Supp. [Doc. 26].  The Court granted Defendants' summary judgment motion,
holding that Defendants' activities did not constitute mining under 25 C.F.R. § 214
and that a lease was not required.  United States v. Osage Wind, LLC, 2015 U.S.
Dist. LEXIS 132480 (N.D. Okla. Sept. 30, 2015), rev'd, 871 F.3d 1078 (10th Cir.
2017).

Plaintiff-Intervenor appealed the district court's opinion dismissing
Plaintiff's claims.  Pl.-Interv.'s Notice Appeal [Doc. 49].  The U.S. Court of
Appeals for the Tenth Circuit ("Tenth Circuit Court of Appeals") reversed the
district court's order, finding that Defendants' activities constituted mining and

**Add. 53**

that a lease was required under 25 C.F.R. § 214.7.  Osage Wind I, 871 F.3d at

1093.  The U.S. Supreme Court denied Defendants' petition for a writ of certiorari.

Osage Wind, LLC v. Osage Minerals Council, 586 U.S. 1096 (2017).

On remand, Plaintiff-Intervenor filed Plaintiff-Intervenor's Motion for

Summary Judgment.  Pl.-Interv.'s Mot. Summ. J [Doc. 294].  Defendants filed

Defendants' Motion for Partial Summary Judgment and Opening Brief in Support.

Defs.' Mot. Part. Summ. J. Opening Br. Supp. [Doc. 297].  Plaintiff filed

Plaintiff's Motion for Summary Judgment.  Pl.'s Mot. Summ. J. [Doc. 300].  This

Court granted summary judgment as to liability on Plaintiff's claims of conversion,

trespass, and continuing trespass and held that Plaintiff and Plaintiff-Intervenor are

entitled to monetary damages on their conversion and trespass claims and equitable

relief in the form of ejectment on their continuing trespass claim.  Osage Wind II,

710 F. Supp. 3d at 1042.

A damages bench trial began on May 21, 2024.  Min. Orders [Docs. 456–

64].  Closing arguments took place on July 9, 2024.  Min. Order [Doc. 491].  The

Parties submitted post-trial briefs.  Pl.'s Resp. Defs.' Br. Resp. July 10, 2024 Order

Concerning Trespass Damages [Doc. 501]; Pl.-Interv.'s Resp. Defs.' Br. Resp. July

# Add. 54

10, 2024 Order [Doc. 503]; Defs.' Reply Supp. Br. Resp. July 10, 2024 Order

[Doc. 505]; see also Order (July 31, 2024) [Doc. 500].

The Court directed the Parties to provide briefing on attorneys' fees and

costs.  Order (July 10, 2024) [Doc. 492].  The Parties filed briefs addressing the

availability of awarding fees and costs.  Pl.'s Br. Entitlement Att'ys' Fees Cost

("Pl.'s Att'ys' Fee Br.") [Doc. 495]; Defs.' Br. Resp. July 10, 2024 Order [Doc.

496]; Pl.-Intervs.' Br. Supp. Att'y Fees Costs ("Pl.-Interv.'s Fees and Costs Br.")

[Doc. 498]; Defs.' Resp. Pl.'s Br. Entitlement Att'ys' Fees Costs ("Defs.' Att'ys'

Fee Br.") [Doc. 502]; Pl.'s Reply Br. Entitlement Att'ys' Fees Costs ("Pl.'s Att'ys'

Fee Reply Br.") [Doc. 504]; Pl.-Interv.'s Reply Entitlement Att'y Fees Costs [Doc.

506].  At the request of the Court, the Parties filed additional briefing on the

quantum of fees and costs that Plaintiff and Plaintiff-Intervenor seek to recover.

Letter (Dec. 4, 2024) [Doc. 511]; Pl.'s Quantum Att'ys' Fees, Costs, & Expenses

("Pl.'s Fees and Costs Br.") [Doc. 513]; Defs.' Resp. Pls.' Br. Quantum Att'ys'

Fees & Costs ("Defs.' Fees and Costs Resp.") [Doc. 514].

At the conclusion of the damages trial, the Parties expressed a desire to

attempt to reach an amicable resolution of this case through mediation.  Trial Tr.

vol. XV, 1719:17–1740:5 [Doc. 472].  The Court ordered the Parties to provide

regular updates on the status of their settlement efforts.  Order (July 10, 2024).

The Parties advised the Court on September 27, 2024 that settlement efforts

**Add. 55**

reached an impasse.  Pl.'s Final Status Report Settlement Efforts [Doc. 509];

Defs.' Resp. Pl.'s Status Report [Doc. 510].

**FINDINGS OF FACT**

The Court makes the following findings of fact based on a review of the

documents admitted into evidence and the credible testimony of the witnesses

during the bench trial:

### I.      Osage Wind Farm

Defendants operate the Osage Wind Farm in Osage County, Oklahoma, a

150-megawatt wind project that includes 84 wind towers, a collector system, a

substation, and transmission poles and lines.  Trial Tr. vol. I, 42:15–23 [Doc. 474];

Trial Tr. vol. XII, 1392:7–10 [Doc. 480].  The project was initially developed by

Osage Wind under the ownership of Wind Capital Group.  See Defs.' Ex. 22.  In

August 2013, Tradewind Energy ("Tradewind"), which is partially owned by

Defendants, purchased the wind farm project from Osage Wind.  Trial Tr. vol. I,

18:24–19:2; Trial Tr. vol. IV, 379:7–13, 409:3–7 [Doc. 467]; Defs.' Sealed Elec.

Filing Supp. Tr. Submission Pursuant LCvR30-1(c) Ex. F at 56:10–13 [Doc. 448].

Defendants purchased the wind farm project from Tradewind in September 2014.

Defs.' Ex. 20; Trial Tr. vol. VI, 613:25–614:14 [Doc. 468].

In 2010, Osage Wind entered into lease agreements with six surface rights

holders for the use of approximately 8,400 acres of land in Osage County.  Trial

# Add. 56

Case 4:14-cv-00704-JCG-JFJ    Document 515 Filed in USDC ND/OK on 12/18/24    Page 9 of
Appellate Case: 25-5020    Document: 92    Date Filed: 04/16/2025    Page: 119

Case No. 4:14-cv-00704-JCG-JFJ                                                              9

Tr. vol. I, 42:12–23; Trial Tr. vol. II, 176:24–177:13 [Doc. 466]; Trial Tr. vol. X,

1154:5–16 [Doc. 479]; Pl.'s Ex. 60 ("Freas Report") at 3; Pl.'s Ex. 61 ("Hazel

Report") at 2; Defs.' Ex. 103 ("Pfahl Report") at 10; Defs.' Ex. 64 ("Surface

Lease").  Excavation work on the wind farm began in September 2014.  See Trial

Tr. vol. VII, 790:14–16 [Doc. 477].  During construction, mineral material was

excavated from the Osage Mineral Estate, crushed, and used as backfill on the

surface.  See Trial Tr. vol. I, 87:17–20.  Blasting was used in the excavation of 82

of the 84 wind tower excavation sites.  Pl.'s Ex. 31; Trial Tr. vol. II, 130:10–12;

Trial Tr. vol. V, 524:6–525:17 [Doc. 476]; Trial Tr. vol. IV, 461:5–19.  In 2014,

Bill Moskaluk, the Site Coordinator for the wind farm, represented to the Court

that Defendants' "contractor records the volume of rock crushed and the rock is

then stored at the site."  Defs.' Resp. Pl.'s Mot. Prelim. Inj. [Doc. 17] at Ex. 1

[Doc. 17-1] ¶ 15(a)(ii).  Defendants' contractors and subcontractors failed to

maintain, however, a record of the volume of mineral material extracted from the

Osage Mineral Estate during the construction of the wind farm.  See Trial Tr. vol.

IX, 988:25–990:2 [Doc. 478].

Prior to the start of construction, Barr Engineering prepared design drawings

("Barr Drawings") and RMT, Inc. prepared a Geothermal Investigation Report

("RMT Report").  Freas Report at 5–7; Pfahl Report at 11, 24, 28; Pl.'s Ex. 65

# Add. 57

("RMT Report"), Defs.' Ex. 16 (2014 Barr Drawings S-01 and S-02).[1]  The

diameter of the wind towers' base foundations measured 52 feet.  Defs.' Ex. 16;

Trial Tr. vol. I, 45:24–46:2, 49:3–7.  The depth of the excavation sites measured

nine feet, nine inches at the wind tower foundation and nine feet, three inches at

the edge of the excavation base.  Defs.' Ex. 16.  The top of the foundation

extended two feet, six inches above ground level.  See Pfahl Report at 29.

Each of the wind tower excavation sites utilized a side slope for access into

the foundation construction area and a work area around the spread footing for

rebar placement, concrete pours, and backfill and compaction requirements.  Freas

Report at 7–8; see Pfahl Report at 29.  The width of the work area measured

approximately eight feet.  Trial Tr. vol. I, 49:17–50:5, 52:6–13.  The side slopes of

the excavation areas needed to adhere to specific Occupational Safety and Health

Administration ("OSHA") requirements.  Trial Tr. vol. I, 52:14–22.  The grade of

the side slope was dependent on the minerals in the ground, a shallower slope

being required with softer materials.  Trial Tr. vol. I, 52:25–53:11; Trial Tr. vol. II,

129:8–130:24 [Doc. 466].  The soil at the excavation sites was generally

---

[1] Plaintiff referenced post-construction Barr Drawings S-01 and S-03 in its cross-examination of Pfahl.  Trial Tr. vol. XII, 1360:6–1365:15.  These drawings were not admitted into evidence during trial.  Barr Drawing S-03, which was produced post-construction, is reproduced as Figure 5-2 in Pfahl's Report.  See Pfahl Report at 25; Trial Tr. vol. XII, 1361:24–1362:18.

classifiable as Type B, which allowed for a one horizontal foot to one vertical foot incline to a depth of 20 feet.  RMT Report at 10; Trial Tr. vol. IX, 1059:22–1060:12; 29 C.F.R. § 1926.652(b)(2), app. A.  The Barr Drawings indicated that the excavations would require a minimum of a one-to-one side slope incline.  See Pfahl Report at 29.  Eleven of the wind tower excavation sites allowed for side slopes with inclines of two horizontal feet for every one vertical foot, and the remaining 73 sites allowed for side slopes with inclines of one horizontal foot for every one vertical foot.  Trial Tr. vol. I, 53:23–54:4; Trial Tr. vol. II, 128:15–130:2.

The 11 wind tower excavation sites with side slopes of a two-to-one incline had a depth of approximately ten feet.  Trial Tr. vol. I, 54:9–11.  The radius of the base of the excavation area, including the wind tower and the eight-foot surrounding work area, measured approximately 34 feet.  See Trial Tr. vol. I, 56:6–16.  The radius of the excavation area at ground level was 54 feet.  Trial Tr. vol. I, 57:7–8.  The volume of mineral material excavated from each wind tower foundation with a two-to-one side slope amounted to 61,868.43 cubic feet.

The remaining 73 wind tower excavation sites with side slopes of a one-to-one incline had a depth of ten feet.  Trial Tr. vol. I, 54:9–11.  The base of each excavation area, including the wind tower and the eight-foot surrounding work area, had a radius of approximately 34 feet.  See Trial Tr. vol. I, 56:6–16.  The

**Add. 59**

radius of the excavation area at ground level stretched 44 feet. Trial Tr. vol. I, 57:5–7.

Trenches of at least 177,277 linear feet in length were excavated in the construction of the collector system. Freas Report at 9; Trial Tr. vol. I, 59:5–18. The typical conduit trench was three feet deep and six inches wide, yielding a cross-sectional area of 1.5 square feet. Freas Report at 9; Trial Tr. vol. I, 59:23–25. Defendants excavated approximately 265,915.5 cubic feet of mineral material during the construction of the collector system. Freas Report at 9; Trial Tr. vol. I, 61:1–7.

The mineral material excavated during construction of the wind farm contained limestone, shale, and clay. Freas Report at 3, 7, 9–11; Pfahl Report at 8, 17, 18–19; Trial Tr. vol. IX, 1034:24–1035:19. Each of these minerals had commercial value and was sold at Burbank Materials, a quarry located adjacent to the wind farm. See Pl.'s Ex. 39. The mineral material excavated for the wind towers was 54.18 percent limestone, 25.56 percent shale, and 20.26 percent clay. Freas Report at 7; Trial Tr. vol. I, 73:23–74:3. The mineral material excavated for the collector system trenches was 28.5 percent limestone, 1.3 percent shale, and 70.2 percent clay. Freas Report at 9; Trial Tr. vol. I, 79:3–12. The excavated limestone had an approximate density of 155 pounds per cubic foot ("pcf"), the

shale had an approximate density of 130 pcf, and the clay had an approximate

density of 115 pcf.  RMT Report at 8.

Burbank Materials was the "nearest shipping point" to the wind farm.  Trial

Tr. vol. I, 63:19–22; Trial Tr. vol. XI, 1309:25–1311:4 [Doc. 470]; 25 C.F.R.

§ 214.10.  During the construction period, Burbank Materials sold limestone for

$8.90 per ton and shale and clay for $6.00 per ton.  Freas Report at 11; Pl.'s Ex.

39; Defs.' Ex. 63.

In October 2013, the Osage Minerals Council solicited information from

Wind Capital Group and Tradewind "to determine the federal permitting, leasing

and other regulatory requirements that could apply to the Osage Wind Project."

Defs.' Ex. 18 at 4.  This letter referenced that "[i]n addition to oil and gas, the

Osage Mineral Estate consists of solid materials, including limestone, dolomite,

sandstone, sand, gravel, clay, and shale" and that activities within the mineral

estate "may be subject to a range of federal regulatory requirements, including the

need to secure a federal permit or lease to undertake such activities, pursuant to 25

C.F.R. §§ 411 and 414."  Id.  The Bureau of Indian Affairs contacted Defendants

on October 9, 2014, advising that an inspector had observed a large pit with piles

of crushed limestone around a wind turbine foundation.  Defs.' Ex. 23.  The letter

directed Defendants to cease further excavation until the necessary permits were

obtained and threatened legal action for non-compliance.  Id.  Acting Principal

**Add. 61**

Chief Raymond Red Corn of the Osage Nation asked Defendants in November 2014 to suspend construction of the wind energy facilities, noting that Defendants "have taken Osage minerals for use in construction of wind turbines without permits or approval of the Osage Minerals Council." Defs.' Ex. 26. Defendants did not cease work in response to these mandates. See Trial Tr. vol. V, 533:24–534:6, 536:20–537:14; Trial Tr. vol. XIII, 1569:12–18, 1572:25–1573:11 [Doc. 471]; Pl.'s Ex. 29.

Wind Capital Group and Tradewind retained the law firm Modrall, Sperling, Roehl, Harris & Sisk, P.A. ("Modrall Sperling") in October 2013, after receiving the Osage Minerals Council's letter soliciting information needed to determine if a lease was required for the wind farm project. Trial Tr. vol. VI, 601:25–602:4, 603:7–11; Defs.' Ex. 18 at 4. Modrall Sperling produced a memorandum on October 31, 2013 with the subject line "[r]ights of surface owners to use soil," discussing "[w]hether a surface owner who excavates land for the purpose of construction consistent with its surface rights—and does not remove the land excavated from the property—is engaged in 'mining' of the mineral estate and requires a mining permit." Defs.' Ex. 48 ("October 2013 Modrall Sperling Memo") at 1; see also Trial Tr. vol. VI, 603:9–11. The October 2013 Modrall Sperling Memo described the wind farm construction as "[t]o the extent any soil or other subsurface material is (touched) by [Tradewind], it is merely incidental to

**Add. 62**

[Tradewinds'] construction of its approved wind farm.  No soil is removed from the site, or processed on site for a commercial use."  October 2013 Modrall Sperling Memo at 2.  The memorandum reasoned that no mining permit was required for the project and concluded that "[Tradewind was] not engaged in mining or other use of the mineral estate, but [was] taking actions consistent *only* with its [Surface Leases]."  Id. (emphasis in original).

Modrall Sperling produced a second memorandum on May 19, 2014 in response to their clients' request that the memorandum be directed to them.  Defs.' Ex. 49 ("May 2014 Modrall Sperling Memo"); Trial Tr. vol. VII, 806:3–9.  The May 2014 Modrall Sperling Memo largely reiterated the prior findings and analysis from the October 2013 Modrall Sperling Memo.  Compare October 2013 Modrall Sperling Memo at 2 with May 2014 Modrall Sperling Memo at 2.  A paragraph in the October 2013 Modrall Sperling Memo acknowledging that 25 C.F.R. § 214 "contains the regulations for the 'Leasing of Osage Reservations Lands, Oklahoma, for mining except oil and gas,'" was removed from the May 2014 Modrall Sperling Memo.  Compare October 2013 Modrall Sperling Memo at 2 with May 2014 Modrall Sperling Memo at 2.  The May 2014 Modrall Sperling Memo also added to its analysis the qualifying language "as we understand its plans" when discussing Tradewind's construction of the wind farm.  Compare October 2013 Modrall Sperling Memo at 2 ("[Tradewind's] construction of the

**Add. 63**

wind farm does not require a permit from the [Bureau of Indian Affairs] or the
Osage Nation") <u>with</u> May 2014 Modrall Sperling Memo at 2 ("[Tradewind's]
construction of the wind farm, *as we understand its plans*, will not require a permit
from the [Bureau of Indian Affairs] or the Osage Nation." (emphasis added)).  In
describing Tradewind's interaction with the mineral estate during construction, the
May 2014 Modrall Sperling Memo replaced the word "touched" with "moved."
<u>Compare</u> October 2013 Modrall Sperling Memo at 2 ("To the extent any soil or
other subsurface material is *(touched)* by [Tradewinds], it is merely incidental to
[Tradewind's] construction of its approved wind farm." (emphasis added)) <u>with</u>
May 2014 Modrall Sperling Memo at 2 ("To the extent any soil or other subsurface
material would be *moved* by [Tradewind], it would be merely incidental to
[Tradewind's] construction of its approved wind farm." (emphasis added)).

In August 2014, Defendants requested that Modrall Sperling prepare a
scaled-back memorandum without legal conclusions to provide to General Electric.
Defs.' Ex. 47 ("August 2014 Modrall Sperling Memo"); Pl.'s Ex. 7; Trial Tr. vol.
VII, 816:5–817:3.  The August 2014 Modrall Sperling Memo included multiple
changes from the prior versions.  <u>Compare</u> August 2014 Modrall Sperling Memo
<u>with</u> October 2013 Modrall Sperling Memo <u>and</u> May 2014 Modrall Sperling
Memo.  The subject line of the August 2014 Modrall Sperling Memo was changed
to expressly reference excavation.  <u>Compare</u> August 2014 Modrall Sperling Memo

**Add. 64**

at 1 ("Rights of surface owners or their lessees in Osage County, Oklahoma to excavate or utilize soil") with October 2013 Modrall Sperling Memo at 1 ("Rights of surface owners to use soil") and May 2014 Modrall Sperling Memo at 1 (same). The "Question Presented" was revised to change "excavates land" to "excavates soil and related materials" and to change "does not remove the land excavated from the property" to "does not remove the materials excavated from the property subject to a mineral reservation." Compare August 2014 Modrall Sperling Memo at 1 with October 2013 Modrall Sperling Memo at 1 and May 2014 Modrall Sperling Memo at 1. The August 2014 Modrall Sperling Memo removed references to the Osage Minerals Council's contention that a lease or permit was necessary, which had been included in prior versions of the memorandum. Compare August 2014 Modrall Sperling Memo with October 2013 Modrall Sperling Memo at 2 and May 2014 Modrall Sperling Memo at 2; see also Trial Tr. vol. VII, 819:16–820:10. A finalized version of the May 2014 Modrall Sperling Memo was prepared in September 2014. Defs.' Ex. 50 ("September 2014 Modrall Sperling Memo"); Defs.' Ex. 46.

## II.    Party Experts

The Parties offered three expert witnesses during trial: Robert C. Freas, John Pfahl, and Stephen Hazel. Trial Tr. vol. I, 33:22–Trial Tr. vol. II, 151:7; Trial Tr.

vol. II, 162:24–Trial Tr. vol. III, 355:24; Trial Tr. vol. IX, 992:23–Trial Tr. vol

XII, 1386:13.

"The district courts have broad discretion to determine the admission of

expert testimony." <u>Taylor v. Cooper Tire & Rubber Co.</u>, 130 F.3d 1395, 1397

(10th Cir. 1997). The court's review of a proposed expert's testimony is governed

by Federal Rule of Evidence 702 and the U.S. Supreme Court's opinions in

<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and <u>Kumho</u>

<u>Tire Co., Ltd. v. Carmichael</u> ("<u>Kumho Tire</u>"), 526 U.S. 137 (1999). Federal Rule

of Evidence 702 provides that:

> [a] witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an opinion
> or otherwise if the proponent demonstrates to the court that it is more
> likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine a
> fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles
> and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, the trial judge is tasked with "ensuring that an

expert's testimony both rests on a reliable foundation and is relevant to the task at

hand." <u>Daubert</u>, 509 U.S. at 597. The objective of this "gatekeeping

requirement . . . is to make certain that an expert, whether basing testimony upon

professional studies or personal experience, employs in the courtroom the same

# Add. 66

level of intellectual rigor that characterizes the practice of an expert in the relevant

field." Kumho Tire, 526 U.S. at 152.  Rule 702 applies to all experts, including

those offered in non-scientific fields.  See United States v. Kamahele, 748 F.3d

984, 998 (10th Cir. 2014).

Admissibility of an expert's opinion is determined through a two-step

analysis.  Mathis v. Huff & Puff Trucking, Inc., 787 F.3d 1297, 1307 (10th Cir.

2015) (citing United States v. Nacchio, 555 F.3d 1234, 1241 (10th Cir. 2009)).

The Court must first "determine whether the expert is qualified by knowledge,

skill, experience, training, or education to render an opinion."  Id. (internal

quotation omitted).  If the expert is deemed qualified, "the [C]ourt must determine

whether the expert's opinion is reliable by assessing the underlying reasoning and

methodology, as set forth in Daubert."  Id. (citation omitted).  In Daubert, the U.S.

Supreme Court identified four non-exclusive factors that may be considered in

judging the reliability of an expert's opinion: (1) whether a "theory or scientific

technique . . . can be (and has been) tested;" (2) whether the "theory or technique

has been subjected to peer review and publication;" (3) whether there exists a

"known or potential rate of error and the existence and maintenance of standards

controlling the technique's operation;" and (4) the degree of acceptance of a

technique within a relevant community.  Daubert, 509 U.S. at 593–94.  The U.S.

Supreme Court has explained that these factors "may or may not be pertinent in

# Add. 67

assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." <u>Kumho Tire</u>, 526 U.S. at 150.

### A.    Robert C. Freas

Plaintiff offered Robert C. Freas as an expert witness on the value of the extracted minerals.  Freas is the President of Industrial Minerals Resource Consultants Inc.  Freas Report at 1.  He holds a Bachelor of Science degree in Geology and Biology and Masters level degrees in Geology and Business and is a registered professional geologist with the American Institute of Professional Geologists and the states of Tennessee and Indiana.  <u>Id.</u> at 2; Trial Tr. vol. I, 34:8–20.  He has more than "45 years' experience in the mining and industrial minerals industry with specific experience in the areas of developing and mining crushed stone and other construction raw materials including limestone, dolomite, sand, and gravel, as well as a host of other materials."  Freas Report at 1–2; Trial Tr. vol. I, 34:21–38:12.  Freas has authored more than 40 publications and has served as the President of the Society for Mining, Metallurgy, and Exploration, the American Institute of Mining, Metallurgical, and Petroleum Engineers, and the United Engineering Foundation.  Freas Report at 2.  Freas was admitted as an expert in the field of industrial mineral geology, industrial mineral valuation, industrial mineral development, and industrial mineral mining operations.  Trial Tr. vol. I, 42:4–11.

# Add. 68

The Court finds that Freas is qualified by knowledge, skill, experience, training, or education to render an opinion.

In calculating the quantity of mineral material extracted in the construction of the wind towers, Freas relied on the Barr Drawings, RMT Report, construction notes, and photographs.  Freas Report at 5–7; see also Defs.' Ex. 16; Pfahl Report at 29.  Based on these sources, Freas determined that each of the wind tower excavation sites required an access ramp into the foundation construction area and a work area around the spread footing for rebar placement, concrete pours, and backfill and compaction requirements.  Freas Report at 7–8.  Freas determined the approximate width of the work area using people in photographs for scale.  Trial Tr. vol. I, 49:17–50:5, 52:6–13; see Pl.'s Ex. 35.  Freas considered drill logs, cores, and photographs in the geologic report in determining the necessary incline of side slopes for each of the 84 wind tower sites.  Trial Tr. vol. I, 53:23–54:4; Trial Tr. vol. II, 128:15–130:2.

In his calculation, Freas used a standard depth of ten feet for each of the wind tower excavation sites.  Trial Tr. vol. I, 54:9–11.  He also used a radius of 34 feet for the base of the work sites, based on the foundation and surrounding work area.  Trial Tr. vol. I, 56:6–16.  Using these values, Freas calculated the area in common to all the wind tower sites—a cylinder extending from the circumference of the base to the ground level, not including the side slope—to have a volume of

36,316.9 cubic feet.[2]  Trial Tr. vol. I, 56:18–22.  Freas next calculated the volume

of the mineral material excavated from the space above the side slopes.  Trial Tr.

vol. I, 56:24–57:8.  In doing so, he treated the space as a truncated hollow cone and

calculated its volume with the formula $\pi \frac{h}{2}(R^2 - r^2)$, where "h" is height, "R" is

the radius of the larger base, and "r" is the radius of the smaller base.  Trial Tr. vol.

I, 56:24–57:8.  For the wind tower sites with a one-to-one side slope, Freas

calculated the volume of the mineral material removed from the side slope areas to

be 12,252.2 cubic feet.[3]  Trial Tr. vol. I, 57:10–16.  For the wind tower sites with a

two-to-one side slope, Freas calculated the volume of the mineral material

removed from the side slope areas to be 27,646.1 cubic feet.[4]  Trial Tr. vol. I,

57:17–21.  These volumes were added together to derive the total volume of

mineral material extracted from each wind tower excavation site.  Trial Tr. vol. I,

57:23–58:7.  Freas calculated that the total volume of mineral material excavated

from each wind tower excavation site with a one-to-one side slope was 48,569.1

cubic feet.[5]  Trial Tr. vol. I, 57:23–58:3.  He calculated that the total volume of

---

[2] To calculate the volume of a cylinder, Freas used the formula V=$\pi r^2$h, where "V"
is volume, "r" is the radius of the base, and "h" is the height of the cylinder.  Trial
Tr. vol. I 56:14–16.  $\pi \times 34^2 \times 10 = 36{,}316.9$.

[3] $\pi \frac{10}{2}(44^2 - 34^2) = 12{,}252.2$.

[4] $\pi \frac{10}{2}(54^2 - 34^2) = 27{,}646.1$.

[5] $36{,}316.9 + 12{,}252.2 = 48{,}569.1$.

# Add. 70

Case 4:14-cv-00704-JCG-JFJ    Document 515 Filed in USDC ND/OK on 12/18/24    Page 23
Appellate Case: 25-5020    Document: 92    Date Filed: 04/16/2025    Page: 133
of 92

Case No. 4:14-cv-00704-JCG-JFJ                                              23

mineral material excavated from each wind tower excavation site with a two-to-one side slope was 63,963 cubic feet.[6]  Trial Tr. vol. I, 58:3–7.  Using these figures, Freas determined that the total volume of mineral material excavated from the 84 wind tower excavation sites was 4,249,137 cubic feet.[7]  Trial Tr. vol. I, 58:9–15.

Freas relied on the RMT Report in determining that the mineral material excavated during construction of the wind farm contained limestone, shale, and clay.  Freas Report at 3, 7, 9–11.  Freas reviewed individual drill logs to determine that the upper ten feet of the mineral estate for the wind tower excavation sites was composed of 54.18 percent limestone, 25.56 percent shale, and 20.26 percent clay.  Freas Report at 7; Trial Tr. vol. I, 73:23–74:3.  He applied the calculated mineral concentrations to the bulk densities for each mineral provided in the RMT Report and the calculated volumes of extracted mineral material to determine the tonnage of each specific mineral extracted during construction of the wind towers.  Freas Report at 7.  For limestone, Freas calculated a total tonnage of 178,419 tons.[8]  Trial Tr. vol. I, 74:7–16; 77:18–78:8.  For shale, Freas calculated a total tonnage of

---

[6] $36,316.9 + 27,646.1 = 63,963.$

[7] $(73 \times 48,569.1) + (11 \times 63,963) = 4,249,137.3.$

[8] $4,249,137 \text{ ft}^3 \times 0.5418 = 2,302,182.43 \text{ ft}^3$

$2,302,182.43 \text{ ft}^3 \times 155 \text{ pcf} = 356,838,276.12 \text{ lbs}$

$356,838,276.12 \text{ lbs} \div 2000 \text{ }^{\text{lbs}}/_{\text{ton}} = 178,419.14 \text{ tons}$

# Add. 71

Case 4:14-cv-00704-JCG-JFJ     Document 515 Filed in USDC ND/OK on 12/18/24     Page 24
Appellate Case: 25-5020     Document: 92     Date Filed: 04/16/2025     Page: 134

Case No. 4:14-cv-00704-JCG-JFJ                                                    24

70,595.16 tons.[9]  Trial Tr. vol. I, 74:16–19; 78:9–12.  For clay, Freas calculated a

total tonnage of 49,500 tons.[10]  Trial Tr. vol. I, 74:19–21; 78:12–16.

      Values for the extracted limestone, shale, and clay were determined by

applying the rates available at the closest quarry to the wind farm project, Burbank

Materials, and by calculating the applicable royalty rate based on 25 C.F.R.

§ 214.10(d), as referenced in <u>Osage Wind I</u>.  Freas Report at 11; <u>see also</u> 25 C.F.R.

§ 214.10(d); <u>Osage Wind I</u>, 871 F.3d at 1089.  Based on a purchase order issued

less than one year before construction began, Freas determined the value of the

minerals at Burbank Materials to be $8.90 per ton for limestone and $6.00 per ton

for both shale and clay.[11]  Trial Tr. vol. I, 65:19–70:14, 73:1–14; Freas Report at

11; <u>see</u> Defs.' Ex. 63.  Freas determined the royalty rate to be ten percent of the

value of the minerals at Burbank Materials.  Trial Tr. vol. I, 61:25–62:22, 76:6–11.

---

[9] $4,249,137 \text{ ft}^3 \times 0.2556 = 1,086,079.42 \text{ ft}^3$
  $1,086,079.42 \text{ ft}^3 \times 130 \text{ pcf} = 141,190,324.6 \text{ lbs}$
  $141,190,324.6 \text{ lbs} \div 2000 \text{ }^{\text{lbs}}/_{\text{ton}} = 70,595.16 \text{ tons}$

[10] $4,249,137 \text{ ft}^3 \times 0.2026 = 860,875.16 \text{ ft}^3$
  $860,875.16 \text{ ft}^3 \times 115 \text{ pcf} = 99,000,643.4 \text{ lbs}$
  $99,000,643.4 \text{ lbs} \div 2000 \text{ }^{\text{lbs}}/_{\text{ton}} = 49,500.32 \text{ tons}$

[11] A purchase order from September 2014 reflecting the same rates was admitted
into evidence at trial.  Pl.'s Ex. 39.

# Add. 72

For the minerals extracted from the wind tower sites, Freas calculated the royalty value of the limestone to be $158,792.91.[12]  Trial Tr. vol. I, 76:14–15.  He calculated the royalty value of the shale to be $42,357.[13]  Trial Tr. vol. I, 76:16–18. He calculated the royalty value of the clay to be $29,700.[14]  Trial Tr. vol. I, 76:19–22.  Freas calculated the total royalty value of the minerals extracted in construction of the wind towers to be $230,849.91.  Trial Tr. vol. I, 76:23–77:1; 77:16–78:23.

In determining the volume of materials extracted in the construction of trenches for the electrical collector system, Freas reviewed a "layout of the collector system, the cross-section drawings of the collector system, . . . [and] the RMT [R]eport."  Trial Tr. vol. I, 58:25–59:5; Freas Report at 9.  Freas calculated that 177,277 linear feet were excavated for the collector system trenches.  Trial Tr. vol. I, 59:2–18; Freas Report at 9.  Freas acknowledged that this amount was less than the 194,400 linear feet of collector system path recorded in Defendants' weekly report, but opted to use the lesser amount, which he deemed more accurate based on a review of the drawings and changes made during construction.  Freas

---

[12] $178,419 \times 8.90 \times 0.1 = \$158{,}792.91$
The Court observes that Freas testified that the value of the limestone was $158,792.81.  Trial Tr. vol. I, 76:14–15.  His calculations appear to use the correct value of $158,792.91.
[13] $70{,}595 \times 6.00 \times 0.1 = \$42{,}357$
[14] $49{,}500 \times 6.00 \times 0.1 = \$29{,}700$

Report at 9; Trial Tr. vol. I, 59:5–18.  Based on engineering drawings, Freas

determined the typical conduit trench to be three feet deep and six inches wide,

yielding a cross-sectional area of 1.5 square feet.  Freas Report at 9; Trial Tr. vol. I,

59:23–25.  The cross-sectional area was multiplied by the total length of the

trenches to determine the quantity of mineral material excavated during the

construction of the collector system.  Freas Report at 9; Trial Tr. vol. I, 61:1–7.

Freas calculated that a total of 265,915.5 cubic feet of mineral material was

excavated during construction of the collector system trenches.[15]  Trial Tr. vol. I,

61:1–12.

Freas reviewed the upper three feet of the nearest drill holes to the collector

system and determined that the mineral estate in that area was composed of 28.5

percent limestone, 1.3 percent shale, and 70.2 percent clay.  Freas Report at 9;

Trial Tr. vol. I, 79:3–12.  Using these percentages, Freas calculated that 5,873 tons

of limestone were excavated during construction of the collector system.[16]  Trial

Tr. vol. I, 79:18–23, 81:15–82:3.  He calculated the tonnage of shale excavated to

---

[15] $1.5 \times 177,277 = 265,915.5$

[16] $265,915.5 \text{ ft}^3 \times 0.285 = 75,785.92 \text{ ft}^3$

$75,785.92 \text{ ft}^3 \times 155 \text{ pcf} = 11,746,817.6 \text{ lbs}$

$11,746,817.6 \text{ lbs} \div 2000 \, ^{\text{lbs}}/_{\text{ton}} = 5,873.41 \text{ tons}$

# Add. 74

be 225 tons.[17]  Trial Tr. vol. I, 79:18–23, 81:15–82:3.  He calculated the tonnage of

excavated clay to be 10,734 tons.[18]  Trial Tr. vol. I, 79:18–23, 81:15–82:3.

Applying the same method as was used with the wind towers, Freas determined the

royalty value of the excavated limestone to be $5,226.97.[19]  Trial Tr. vol. I, 80:10–

15,82:3–10.  He calculated the royalty value of the shale to be $135.[20]  Trial Tr.

vol. I, 80:16–18, 82:3–10.  He calculated the royalty value of the clay to be

$6,440.40.[21]  Trial Tr. vol. I, 80:19–21, 82:3–10.  Freas calculated the total value of

the mineral material excavated in the construction of the collector system to be

$11,802.37.[22]  Trial Tr. vol. I, 80:22–25, 82:8–10.  Freas calculated the total

royalty value of the minerals excavated during construction of the wind towers and

collector system to be $242,652.28.[23]  Trial Tr. vol. I, 82:16–19.

     The Court finds that Freas' testimony is relevant to the issue of determining

the quantity and value of the mineral material extracted by Defendants.  In arriving

---

[17] $265,915.5 \text{ ft}^3 \times 0.013 = 3,456.90 \text{ ft}^3$
  $3,456.90 \text{ ft}^3 \times 130 \text{ pcf} = 449,397.2 \text{ lbs}$
  $449,397.2 \text{ lbs} \div 2000 \; {}^{\text{lbs}}/_{\text{ton}} = 224.7 \text{ tons}$
[18] $265,915.5 \text{ ft}^3 \times 0.702 = 186,672.68 \text{ ft}^3$
  $186,672.68 \text{ ft}^3 \times 115 \text{ pcf} = 21,467,358.2 \text{ lbs}$
  $21,467,358.2 \text{ lbs} \div 2000 \; {}^{\text{lbs}}/_{\text{ton}} = 10,733.68 \text{ tons}$
[19] $5,873 \times 8.90 \times 0.1 = \$5,226.97$
[20] $225 \times 6.00 \times 0.1 = \$135.00$
[21] $10,733.68 \times 6.00 \times 0.1 = \$6,440.40$
[22] $\$5,226.97 + \$135.00 + 6,440.40 = \$11,802.37$
[23] $\$230,849.91 + \$11,802.37 = \$242,652.28$

**Add. 75**

at his opinion, Freas relied on sufficient facts and data derived from the Barr Drawings, RMT Report, and other contemporaneous recordings. The Court finds Freas' method of calculating the approximate volume of minerals extracted to be based on reliable principles and methods. The Court further finds that Freas' methods of determining the quantity and value of limestone, shale, and clay included in the extracted mineral material are based on reliable principles and methods. Therefore, the Court finds that Freas' expert testimony is sufficiently reliable and is admissible.

### B.    John Pfahl

Defendants offered John Pfahl as an expert on the valuation of the excavated minerals. Pfahl is currently employed as Practice Lead, Portfolio Strategy and Development with BHP, a diversified mining company. Trial Tr. vol. IX, 993:5–10. At the time of preparing his report, Pfahl was employed by SRK Consulting, a consulting firm in the mining industry. Trial Tr. vol. IX, 994:5–20; Pfahl Report at 6. Pfahl holds a Master of Engineering, Engineer of Mines, and a Bachelor of Science in Engineering. Pfahl Report at 6; Trial Tr. vol. IX, 999:24–1000:4. He has worked in the mining and mineral industry for more than 20 years. Pfahl Report at 6. The primary component of his current position is "evaluat[ing] mining projects for investment and acquisition." Trial Tr. vol. IX, 993:11–16. Pfahl is a registered member of the Society of Miners. Trial Tr. vol. IX, 998:13–

**Add. 76**

25.  Through the Society of Miners, Pfahl is a "Qualified Person under the

disciplines of Valuation, Market and Financial Analysis and Engineering, Mine

Design, Infrastructure, Metallurgy and Processing under the guidelines of the

Canadian National Instrument 43-101, as well as a Competent Person in

accordance with the Australasian JORC Code." Pfahl Report at 6; see Trial Tr.

vol. IX, 999:1–14. Pfahl was admitted as an expert at trial. Trial Tr. vol. IX,

1017:14–17. The Court finds that Pfahl is qualified by knowledge, skill,

experience, training, or education to render an opinion.

In calculating the quantity of mineral material extracted in the construction

of the wind towers, Pfahl calculated the average diameter of a wind tower

excavation site by averaging the diameter at the base of a wind tower and the

diameter of the excavation site at ground level, resulting in an average diameter of

59.5 feet. Pfahl Report at 26; Trial Tr. vol. IX, 1053:24–1055:5. He then

calculated the depth of the excavation site by subtracting two feet, six inches, the

portion of the foundation extending above the surface, from nine feet, three inches,

the total height of the foundation, resulting in an average depth of six feet, nine

inches. Pfahl Report at 30. Though Pfahl considered this calculation to be

consistent with Moskaluk's declaration, he acknowledged that it likely did not

account for the total volume blasted. Id. at 30–31. Pfahl also acknowledged that

the Barr Drawings did not account for the possibility of over-excavation or

**Add. 77**

allowances for a working space or side slope. Id. at 31–32. Pfahl assumed a working space of five feet, though he noted that some photos suggested little or no working space for certain towers. Trial Tr. vol. IX, 1057:17–1058:20. He also testified that he assumed a one foot to one foot side slope for all of the sites because it was referenced in the Barr drawings. Trial Tr. vol. IX, 1059:4–20. Pfahl explained that the soil type identified in the RMT Report for all of the sites allowed for a one-to-one slope up to a depth of 20 feet. Trial Tr. vol. IX, 1059:4–16. To account for these additional factors, Pfahl calculated his volume estimate based on an average diameter of 70 feet and an average depth of ten feet. Pfahl Report at 32; Trial Tr. vol. IX, 1054:1–1055:5. This allowed for the average volume to be approximated by a cylinder with a volume of 1,425 cubic yards. Pfahl Report at 32. Pfahl limited his calculations to only 82 wind tower sites, concluding that mining did not occur at the other two sites. Id. at 34. Pfahl concluded that approximately 117,000 cubic yards of mineral material was excavated. Id. at 34–35.

Pfahl did not include the mineral material excavated from two of the wind tower sites or the collector system because he determined that they did not require the crushing of extracted minerals. Id. at 64. Significantly, Pfahl did not include shale and clay in determining the quantities and values of specific minerals because he considered shale and clay unlikely to have been crushed for backfill.

**Add. 78**

Id. at 26.  Pfahl reasoned that under the Tenth Circuit Court of Appeals' decision in Osage Wind I, crushing of the extracted mineral material was a required element to constitute mining.  Id. at 28, 60; Trial Tr. vol. IX, 1037:17–1039:1.  The Court has previously rejected such a narrow interpretation and held that the mining of the Osage Mineral Estate involved multiple actions, including excavation, sorting, crushing, and the "use of crushed rocks as backfill for support."  Osage Wind II, 710 F. Supp. 3d at 1036–38.  Despite considering only the value of the extracted limestone, Pfahl relied on the geotechnical drill borings in the RMT Report to determine that the top ten feet of the mineral estate for the average excavation site was composed of 54 percent limestone, 34 percent clay, and 10 percent shale. Pfahl Report at 28.

In his assessment of the value of the extracted mineral material, Pfahl considered a mineral lease between the Osage Minerals Council and Candy Creek Crusher, LLC, a quarry in Osage County, and a resolution passed by the Osage Minerals Council concerning another lease with APAC Central to mine at a quarry in Osage County.  Id. at 35–36; Trial Tr. vol. IX, 1068:12–1069:14, 1073:29– 1074:2; see Defs.' Exs. 21, 85.  Based on these documents, Pfahl determined that the royalty rate for limestone, as determined by the market, was $0.52 per ton in 2014.  Pfahl Report at 35–36.

**Add. 79**

Pfahl's calculation is inconsistent with 25 C.F.R. § 214.10(d), which provides that "[f]or substances other than gold, silver, copper, lead, zinc, coal, and asphaltum the lessee shall pay quarterly a royalty of [ten] percent of the value at the nearest shipping point of all ores, metals, or minerals marketed." 25 C.F.R. § 214.10(d). Neither of the quarries considered by Pfahl qualify as the "nearest shipping point" for the minerals extracted and both apply a rate different than that mandated by regulation 25 C.F.R. § 214.10(d).

Because Pfahl's opinion is heavily reliant on averaging, inconsistent with the holdings of <u>Osage Wind I</u> and <u>Osage Wind II</u>, and fails to apply the requirements of 25 C.F.R. § 214.10, the Court finds Pfahl's expert testimony to be unreliable and inadmissible.

### C.    Stephen Hazel

Plaintiff offered Stephen Hazel as an expert witness on the value of mineral leases. Hazel is a certified public account with FTI Consulting. Trial Tr. vol. II, 163:3–12, 164:19–22; <u>see also</u> Trial Tr. vol. II, 176:3–5. Hazel holds a degree in accounting from the University of Denver and has various credentials in valuation and financial forensics. Trial Tr. vol. II, 164:19–165:15. Between 1982 and 1999, Hazel was employed in "traditional accounting." Trial Tr. vol. II, 165:16–166:4. Since 1999, he has focused on forensic accounting. Trial Tr. vol. II, 166:5–167:20. Hazel has experience working on valuations involving Indian tribal interests and

**Add. 80**

mining operations.  Trial Tr. vol. II, 172:13–173:6, 174:4–175:21.  Hazel was

designated as an expert at trial.  Trial Tr. vol. III, 240:15–242:3 [Doc. 475].  The

Court finds that Hazel is qualified by knowledge, skill, experience, training, or

education to render an opinion.

In attempting to assign a value to the lease that Defendants failed to obtain

before extracting mineral material from the Osage Mineral Estate, Hazel

determined that the surface rights leases between surface rights holders and

Defendants were the "most reasonable and comparable proxy for the mineral lease

that Osage Wind was federally obligated to obtain in order to construct its [w]ind

[f]arm."  Hazel Report at 7, 20–22.  Hazel considered six Surface Leases between

Defendants and surface rights owners, with six identifiable income streams:

(1) signing bonuses; (2) development period rents; (3) exercise of option payments;

(4) fees during the construction period; (5) construction payments; and

(6) compensation for pasture damages.  Id. at 4–5, 7–12.  Based on these income

streams, Hazel calculated the amount paid by Defendants to surface rights owners

during the period in which the wind farm was under construction.  Id. at 4–5, 7–12;

Trial Tr. vol. II, 180:13–183:1, 195:17–198:10; Surface Lease ¶¶ 3.1, 3.2, 5.1, 5.2,

5.6, 14.7.  Hazel also calculated the damages based on the cash flows that would be

paid to the surface rights owners during the commercial operation of the towers.

Hazel Report at 12–22.  The Surface Leases have an initial term of 25 years and an

**Add. 81**

Case 4:14-cv-00704-JCG-JFJ    Document 515 Filed in USDC ND/OK on 12/18/24    Page 34
Appellate Case: 25-5020    Document: 92    Date Filed: 04/16/2025    Page: 144
of 92

Case No. 4:14-cv-00704-JCG-JFJ                                              34

option to renew for an additional 20 years.  Hazel's Report at 14; Trial Tr. vol. II,

183:6–13; Surface Lease ¶¶ 3–4.  During the period of commercial operation,

Defendants pay the surface rights owners an annual "Turbine Operating Fee"

determined by the greater of the (1) turbine capacity in megawatts; (2) applicable

royalty amount; and (3) total number of acres included in the project.  Hazel

Report at 5–7; Trial Tr. vol. II, 200:2–15; Surface Lease ¶ 5.3.  Hazel applied a

discounted cash flow method to calculate the anticipated present value of the

payments that would be made over both the initial 25 years of the surface leases

and the additional 20-year renewal period.  Hazel Report at 13–14; Trial Tr. vol. II,

200:16–202:20.

    At trial, Hazel was unable to identify another similar situation in which the

value of a mineral estate was based on the lease of an accompanying surface estate.

Trial Tr. vol. III, 244:6–246:25.  Hazel acknowledged that the "most important

thing" to his analysis was the "understanding that the Osage [N]ation, the [Osage

Minerals Council] didn't want the turbines there at all."  Trial Tr. vol. II, 185:3–16,

216:17–217:7; see also Trial Tr. vol. III, 269:15–22.  This perspective is reflected

in Hazel's Report, which assumes "that the [Osage] Mineral Estate is *at least as*

*integral* as the [s]urface [e]state to the construction of the [w]ind [f]arm by

[Defendants]" and concludes that "the damages suffered by the Osage Nation due

to Defendants' failure to enter into the appropriate leases are *at least equal* to the

present value of the amount paid by, or willing to be paid by the Defendants to the owners of the [s]urface [e]state." Hazel's Report at 6 (emphasis in original); Trial Tr. vol. II, 185:21–187:2, 189:23–190:9.

Hazel's reasoning that Defendants would have been forced to accept a mineral rights lease with terms at least equal to the terms of the surface rights leases is at odds with both accepted valuation standards and common sense. At trial, Hazel conceded that "a market valuation looks at what a willing buyer and a willing seller would pay in an arm's length transaction." Trial Tr. vol. III, 269:25–270:5. In order to define "willing seller" and "willing buyer," Defendants offered the International Valuation Standards published by the International Valuation Standards Council as representative of best practices for valuing assets. Defs.' Ex. 95 (International Valuation Standards); see also Defs.' Ex. 1 (IVS 105: Valuation Approaches and Methods: Exposure Draft). At trial, Hazel acknowledged the International Valuation Standards Council to be reputable and its standards credible. Trial Tr. vol. III, 273:4–14. The International Valuation Standards defines a "willing seller" as:

> neither an over-eager nor a forced seller prepared to sell at any price, nor one prepared to hold out for a price not considered reasonable in the current market. The willing seller is motivated to sell the asset at market terms for the best price attainable in the open market after proper marketing, whatever that price may be. The factual circumstances of the actual owner are not a part of this consideration because the willing seller is a hypothetical owner.

**Add. 83**

Defs.' Ex. 95 § 30.2(e).  A "willing buyer" is defined as:

> one who is motivated, but not compelled to buy.  This buyer is neither over-eager nor determined to buy at any price.  This buyer is also one who purchases in accordance with the realities of the current market and with current market expectations, rather than in relation to an imaginary or hypothetical market that cannot be demonstrated or anticipated to exist.  The assumed buyer would not pay a higher price than the market requires.  The present owner is included among those who constitute "the market."

Id. § 30.2(d).  Hazel testified that he did not disagree with these definitions.  Trial Tr. vol. III, 273:15–275:25.

Hazel's valuation is premised on the Osage Minerals Council not acting as a willing seller in an arm's length transaction and, instead, imposing an exorbitant price on an unwanted transaction.  The valuation also presumes Defendants to be compelled purchasers, required to accept the terms offered to secure necessary permissions to complete the wind farm project.  This assumption ignores that Defendants could have secured minerals for backfill from local quarries, potentially avoiding the need for the mineral lease in its entirety.  It would have been unreasonable for Defendants to have accepted a lease imposing tens of millions of dollars in obligations when a significantly cheaper alternative was available.  Because there is no evidence that Hazel's valuation methodology is based on industry practice, the Court strikes Hazel's testimony with respect to his

valuation of the leases.  The Court finds that Hazel's valuation is not a reasonable or reliable fair rental rate and Hazel's testimony is inadmissible.

**CONCLUSIONS OF LAW**

### I.      Conversion

The Court granted summary judgment on Plaintiff's claims of conversion. Osage Wind II, 710 F. Supp. 3d at 1030–32.  Conversion is an "act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein."  Welty v. Martinaire of Okla., Inc., 867 P.2d 1273, 1275 (Okla. 1994).  Defendants' extraction of minerals from the mineral estate and subsequent use of the minerals as backfill during construction of the wind farm constituted an act of conversion.  Osage Wind II, 710 F. Supp. 3d at 1031–32. Plaintiff is entitled to recovery of the market value, or replacement cost, of the converted property.  See United States v. Hatahley, 257 F.2d 920, 923 (10th Cir. 1958) (recognizing that plaintiffs were entitled to the market value, or replacement cost, of horses and burros unlawfully taken by the United States).

In order to determine the appropriate royalty amount for the minerals extracted, the Court must determine: (1) the volume of the extracted mineral material; (2) the specific minerals composing the excavated materials; and (3) the applicable royalty rate and market value for those specific minerals.

# Add. 85

### A.    Volume

The volume of the extracted minerals is in question because Defendants' contractors and subcontractors did not maintain records of such information during construction of the wind farm.  See Trial Tr. vol. IX, 988:25–990:2.  As an initial matter, Plaintiff urges the Court to draw adverse inferences against Defendants, alleging that "[a]ny uncertainty that exists is due to Enel's flagrant misrepresentation to the Court while blasting was ongoing."  Pl.'s Post-Trial Br. at 5.  In a 2014 declaration in support of Defendants' response to a motion for preliminary injunction, Moskaluk represented to the Court that Defendants' "contractor records the volume of rock crushed and the rock is then stored at the site," Defs.' Resp. Pl.'s Mot. Prelim. Inj. at Ex. 1  ¶ 15(a)(ii), which was later revealed to be untrue.  Judge Frizzell previously considered Plaintiff's request for sanctions against Defendants for Moskaluk's inaccurate representation, ruling that Defendants were not required by statute or regulation to create records of extracted mineral volumes and that sanctions were not warranted.  Order (Oct. 18, 2022) at 10 [Doc. 364]; see also Pl.'s Mot. Determine Sanctions Spoilation Evid. [Doc. 293].  This Court is not inclined to relitigate the same issue at this stage of the litigation and will not order sanctions in the form of adverse inferences based on Defendants' failure to maintain records of extracted mineral volumes or Moskaluk's misrepresentation.

# Add. 86

Case 4:14-cv-00704-JCG-JFJ     Document 515 Filed in USDC ND/OK on 12/18/24     Page 39
Appellate Case: 25-5020     Document: 92     Date Filed: 04/16/2025     Page: 149

Case No. 4:14-cv-00704-JCG-JFJ                                          39

At trial, Plaintiff confirmed that it is no longer seeking damages related to mineral material excavated in the construction of the collector substation foundation and transmission towers, leaving only the wind tower excavation sites and the trenches dug for the collector system.  Trial Tr. vol. II, 122:12–123:6.  In calculating the volume of minerals extracted from each wind tower site, Freas and Pfahl both relied on the Barr Drawings and the RMT Report.  Freas Report at 5–7; Pl.'s Ex. 65; Defs.' Ex. 16; Pfahl Report at 29; see also Defs.' Ex. 14 (email directing that foundations be built to the Barr Drawings).  In relevant part, the Barr Drawings reflect that each wind tower had a 52-foot diameter foundation ring. Defs.' Ex. 16; Pfahl Report at 29; Trial Tr. vol. I, 45:24–46:2, 49:3–7.  The depth of the excavation sites was nine feet, nine inches at the wind tower foundation and nine feet, three inches at the edge of the excavation base.  Pfahl Report at 29.  The top of the foundation extended two feet, six inches above ground level.  Id.

Freas observed that two of the three design drawings, S-01 and S-02, referenced the need for a three-inch mud mat of lean concrete below the spread footing of the towers.  Freas Report at 6.  He also noted that construction notes and photographs identified the need for an access ramp into the foundation construction area and a work area around the spread footing for rebar placement, concrete pours, and backfill and compaction requirements.  Id. at 7–8.  Freas estimated the width of the work area to be approximately eight feet.  Trial Tr. vol. I, 49:17–50:5,

52:6–13. He also explained that the slopes on the sides of the excavation area were required to adhere to specific OSHA requirements. Trial Tr. vol. I, 52:14–22. Freas explained that the grade of the side slope is dependent on the minerals in the ground, a shallower slope being required with softer materials. Trial Tr. vol. I, 52:25–53:11; Trial Tr. vol. II, 129:8–130:24. Based on a review of the available drill logs, cores, and photographs in the primary geologic report, Freas determined that 11 sites would have required side slopes with a two-to-one incline and the remaining 73 sites would have allowed for side slopes with a one-to-one incline. Trial Tr. vol. I, 53:23–54:4; Trial Tr. vol. II, 128:15–130:2.

The Court finds Freas' conclusion that 11 of the wind tower excavation sites had side slopes with a two-to-one incline to be reasonable. The Barr Drawings reference the need for a side slope and show a "min[imum] compaction limit" of one-to-one and note that "excavation [is] to meet all OSHA requirements." See Pfahl Report at 29. The RMT Report states that "the overburden soil at the site may generally be inferred to be a Type B soil." RMT Report at 10. Soil Type B allows for a one-to-one side slope to a depth of 20 feet. See 29 C.F.R. § 1926.652(b)(2), app. A, Table B-1. This is the maximum permissible incline, however, and can be reduced based on the conditions present. See 29 C.F.R. § 1926.652(b)(2), app. A. Freas reviewed the available drill logs, photographs, cores, and materials logs in determining that some of the sites required a shallower

**Add. 88**

incline.  Trial Tr. vol. I, 53:23–54:4.  The Court finds this to be reasonable and accepts that 73 wind tower sites had side slopes with a one-to-one incline and the remaining 11 wind tower sites had side slopes with a two-to-one incline.

The Court also adopts Freas' method of calculating volume for the wind towers and collector system.  Freas calculated the area in common to all the wind tower sites, a cylinder extending from the circumference of the base to the ground level, to have a volume of 36,316.9 cubic feet.  Trial Tr. vol. I, 56:18–22.  For the wind tower sites with a one-to-one side slope, Freas calculated the volume of the mineral material removed from the side slope areas to be 12,252.2 cubic feet.  Trial Tr. vol. I, 57:10–16.  He calculated the total volume of mineral material excavated from each wind tower excavation site with a one-to-one side slope as 48,569.1 cubic feet.  Trial Tr. vol. I, 57:23–58:3.  For the wind tower sites with a two-to-one side slope, Freas calculated the volume of the mineral material removed from the side slope areas to be 27,646.1 cubic feet.  Trial Tr. vol. I, 57:17–21.  He calculated the total volume of mineral material excavated from each wind tower excavation site with a two-to-one side slope as 63,963 cubic feet.  Trial Tr. vol. I, 58:3–7.  Using these figures, Freas determined that the total volume of mineral material excavated from the 84 wind tower excavation sites was 4,249,137 cubic feet.  Trial Tr. vol. I, 58:9–15.

**Add. 89**

Freas calculated that 177,277 linear feet were excavated for the collector system trenches.  Trial Tr. vol. I, 59:2–18; Freas Report at 9.  Based on engineering drawings, Freas determined the typical conduit trench to be three feet deep and six inches wide, yielding a cross-sectional area of 1.5 square feet.  Freas Report at 9; Trial Tr. vol. I, 59:23–25.  The cross-sectional area was multiplied by the total length of the trenches to determine the quantity of mineral material excavated during the construction of the collector system.  Freas Report at 9; Trial Tr. vol. I, 61:1–7.  Freas calculated that a total of 265,915.5 cubic feet of mineral material was excavated during construction of the collector system trenches.  Trial Tr. vol. I, 61:1–12.

### B.    Composition

The Osage Act provides that "the oil, gas, coal, or *other minerals*" of the Osage Mineral Estate are to be reserved to the Osage Nation.  Osage Act § 2–3, 34 Stat. at 543 (emphasis added).  The act further provides for "leases for all oil, gas, and *other minerals*" to be issued.  Id.  In Millsap v. Andrus, 717 F.2d 1326 (10th Cir. 1983), the Tenth Circuit Court of Appeals held that the phrase "other minerals" should be interpreted broadly.  Millsap v. Andrus, 717 F.2d 1326, 1328–29 (10th Cir. 1983).  The mineral material extracted during the construction of the wind farm was composed, in relevant part, of limestone, shale, and clay.  Freas Report at 3, 7, 9–11.

# Add. 90

In determining the composition of the mineral material excavated during construction of the wind towers, Freas reviewed individual drill logs to determine that the upper ten feet of the mineral estate for the wind tower excavation sites was composed of 54.18 percent limestone, 25.56 percent shale, and 20.26 percent clay. Freas Report at 7; Trial Tr. vol. I, 73:23–74:3.  The RMT Report provides the average density determined for the minerals composing the Osage Mineral Estate. RMT Report at 8.  The approximate density of limestone was determined to be 155 pcf, the approximate density of shale was determined to be 130 pcf, and the approximate density of clay was determined to be 115 pcf.  Id.  Applying these values to the 4,249,137 cubic feet of mineral material excavated during construction of the wind towers results in 178,419 tons of limestone, 70,595.16 tons of shale, and 49,500 tons of clay.  Trial Tr. vol. I, 74:7–21; 78:8–16.

In calculating the composition of the mineral material excavated during construction of the collector system trenches, Freas reviewed the upper three feet of the nearest drill holes to the collector system and determined that the mineral estate in that area was composed of 28.5 percent limestone, 1.3 percent shale, and 70.2 percent clay.  Freas Report at 9; Trial Tr. vol. I, 79:3–12.  Applying these proportions to the 265,915.5 cubic feet of mineral material excavated for the collector system trenches results in 5,873 tons of limestone, 225 tons of shale, and 10,734 tons of clay.  Trial Tr. vol. I, 79:3–23, 81:15–82:3.

**Add. 91**

## C.     Value

Under the applicable regulation, "[f]or substances other than gold, silver, copper, lead, zinc, coal, and asphaltum the lessee shall pay quarterly a royalty of [ten] percent of the value at the nearest shipping point of all ores, metals, or minerals marketed." 25 C.F.R. § 214.10.  Freas adopted this method of valuation in his report and identified Burbank Materials, located adjacent to the wind farm, as the nearest shipping point.  Freas Report at 11.  Based on a purchase order issued less than one year before construction began, Freas determined the value of the minerals to be $8.90 per ton for limestone and $6.00 per ton for both shale and clay.[24]  Id.; see Defs.' Ex. 63.  For each of these, the royalty rate would be $0.89 per ton for limestone and $0.60 per ton for shale and clay.  Applying these rates to the quantities calculated for the respective minerals results in values of $164,019.88 for limestone, $42,492.00 for shale, and $36,140.40 for clay.  This equates to a royalty of $242,652.28.

Therefore, Plaintiff is entitled to a damages award of $242,652.28 in royalties for the mineral material excavated during construction of the wind farm on the claim of conversion.

---

[24] A purchase order from September 2014 reflecting the same rates was admitted into evidence at trial.  Pl.'s Ex. 39.

# Add. 92

### D.    Pre-Judgment Interest

Plaintiff asks the Court to award pre-judgment interest on its conversion damages to address the unfair benefit experienced by Defendants during the prolonged life of this dispute and to dissuade others that might be tempted to unlawfully invade the Osage Mineral Estate.  Pl.'s Pre-Trial Br. at 6–7; Pl.'s Post-Trial Br. at 9–10.  Oklahoma law permits "[a]ny person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day."  23 Okla. St. Ann. § 6.  Pre-judgment interest may only be awarded for "damages that are 'liquidated or capable of ascertainment before judgment.'"  MCC Mgmt. of Naples, Inc. v. Int'l Bancshares Corp., 468 Fed. App'x 816, 829 (10th Cir. 2012) (quoting Taylor v. State Farm Fire & Cas. Co., 981 P.2d 1253, 1261 (Okla. 1999)).  "[I]f the fact-finder must weigh conflicting evidence in order to determine the precise amount of damages due to the plaintiff, then a court cannot grant prejudgment interest."  Strickland Tower Maint., Inc. v. AT&T Comms., Inc., 128 F.3d 1422, 1429 (10th Cir. 1997) (citing Withrow v. Red Eagle Oil Co., 755 P.2d 622, 625 (Okla. 1988); Liberty Nat'l Bank & Trust Co. v. Acme Tool Div., 540 F.2d 1375, 1383 (10th Cir. 1976)).  In this case, multiple factual elements of the damages calculation were unresolved

**Add. 93**

before trial, including the nature and quantity of the mineral material extracted.

Therefore, the Court cannot award pre-judgment interest.

## II.    Trespass

Plaintiff contends that the proper valuation of damages for trespass is the

reasonable rental value of the property.  Pl.'s Pre-Trial Br. at 9–11; Pl.'s Post-Trial

Br. at 12–13.  Conversely, Defendants contend that the proper value of Plaintiff's

damages for trespass is the royalty value of the minerals excavated, because both

Plaintiff's conversion and trespass claims derived from the same conduct of

"entering the mineral estate, extracting minerals, and using the extracted minerals

without first obtaining the necessary lease."  Defs.' Post-Trial Br. at 20–21

(quoting Osage Wind II, 710 F. Supp. 3d at 1031).  Because these damages are the

same as those recoverable for conversion, Defendants argue that double recovery

should not be permitted.  Id. at 33–34.

At the outset, the Court disagrees with Defendants' position that because

Plaintiff's trespass and conversion claims arose from common facts, the two claims

resulted in the same injury.  Conversion is an "act of dominion wrongfully exerted

over another's personal property in denial of or inconsistent with his rights

therein."  Welty, 867 P.2d at 1275.  "The State of Oklahoma recognizes a right of

action in trespass where one person 'actual[ly] physical[ly] inva[des] . . . the real

estate of another without the permission of the person lawfully entitled to

# Add. 94

possession.'" Davilla v. Enable Midstream Partners L.P., 913 F.3d 959, 966 (10th

Cir. 2019) (quoting Williamson v. Fowler Toyota, Inc., 956 P.2d 858, 862 (Okla.

1998)).  In this case, conversion occurred through limited discrete acts of removing

and acting upon extracted minerals.  Trespass was a prolonged occupation of the

mineral estate, preventing its use by other parties.  These were distinct offenses

that resulted in distinct injuries.

Though the specific facts of this case are unique, the Court finds persuasive

prior cases involving trespass against Indian surface property.  In Oneida County v.

Oneida Indian Nation of New York State ("Oneida"), 470 U.S. 226 (1985), the

U.S. Supreme Court affirmed the decision of the lower courts awarding damages

for trespass against Indian land based on the "fair rental value of the land in

question."  Oneida Cnty. v. Oneida Indian Nation of New York State, 470 U.S.

226, 229–33 (1985); see also Cayuga Indian Nation of New York v. Pataki, 413

F.3d 266, 273–74 (2d Cir. 2005) (recognizing that Oneida "allowed Indian Tribes

to seek fair rental value damages for violation of their possessory rights following

an ancient dispossession"); Hammond v. Cnty. of Madera, 859 F.2d 797, 804 (9th

Cir. 1988), rev'd on other grounds, Woods v. Ostrander, 851 F.2d 1212 (9th Cir.

1988); Watson v. United States, 263 F. 700, 702 (8th Cir. 1920) ("We think they

show wrongful entry and unlawful holding of [Osage] possession, which are the

elements of an action of trespass for mesne profits, in which reasonable rental value may measure the damages to be recovered.").

The Court concludes that the fair rental value of the mineral estate occupied by Defendants is a reasonable and appropriate method for valuing the damages caused by Defendants' trespass. However, determining a reasonable fair market rental value for the mineral estate is challenging.

Plaintiff and the Osage Minerals Council urge the Court to calculate a reasonable rental rate, based on the expert testimony of Stephen Hazel. Pl.-Interv.'s Br. Supp. Pl.-Interv.'s Mot. Summ. J. at 21–22 [Dkt. 294-1]; Pl.'s Mot. Summ. J. at 11–13 [Dkt. 300]. As discussed above, the Court does not find Hazel's testimony to be reliable or consistent with industry practice and strikes Hazel's testimony. In contrast to Hazel's proposed methodology, the regulations applicable to the management of the Osage Mineral Estate provide a more reasonable method of calculating a fair rental value. Pursuant to 25 C.F.R. § 214.9, lessees are required to pay as advance rental "15 cents per acre for the first year; 30 cents per acre for the second year; 50 cents per acre for the third year; and $1 per acre per annum for the fourth and each succeeding year during the life of any lease." 25 C.F.R. § 214.9 The rate represents the value of the mineral estate prior to development and mineral extraction. See id. In the instant case, the trespass claim concerns the unlawful occupancy of the mineral estate and the

conversion claim concerns the unlawful development. For this reason, the Court adopts the rental rates described in 25 C.F.R. § 214.9 for purposes of calculating trespass damages.

Defendants began excavation and first entered the mineral estate in September 2014. See Trial Tr. vol. VII, 790:14–16. For the first year, September 2014 through September 2015, Defendants incurred $1,260.00 in advance rental fees. The following year, September 2015 through September 2016, that amount increased to $2,520.00. In the third year, September 2016 through September 2017, Defendants incurred $4,200.00. Defendants incurred an additional $8,400.00 in each of the seven years between September 2017 and this opinion. The total value of advance rentals between September 2014 and September 2024 is $66,780.00.

Therefore, the Court awards $66,780.00 in damages for trespass, with an additional $8,400 to accrue on the first day of September of each subsequent year until the wind towers are removed and the mineral estate is returned to Plaintiff.

### III.    Treble Damages

Plaintiff contends that Defendants' conduct warrants the trebling of damages. Pl.'s Pre-Trial Br. at 12–25; Pl.'s Post-Trial Br. at 20–22. Defendants counter that the facts of the case do not justify treble damages. Defs.' Pre-Trial Br. at 20–25; Defs.' Post-Trial Br. at 34–40.

# Add. 97

Oklahoma law recognizes that "[f]or forcibly ejecting or excluding a person from the possession of real property, the measure of damages is three times such a sum as would compensate for the detriment caused to him by the act complained of." 23 Okla. Stat. Ann. § 71.  This statute is penal in nature and must be construed strictly.  Ansay v. Boecking-Berry Equip. Co., 450 F.2d 433, 436 (10th Cir. 1971); Autumn Wood Farms, LLC v. Bynum, 361 P.3d 540, 542–43 (Ct. Civ. App. Okla. 2015).  To establish an entitlement to treble damages, a Plaintiff must demonstrate ejectment through an active force by the trespasser.  Ansay, 450 F.2d at 436.  This Court has previously held that Section 71 also requires some degree of wrongful intent.  Order (Apr. 23, 2024) at 5–6 [Doc. 408] (citing Main v. Levine, 118 P.2d 252, 255 (Okla. 1941); Maxwell v. Samson Res. Co., 848 P.2d 1166, 1173 (Okla. 1993); Crow v. Davidson, 96 P.2d 70, 72–73 (Okla. 1939)).

Plaintiff argues that the use of blasting in the construction of the wind towers and the scale of the wind farm's construction demonstrate the use of active force and oppressive intent.  Pl.'s Pre-Trial Br. at 13; Pl.'s Post-Trial Br. at 20.  Defendants counter that they did not attempt to remove Plaintiff from the Osage Mineral Estate by force, as required for treble damages under the statute.  Defs.' Pre-Trial Br. at 22–24.  A review of case law applying the Oklahoma statute supports Defendants' position.

**Add. 98**

In <u>Crow v. Davidson</u>, 96 P.2d 70 (Okla. 1939), the Oklahoma Supreme

Court explained that not every ejection from property is forcible.  <u>Crow</u>, 96 P.2d at

72.  In considering the statute, the court noted that:

> [t]he term forcibly ejected or excluded has been construed in similar
> statutes to mean force of an unusual kind which tends to bring about a
> breach of the peace, such as an injury with a strong arm, or a multitude
> of people, or in a riotous manner, or with personal violence, or with
> threat or menace to life or limb, or under circumstances which would
> naturally inspire fear.

<u>Id.</u>  In the view of the <u>Crow</u> court, the purpose of allowing treble damages in the

case of forcible ejection is to dissuade competing uses of force that would breach

the public peace at the cost of a public disturbance or injuries to the parties.  <u>Id.</u>

The Oklahoma Supreme Court provided further clarification of the type of

force required for an award of treble damages in <u>Main v. Levine</u>, 118 P.2d 252

(Okla. 1941), two years after the <u>Crow</u> decision.  <u>Main</u> concerned plaintiffs who

rented a dwelling from the defendants.  <u>Main</u>, 118 P.2d at 254.  The defendants

terminated the plaintiffs' rental agreement and notified the plaintiffs that they must

vacate the property.  <u>Id.</u>  When the plaintiffs refused to vacate, the defendants sent

a moving crew to the property that jacked up the house and disconnected utilities

in preparation to move the house to another location.  <u>Id.</u>  In affirming the award of

treble damages, the Oklahoma Supreme Court found that the "[d]efendants ignored

the legal methods provided for securing possession of the premises, and in

**Add. 99**

disregard of the rights of plaintiffs and their claim of rightful possession, attempted by force to remove them from the premises, and were about to do so when plaintiffs, to avoid further conflict, removed therefrom." Id. at 255.  The court further held that "[w]hile the force was not applied to the persons of plaintiffs, it was nevertheless a forcible and unlawful ejection from the premises, in disregard of their right of occupancy." Id. (citing Crow, 96 P.2d 70; Sanders v. Cline, 101 P. 267 (Okla. 1908)).

The Tenth Circuit Court of Appeals later considered the meaning of "forcibly ejecting or excluding" in Ansay v. Boecking-Berry Equipment Co., 450 F.2d 433 (10th Cir. 1971).  In Ansay, a trespasser erected a chain link fence topped with barbed wire around a disputed property.  Ansay, 450 F.2d at 435.  The trial court believed that the erection of the fence constituted forcible exclusion within the meaning of Section 71, but denied treble damages because the court found that the defendant honestly believed that it was legally within its rights to occupy the property.  Id. at 436.  On appeal, the Tenth Circuit Court of Appeals affirmed the denial of treble damages, but deviated from the findings of the trial court by holding that "[t]he building of the fence was a clear symbol of an assertion of a right and of exclusion, but it was not an active force as contemplated by [Section 71]." Id.

**Add. 100**

In considering these cases, it is clear to the Court that forcible ejection or exclusion requires more than a simple act of impairing access to property. See Ansay, 450 F.2d at 436; see also Wiley v. Safeway Stores, Inc., 400 F. Supp. 653, 655 (N.D. Okla. 1975) (holding that a notice to remove an amusement ride from property did not constitute force as required under Section 71). To warrant an award of treble damages, a trespasser must exert an unusual degree of force or violence such that the owner or possessor of a property feels threatened and compelled to abandon the property. See Main, 118 P.2d at 254.

Defendants' use of blasting to disturb the Osage Mineral Estate while excavating for the wind tower foundations, though an inherently violent act, was not the type of force contemplated by Section 71. The blasting was conducted as a normal part of the construction process based on the composition of the ground. It was not done for the purpose of excluding Plaintiff or the Osage Minerals Council from accessing the mineral estate. It was also not the type of force that risked disturbing the peace, invoking retaliatory force, or causing injury or harm to another party. See Crow, 96 P.2d at 72. Therefore, the Court holds that Plaintiff is not entitled to treble damages.

Plaintiff urges the Court to interpret the force element of Section 71 differently in light of federal policies protecting the rights of Indians to peacefully occupy land. Pre-Trial Br. at 23–25; Pl.'s Post-Trial Br. at 20–21. The Court is

**Add. 101**

not convinced that its reading of Section 71 frustrates any specific objectives of a federal policy.  See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98 (1991) ("[F]ederal courts should 'incorporat[e] [state law] as the federal rule of decision,' unless 'application of [the particular] state law [in question] would frustrate specific objectives of the federal programs.'" (quoting United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979))).  Section 71 does not set a bar so high that it would foreclose exemplary damages in all cases but those involving heinous or violent acts.  It does set, however, a threshold high enough to exclude acts of a symbolic nature or that are not intended to induce concern or apprehension in the property holder.  This is necessary to limit treble damages to only those cases in which they are warranted by a defendant's actions.  Ultimately, in this case, federal Indian policies cannot alter the fact that the type of force applied by Defendants in blasting the ground during construction is not the type of force contemplated by Section 71.

Though Plaintiff has not demonstrated the requisite forcible ejection or exclusion under Section 71, the Court finds it appropriate to address the remaining element of Defendants' alleged wrongful intent.  Defendants maintain the position that they "'honestly believed' that construction of the Osage Wind project did not require a mining lease or permit" in reliance on the advice of counsel.  Defs.' Pre-Trial Br. at 21; Defs.' Post-Trial Br. at 35–36.  Plaintiff argues that Defendants'

**Add. 102**

reliance on the advice of outside counsel is disingenuous because Defendants did

not provide their counsel with all the pertinent information and made decisions for

a financial benefit.  Pl.'s Pre-Trial Br. at 16–23.

Defendants and their predecessors in the wind farm project were told by

officials of the United States and Osage Nation governments on multiple occasions

of the need to secure permits and leases, and the governments issued cease-and-

desist requests until such authorization was obtained.  As early as October 2013,

the Osage Minerals Council solicited information from Wind Capital Group and

Tradewind "to determine the federal permitting, leasing and other regulatory

requirement that could apply to the Osage Wind Project."  Defs.' Ex. 18 at 4.  The

October 2013 letter referenced that "[i]n addition to oil and gas, the Osage Mineral

Estate consists of solid materials, including limestone, dolomite, sandstone, sand,

gravel, clay, and shale," and that activities within the mineral estate "may be

subject to a range of federal regulatory requirements, including the need to secure a

federal permit or lease to undertake such activities, pursuant to 25 C.F.R. §§ 411

and 414."  Id.

The Bureau of Indian Affairs contacted Defendants on October 9, 2014,

advising that an inspector had observed a large pit with piles of crushed limestone

around a wind turbine foundation.  Defs.' Ex. 23.  The letter directed Defendants to

cease further excavation until the necessary permits were obtained, and legal action

**Add. 103**

was threatened for non-compliance.  Id.  The following month, in response to a request by Defendants to arrange a meeting, Acting Principal Chief Raymond Red Corn of the Osage Nation asked Defendants to suspend construction of the wind energy facilities, noting that Defendants "have taken Osage minerals for use in construction of wind turbines without permits or approval of the Osage Minerals Council."  Defs.' Ex. 26.

Defendants disregarded these governmental mandates and continued with construction.  It is apparent that this decision was the product of a desire to maximize financial gains by Defendants' representatives, while recklessly disregarding the risks of infringing upon the mineral rights of the Osage Nation. When asked to explain the decision to disregard the Bureau of Indian Affairs' cease-and-desist instruction, multiple representatives for Defendants indicated that they simply believed that the Bureau of Indian Affairs and Osage Minerals Council, the organizations responsible for administering the Osage Mineral Estate, were wrong to require a permit and needed to be better educated on the topic. Michael Storch, a former Enel Green Power executive, testified that:

> [w]e had several factors, you know, involved.  The question of authority to stop the project was one.  The fact that we didn't believe we needed a permit and that it was more about, as you've seen in other e-mails and so forth, communication with the Bureau of Indian Affairs to help have them understand the basis for our conclusion that no permit was required and so forth.

Add. 104

Trial Tr. vol. V, 536:20–537:10.  William Price, Head of Engineering Construction for Enel North America, testified that Defendants' plan to address the Bureau of Indian Affairs' cease-and-desist letter was to "execute the project as originally planned" and to educate the Bureau of Indian Affairs on the matter.  Trial Tr. vol. XIII, 1562:15–24.  He testified further that "the request to cease activity was not valid" because Defendants determined that they did not need a permit.  Trial Tr. vol. XIII, 1569:12–18, 1572:25–1573:11.

It is also clear that financial considerations, in large part, drove the decision to ignore the cease-and-desist instructions.  In October 2014, Defendants' counsel, Lynn Slade, informed a representative of the Department of the Interior's Regional Solicitor's Office that Defendants were "continuing operations notwithstanding the [Bureau of Indian Affairs'] letter due to extreme costs."  Pl.'s Ex. 29; see also Trial Tr. vol. V, 533:24–534:6.  This sentiment was reflected in the witness testimony at trial.  Stephen Pike, President and CEO of Enel Green Power North America, testified that the decision to not cease construction was the result of "the high cost to stop a construction project of that magnitude with hundreds of workers."  Trial Tr. vol. XIV, 1610:14–16 [Doc. 481].  Storch also noted the "extreme cost" among his reasons for continuing work.  Trial Tr. vol. V, 537:10–14.

Defendants attempt to justify their decision to ignore the Bureau of Indian Affairs and Osage Minerals Council by claiming that they relied on the advice of

**Add. 105**

outside counsel.  Good faith reliance on the advice of counsel is not a complete

defense, but may be considered when determining if a defendant acted willfully.

United States v. Wenger, 427 F.3d 840, 853 (10th Cir. 2005) (citing United States

v. Custer Channel Wing Corp., 376 F.2d 675, 683 (4th Cir. 1967)).  A defendant

must demonstrate "(1) a request for advice of counsel on the legality of a proposed

action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice from

counsel that the action to be taken will be legal, and (4) reliance in good faith on

counsel's advice."  Id. (quoting C.E. Carlson, Inc. v. S.E.C., 859 F.2d 1429, 1436

(10th Cir. 1988)).

Defendants point to the series of memoranda produced by Modrall Sperling

in 2013 and 2014.  See August 2014 Modrall Sperling Memo; October 2013

Modrall Sperling Memo; May 2014 Modrall Sperling Memo; September 2014

Modrall Sperling Memo.  Wind Capital Group and Tradewind retained Modrall

Sperling in October 2013, after receiving the Osage Minerals Council's letter

soliciting information needed to determine if a lease was required for the wind

farm project.  Trial Tr. vol. VI, 601:25–602:4, 603:7–11; Defs.' Ex. 18 at 4.

Modrall Sperling produced its first memorandum on October 31, 2013.

October 2013 Modrall Sperling Memo.  The subject line of the memorandum reads

"[r]ights of surface owners to use soil" and the content of the memorandum

addresses the question of "[w]hether a surface owner who excavates land for the

**Add. 106**

purpose of construction consistent with its surface rights—and does not remove the

land excavated from the property—is engaged in 'mining' of the mineral estate and

requires a mining permit." Id. at 1; see also Trial Tr. vol. VI, 603:9–11.  In

reaching the ultimate conclusion that a mining permit was not required for the

project, the October 2013 Modrall Sperling Memo described the construction as

"[t]o the extent any soil or other subsurface material is (touched) by [Tradewind],

it is merely incidental to [Tradewind's] construction of its approved wind farm.

No soil is removed from the site, or processed on site for a commercial use."

October 2013 Modrall Sperling Memo at 2.  It concluded that "[Tradewind was]

not engaged in mining or other use of the mineral estate, but [was] taking actions

consistent only with its lease." Id. (emphasis in original).

Modrall Sperling produced a second memorandum on May 19, 2014 in

response to their clients' request that the memorandum be directed to them.  Trial

Tr. vol. VII, 806:3–9.  The May 2014 Modrall Sperling Memo largely reiterated its

prior findings and analysis, with a few notable differences.  May 2014 Modrall

Sperling Memo.  A paragraph acknowledging that 25 C.F.R. § 214 "contains the

regulations for the 'Leasing of Osage Reservations Lands, Oklahoma, for mining

except oil and gas,'" was removed from the May 2014 Modrall Sperling Memo.

Compare October 2013 Modrall Sperling Memo at 2 with May 2014 Modrall

Sperling Memo at 2.  The May 2014 Modrall Sperling Memo also added to its

# Add. 107

analysis the qualifying language "as we understand its plans" when discussing Tradewind's construction of the wind farm.  <u>Compare</u> October 2013 Modrall Sperling Memo at 2 ("[Tradewind's] construction of the wind farm does not require a permit from the [Bureau of Indian Affairs] or the Osage Nation") <u>with</u> May 2014 Modrall Sperling Memo at 2 ("[Tradewind's] construction of the wind farm, *as we understand its plans*, will not require a permit from the [Bureau of Indian Affairs] or the Osage Nation." (emphasis added)).  In describing Tradewind's interaction with the mineral estate during construction, the May 2014 Modrall Sperling Memo replaced the word "touched" with "moved."  <u>Compare</u> October 2013 Modrall Sperling Memo at 2 <u>with</u> May 2014 Modrall Sperling Memo at 2.  At trial, Slade testified that he did not recall any additional material information on the construction plans being provided between the October 2013 Modrall Sperling Memo and the May 2014 Modrall Sperling Memo.  Trial Tr. vol. VII, 807:21–808:23.

In August 2014, Defendants requested that Modrall Sperling prepare a scaled-back memorandum that did not include legal conclusions.  Pl.'s Ex. 7. Slade testified that Defendants requested the change because the memorandum would be shared with an investor, identified as General Electric.  Trial Tr. vol. VII, 816:5–817:3.  The August 2014 Modrall Sperling Memo included multiple changes from the prior versions.  For example, the subject line of the memorandum

**Add. 108**

was changed to expressly reference excavation.  Compare August 2014 Modrall

Sperling Memo at 1 ("Rights of surface owners or their lessees in Osage County,

Oklahoma to excavate or utilize soil") with October 2013 Modrall Sperling Memo

at 1 ("Rights of surface owners to use soil") and May 2014 Modrall Sperling

Memo at 1 (same).  The "Question Presented" was also changed from "excavates

land" to "excavates soil and related materials" and from "does not remove the land

excavated from the property" to "does not remove the materials excavated from the

property subject to a mineral reservation."  Compare August 2014 Modrall

Sperling Memo at 1 with October 2013 Modrall Sperling Memo at 1 and May

2014 Modrall Sperling Memo at 1.  The August 2014 Modrall Sperling Memo also

removed references to the Osage Minerals Council's contention that a lease or

permit was necessary, which had been included in prior versions of the

memorandum.  Compare August 2014 Modrall Sperling Memo with October 2013

Modrall Sperling Memo at 2 and May 2014 Modrall Sperling Memo at 2; see also

Trial Tr. vol. VII, 819:16–820:10.  A finalized version of the May 2014 Modrall

Sperling Memo was prepared in September 2014.  September 2014 Modrall

Sperling Memo; Defs.' Ex. 46.

　　　As an initial matter, Defendants' reliance on the Modrall Sperling

memoranda to justify their decision to ignore the directions of the Bureau of Indian

Affairs and the Osage Minerals Council is severely weakened by the fact that none

**Add. 109**

of the memoranda expressly recommended that Defendants disregard the cease-and-desist instructions and continue with construction of the wind farm. The content of the memoranda was limited to whether a permit or lease was required for certain activities related to construction. Counsel did not suggest that Defendants were legally authorized to disregard directives from governmental authorities. It is unreasonable to conclude that counsel were authorizing Defendants to disregard the clear instructions of the Bureau of Indian Affairs and Osage Minerals Council.

In addition to this serious flaw, it is clear to the Court that Defendants failed to fully disclose all of the relevant facts to counsel when requesting Modrall Sperling's opinion. Changes between the October 2013 Modrall Sperling Memo and the May 2014 Modrall Sperling Memo suggest that at the time of the May 2014 Modrall Sperling Memo, Defendants' outside counsel had a different understanding of the situation than it had a few months prior. The Court also notes that the Modrall Sperling memoranda do not expressly describe the nature of the construction project, such as the use of blasting, or the intended use of excavated materials as backfill. This ambiguity demonstrates that Defendants failed to provide all the specific details of the construction project to Modrall Sperling.

Defendants have also failed to convincingly demonstrate that they relied on Modrall Sperling's legal advice. At trial, Storch described the October 2013

**Add. 110**

Modrall Sperling memorandum as "quite strong," "conclusive," "no room for doubt," and lacking "any kind of qualifiers of concern in describing the work that had been done to reach the conclusion that they had reached." Trial Tr. vol. IV, 390:4–18 [Doc. 461]; Trial Tr. vol. V, 604:3–8. The Court finds this characterization to be inconsistent with the express language of the October 2013 Modrall Sperling Memo, which conceded that "there is no controlling authority on" whether a mining lease was required and that only "some weak authority was found on" whether excavation incident to construction on the surface qualified as mining. October 2013 Modrall Sperling Memo at 1, 7. The memorandum also noted that "no federal cases interpreting [the] regulatory definition of 'mining' were located, or the rights of mineral estate owners in Osage County." Id. at 1–2. Additionally, the Court finds troubling Defendants' request for an altered memorandum excluding legal conclusions that was provided to a potential investor. This conduct strongly suggests that the memoranda were drafted in the interest of Defendants' business goals, rather than to provide accurate legal information.

Defendants cannot now assert that they relied on the advice of counsel in good faith to negate their willful decision to disregard the cease-and-desist instructions. See Mumby v. Pure Energy Servs. (USA), Inc., 636 F.3d 1266, 1270 (10th Cir. 2011) (holding that, in the context of employment, "[a]lthough

**Add. 111**

Case 4:14-cv-00704-JCG-JFJ    Document 515 Filed in USDC ND/OK on 12/18/24    Page 64
Appellate Case: 25-5020    Document: 92    Date Filed: 04/16/2025    Page: 174

Case No. 4:14-cv-00704-JCG-JFJ                                                    64

consultation with an attorney may help prove that an employer lacked willfulness, such a consultation is, by itself, insufficient to require a finding in favor of the employer"); Wenger, 427 F.3d at 853 (holding that, in the context of securities fraud, "[g]ood faith reliance on counsel . . . is merely one factor a jury may consider when determining whether a defendant acted willfully"); Takecare Corp. v. Takecare of Okla., Inc., 889 F.2d 955, 957 (10th Cir. 1989) (holding that, in the context of trademark infringement, "[a]bsent [a showing of other factors], counsel's advice alone will not shield the actor from the consequences of his act" (internal quotation omitted)).  Modrall Sperling advised Defendants that it believed that a lease was not required for the construction of the wind farm.  It did not instruct Defendants to disregard the cease-and-desist instructions.  Based on the testimony of Defendants' representative and the evidence presented at trial, it is clear that Defendants' decision to move forward with construction of the wind farm was motivated by financial interests and not a legitimate belief in the legality of their actions.  Defendants viewed the Modrall Sperling memoranda not as statements of law, but as tools to entice investors and as a potential shield against the consequences of Defendants' actions.  Defendants' bad-faith reliance on the advice of counsel cannot excuse its willful and wrongful intent; however, because Plaintiff has not demonstrated the requisite forcible ejection, the Court cannot award treble damages based on the facts of this case.

# Add. 112

## IV.    Continuing Trespass

The Court held Defendants liable for continuing trespass and ordered ejectment of the wind towers.  <u>Osage Wind II</u>, 710 F. Supp. 3d at 1038, 1039–42. The Parties were directed to file briefs proposing a plan and schedule for removal of the wind turbines and rehabilitation of the impacted mineral estate.  Order (Feb. 8, 2024) [Doc. 393].

As an initial matter, Defendants argued for the first time that the Court should alter its prior ruling and require only the removal and replacement of the backfill used for support of the wind towers.  Defs.' Br. Resp. Feb. 8, 2024 Order at 2–3, 7–10 [Doc. 396].  Defendants argue that removal of the backfill and replacement with substitute materials would be a more narrowly-tailored remedy than total removal of the wind towers.  <u>Id.</u> at 2–3 (citing <u>Garrison v. Baker Hughes Oilfield Operations, Inc.</u>, 287 F.3d 955, 962 (10th Cir. 2002)).  The Court disagrees.  As explained in <u>Osage Wind II</u>, the harm resulting from Defendants' continuing trespass is not only the continued use of the wrongfully obtained backfill, but also the interference with the Osage Nation's sovereignty.  <u>Osage Wind II</u>, 710 F. Supp. at 1041–42.  Defendants reiterate many of the same arguments previously weighed by the Court regarding the claimed benefits of the wind farm continuing to operate.  These arguments are not more impactful now than they were at the summary judgment stage of this litigation.  The Court is not

**Add. 113**

persuaded by Defendants' backdoor attempt to seek reconsideration of the prior

grant of injunctive relief and the Court does not alter its award of "injunctive relief

in the form of ejectment of the wind towers." Id.

In addressing the Court's request for a removal plan, Defendants represented

that "the removal of all 84 wind turbines—via either controlled demolition, more

targeted decommissioning and dismantling, or a combination of both—is expected

to take 18 months." Defs.' Br. Resp. Feb. 8, 2024 Order at 2. Defendants propose

that the first six months of this period would be spent obtaining necessary permits

and engaging external specialists. Id. at 4–5. During this time, Defendants would

also "develop and distribute a detailed plan for the project such that the qualified

specialists needed to do the work could evaluate and bid on it." Id. at 5.

Defendants anticipate that the physical removal of the wind turbines and

restoration of the surrounding land will take 12 months. Id. at 6. Defendants have

estimated that removal of the wind towers would result in Osage Wind suffering a

negative economic impact of $258,729,611.70. Defs.' Resp. Pl.'s Mot. Summ. J.

at 5–6 [Doc. 321].

The Osage Minerals Council argues that removal should be limited to 12

months. Pl.-Interv.'s Resp. Defs.' Br. Regarding Feb. 8, 2024 Order at 7–8 [Doc.

404]. In support of this argument, the Osage Minerals Council relies on a

provision of the Surface Leases that requires Defendants to "remove all

[w]indpower [f]acilities" within 12 months of the expiration or termination of the Surface Lease.  <u>Id.</u>; Surface Lease ¶ 14.6.

The Court is convinced that 12 months is an adequate period of time for the removal of the wind farm.  At the time of negotiating the Surface Leases, Defendants clearly believed that the wind farm could be removed from the surface estate within 12 months.  There has been nothing presented to the Court suggesting that conditions have changed to require a longer period.  Furthermore, Defendants have had nearly one year (while the damages phase of this trial continued) since the Court ordered ejectment of the wind farm to obtain necessary permits, contact specialists, and make other initial arrangements.  Therefore, the Court holds that Defendants shall remove the wind farm from the Osage Mineral Estate and return the Osage Mineral Estate to its pre-trespass condition on or before December 1, 2025.

Defendants contend that the Court should not award both injunctive and monetary damages for continuing trespass.  Defs.' Br. Resp. July 10, 2024 Order. The Court agrees.  Injunctive relief is appropriate only to prevent irreparable harm that cannot be satisfied through a monetary award.  <u>See</u> <u>Schrier v. Univ. of Colo.</u>, 427 F.3d 1253, 1267 (10th Cir. 2005).  In this case, the injury caused by Defendants' continuing trespass was the interference to the Osage Nation's sovereignty, which a monetary award cannot cure.  <u>Osage Wind II</u>, 710 F. Supp.

# Add. 115

3d. at 1041.  The Court hereby incorporates by reference its prior analysis on

ejectment and sovereignty in <u>Osage Wind II</u>.  <u>Id.</u> at 1039–42.  The injury suffered

as a result of Defendants' continuing trespass should not be conflated with the

injury suffered as a result Defendants' trespass against the mineral estate, which

can be cured through a monetary award and will continue to accrue until the

ejectment of the wind towers is complete.  The Court's grant of injunctive relief for

continuing trespass does not bar or limit Plaintiff's ability to recover damages in

trespass.

### V.      Attorneys' Fees and Costs

Plaintiff and the Osage Minerals Council seek recovery of attorneys' fees

and costs related to this litigation.  Pl.'s Att'ys' Fee Br.; Pl-Interv.'s Att'ys' Fee Br.

Their theories of recovery are based on 23 Okla. St. Ann. § 64(3), which allows for

recovery of "fair compensation for the time and money properly expended in

pursuit" of recovering property; 12 Okla. St. Ann. § 940(A), which allows for

recovery of fees for negligent or willful injury to property, principles of equity and

federal Indian policy; and the Declaratory Judgment Act, 28 U.S.C. § 2202.  Pl.'s

Att'ys' Fee Br.; Pl-Interv.'s Att'ys' Fee Br.  Defendants contend that the Court has

already ruled on Plaintiff's and Plaintiff-Intervenor's Sections 64(3) and 940(A)

theories and that no misconduct during the life of this case warrants an award of

costs and fees in equity.  Defs.' Att'ys' Fee Br.

# Add. 116

### A.    Availability of Fees and Costs

Section 64(3) of Title 23 provides that "[t]he detriment caused by the wrongful conversion of personal property is presumed to be [a] fair compensation for the time and money properly expended in pursuit of the property."  23 Okla. St. Ann. § 64(3).  In advance of trial, Defendants moved to exclude evidence related to the recovery of litigation fees and costs.  Defs.' Mot. Exclude Certain Evid. Trial at 4–6 [Doc. 413].  In ruling on Defendants' pre-trial motion, the Court relied on U.S. Supply Co. v. Gillespie, 166 P. 139 (1917), in which the Oklahoma Supreme Court held that attorneys' fees "paid in connection with the prosecution of [an] action for damages [. . .] are not recoverable as compensation for money properly expended in pursuit of the property."  Order (Apr. 23, 2024) at 9 [Doc. 423]; Gillespie, 166 P. at 140.  This Court held that Section 64(3) does not allow for the recovery of attorneys' fees incurred in pursuit of litigation.  Order (Apr. 23, 2024) at 9.

Plaintiff contends that it is entitled to recover the costs of its experts and specialists retained for purposes of this litigation.  Pl.'s Att'ys' Fee Br. at 5–6; Pl.'s Att'ys' Fee Reply Br. at 5.  In support of this argument, Plaintiff cites to two cases from the Oklahoma appellate courts: W.P. Bistro Tulsa v. Henry Real Estate, 514 P.3d 1091 (Okla. Ct. App. 2022) and First National Bank & Trust Co. v. Exchange National Bank & Trust Co., 517 P.2d 805 (Okla. Ct. App. 1973).  Pl.'s Att'ys' Fee Br. at 5–6.  These cases are distinguishable from the facts of the instant case

**Add. 117**

because they each involve recovery of fees related to experts tasked with pursuing

property, not with litigation. W.P. Bistro Tulsa, LLC, 514 P.3d at 1098 (fee for an

asset recovery specialist retained to determine if appellee's assets could be

gathered and collateral sold); First Nat'l Bank & Trust, 517 P.2d at 807

("accountants' fees necessary in pursuit of the property"). In contrast, the experts

retained by Plaintiff and Plaintiff-Intervenor in this case provided valuations and

other functions specifically within the scope of the litigation. These are not the

type of fees recoverable under Section 64(3).

> Section 940(A) of Title 12 provides that:
>
> [i]n any civil action to recover damages for the negligent or willful injury to property and any other incidental costs related to such action, the prevailing party shall be allowed reasonable attorney's fees, court costs and interest to be set by the court and to be taxed and collected as other costs of the action.

12 Okla. St. Ann. § 940(A). In ruling on Defendant's pre-trial motion to exclude,

the Court held that Section 940(A) "does not provide an avenue for recovery of

attorneys' fees in this case because Plaintiff and Plaintiff-Intervenor have not

claimed damages based on physical injury to the mineral estate." Order (Apr. 23,

2024) at 9 (citing Weyerhaeuser Co. v. Brantley, 510 F.3d 1256, 1268 (10th Cir.

2007)).

Plaintiff now contends that it raised the issue of physical injury to the Osage

Mineral Estate in the Amended Complaint. Pl.'s Att'ys' Fee Reply Br. at 2; Am.

# Add. 118

Compl.  In the Amended Complaint, Plaintiff makes general reference to damages

resulting from Defendants' trespass and conversion:

> 50.    By conducting unauthorized and unapproved mining or work related to minerals, as contemplated by 25 C.F.R. § 211 or 25 C.F.R. § 214, Defendants trespassed on the Osage [M]ineral [E]state, in violation of law and, in doing so, caused damages.

> 51.    Defendants are co-trespassers and are jointly and severally liable for all damages that resulted from the trespass.

* * *

> 64.    By conducting unauthorized and unapproved mining or work related to minerals, as contemplated by 25 C.F.R. § 211 or 25 C.F.R. § 214, Defendants converted property belonging to the Osage mineral estate and, in doing so, caused damages.

> 65.    Defendants are jointly and severally liable for all damages that resulted from the conversion.

* * *

Prayer for Relief

* * *

> 3.    Enter a judgment assessing damages, as determined, to the Osage [M]ineral [E]state for unlawful or unauthorized mining, excavation or other work, as set out in the federal regulations.

> 4.    Enter a judgment finding Defendants jointly and severally liable for damages, in an amount to be proven, resulting from the trespass and conversion.

Am. Compl. ¶¶ 50–51, 64–65, 3–4.  In light of the evidence presented at trial, the

Court views these general references to damages related to trespass as allegations

**Add. 119**

of injury to the Osage Mineral Estate and considers the Section 940(A) arguments presented by Plaintiff and Plaintiff-Intervenor.

In considering Section 940(A), the Tenth Circuit Court of Appeals has held that "[t]he use of the word 'shall' renders the award of attorney's fees mandatory when an action falls under the purview of § 940(A)." Sundance Energy Okla., LLC v. Dan D. Drilling Corp., 836 F.3d 1271, 1280 (10th Cir. 2016) (citing Schaeffer v. Shaeffer, 743 P.2d 1038, 1040 (Okla. 1987)). The statute only applies when a prevailing party recovers actual damages for physical injury to property. Weyerhaeuser, 510 F.3d at 1268. With regard to Plaintiff's trespass claims, Plaintiff has only recovered damages related to Defendants' occupancy of the Osage Mineral Estate equivalent to fair rental value. Supra § II. Alternatively, the Court has awarded damages on Plaintiff's conversion claims based on the value of minerals removed from the mineral estate through blasting and excavation. Supra § I. The Court concludes that the damages award for Plaintiff's conversion claim is sufficient under Section 940(A). Because the statute makes the awarding of attorneys' fees mandatory, the Court grants Plaintiff's and Plaintiff-Intervenor's requests for attorneys' fees and costs incurred in litigating this case.

Plaintiff also seeks recovery of fees and costs in equity, alleging that Defendants' actions impeded Plaintiff's ability to enforce its rights. Pl.'s Att'ys' Fee Br. at 7–8; Pl.'s Att'ys' Fee Reply Br. at 6–9. Defendants contend that

**Add. 120**

Plaintiff has not identified any specific litigation misconduct warranting a shifting of fees.  Defs.' Att'ys' Fee Br. at 7–10.

As the U.S. Supreme Court has recognized, "it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  Hall v. Cole, 412 U.S. 1, 5 (1973) (internal quotation omitted).  In the Tenth Circuit, "the bad faith exception is drawn very narrowly, and may be resorted to 'only in exceptional cases and for dominating reasons of justice.'"  Sterling Energy, Ltd. v. Friendly Nat'l Bank, 744 F.2d 1433, 1437 (10th Cir. 1984) (quoting Cornwell v. Robinson, 654 F.2d 685, 687 (10th Cir. 1981)).  As the U.S. Supreme Court has explained:

> if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.

Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991).

Plaintiff points to multiple examples in which it contends that Defendants "at least acted in a manner oppressive to the rights of Plaintiffs."  Pl.'s Att'ys' Fee Br. at 8.  For example, Plaintiff raises Defendants' failure to obtain a lease following Osage Wind I, despite the Tenth Circuit Court of Appeals finding that the lease was required for Defendants' mining activities.  Pl.'s Att'ys' Fee Br. at 8; Pl.'s Att'ys' Fee Reply Br. at 6–7.  Though it would have been advisable following

**Add. 121**

the Tenth Circuit Court of Appeals' decision for Defendants to make efforts to obtain the needed lease, their failure to do so has not amounted to a fraud upon the Court nor hampered this litigation.  If anything, Defendants' failure to obtain a lease has contributed to increased damages owed to Plaintiffs.

Plaintiff also argues that Moskaluk's misrepresentation that a "record [of] the volume of crushed" materials was maintained during construction warrants fee shifting.  Pl.'s Att'ys' Fee Br. at 8; Pl.'s Att'ys' Fee Reply Br. at 7.  This representation was made in the context of a motion for injunctive relief and the accompanying filing was signed by counsel.  Pl.'s Ex. 57 at 22–23, 25–26; Pl.'s Ex. 58 ¶ 15(a)(ii).  Though it has been established that Moskaluk's statement was inaccurate, it has not been demonstrated that it was made in bad faith, rather than innocent error.  See Autorama Corp. v. Stewart, 802 F.2d 1284, 1288 (10th Cir. 1986) ("[I]t is not surprising that attorneys' fees are awarded only when there is 'clear evidence' that challenged actions are taken entirely without color and are pursued for reasons of harassment or delay.").  In fact, as discussed above, Judge Frizzell previously considered and denied a request for sanctions based on Moskaluk's misstatement.  Order (Oct. 18, 2022) at 10.  The fact that Defendants' counsel signed the accompanying submission might reflect on the quality of representation, but it does not amount to a fraud on the Court.

# Add. 122

Plaintiff alleges that Defendants made other misrepresentations during the litigation.  Pl.'s Att'ys' Fee Br. at 8 n.6.  Plaintiff points to inconsistencies between some witnesses who claimed that roughly 25% of the material excavated was not returned to the ground and others who testified that all the material was returned.  Id.; see also Pl.'s Ex. 58 ¶ 15(a)(i); Trial Tr. vol. I, 20:10–13; Trial Tr. vol. XII, 1406:1–7, 1418:22–25, 1423:5–18, 1426:2–4; Trial Tr. vol. XIII, 1537:15–1540:23, 1541:3–1545:23, 1546:7–25.  Plaintiff argues that these inconsistencies are significant because the location of the minerals was considered relevant to Pfahl's valuation calculation.  Pl.'s Att'ys' Fee Reply Br. at 7–8.  As with Moskaluk's statement discussed above, there is no indication that these inconsistencies between witnesses were acts of bad faith, rather than misremembrances of events that occurred a decade prior to the trial.

Plaintiff next argues that Defendants' continuation of construction after the filing of this action was an oppressive act.  Pl.'s Att'ys' Fee Br. at 8.  Again, this behavior does not warrant fee shifting because it did not impact the litigation.  Defendants' decision to continue an action that was later held to be unlawful might impact damages, but it did not hamper Plaintiff's ability to prosecute this case.

Finally, Plaintiff takes issue with Defendants' reliance on statements of a Bureau of Indian Affairs inspector, Ray Whiteshield, who did not testify at the trial.  Pl.'s Att'ys' Fee Br. at 8 n.6; Pl.'s Att'ys' Fee Reply Br. at 8–9.

# Add. 123

Case 4:14-cv-00704-JCG-JFJ   Document 515 Filed in USDC ND/OK on 12/18/24   Page 76
Appellate Case: 25-5020   Document: 92   Date Filed: 04/16/2025   Page: 186

Case No. 4:14-cv-00704-JCG-JFJ                                          76

Whiteshield's visit to the wind farm is described in an internal email. Defs.' Ex 35. At trial, Defendants' counsel asked Storch to give his impressions of Whiteshield's site visit, which Storch did not attend, based on the email. Trial Tr. vol. VI, 635:14–21. The Court sustained an objection to the testimony as hearsay, and Defendants' counsel represented to the Court that the evidence was not being offered for the truth of the matter. Trial Tr. vol. VI, 635:22–636:14. In their Proposed Findings of Fact and Conclusions of Law, Defendants state that "[t]he inspector expressed concern that Enel was 'crushing rock for sale.'" Defs.' Post-Trial Br. at 10. This statement directly quotes language from the internal email and cites the email as support. Id.; Defs.' Ex. 35. The Court notes that the email was admitted into evidence without objection. Trial Tr. vol. XII, 1425:16–22. The Court does not consider one sentence improperly based on inadmissible evidence to amount to fraud or an attempt to hinder the proceedings.

Even viewed in their totality, Plaintiff's complaints do not amount to the type of bad faith or vexatious conduct needed to warrant equitable fee shifting. It is without question that Plaintiff has identified examples of imperfect lawyering and imperfect witnesses, but Plaintiff's allegations do not reach the level of fraud or disruption to the proceedings required to reallocate fees and costs based on equity.

# Add. 124

Plaintiff's final theory for recovery of attorneys' fees and costs is through the Declaratory Judgments Act. Pl.'s Att'ys' Fee Br. at 9–10; Pl.'s Att'ys' Fee Reply Br. at 9–10. 28 U.S.C. § 2202 provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202. "Further necessary or proper relief" can include an award of attorneys' fees and costs. See Sec. Ins. Co. v. White, 236 F.2d 215, 220 (10th Cir. 1956). The statute is not an independent basis for such an award and does not authorize the Court to grant attorney's fees and costs that are "not otherwise authorized by statute, contract, or state law." Schell v. OXY USA Inc., 814 F.3d 1107, 1127 (10th Cir. 2016).

It is uncontroverted that Plaintiff prevailed on its claim for declaratory relief. Osage Wind II, 710 F. Supp. 3d at 1030. In this case, an independent statutory ground exists under 12 Okla. St. Ann. § 940(A) for an award of attorneys' fees and costs related to Defendants' failure to obtain the necessary lease for their mining activities. Therefore, an award of attorneys' fees and costs for Plaintiff's declaratory claims is appropriate.

Plaintiff and Plaintiff-Intervenor are not required to succeed on each of their theories for recovery. Typically, the Court is required to apportion attorneys' fees and costs between claims for which there is a statutory authorization to shift fees

**Add. 125**

and claims for which there is not an independent authorization. See Travelers

Indem. Co. v. Hans Lingl Anlagenbau und Verfahrenstechnik GMBH & Co KG,

189 Fed. App'x 782, 788 (10th Cir. 2006). "[W]here non-authorized claims

contain common components of a claim for which attorney fees are authorized, it

may be proper to award fees without apportionment." Id. (citing Green Bay

Packaging, Inc. v. Preferred Packaging, Inc., 932 P.2d 1091, 1098 (Okla. 1996)).

Plaintiff and Plaintiff-Intervenor are entitled to recover attorneys' fees and cost

related to their successful trespass, conversion, and declaratory judgment claims.

Because those claims are intrinsically connected to the remaining claims in this

case based on their common facts and allegations, the Court finds it appropriate to

award Plaintiff and Plaintiff-Intervenor attorneys' fees and costs related to all

claims in this case.

### B.    Attorneys' Fees

In determining a reasonable attorneys' fee amount, the Court begins with

"the number of hours reasonably expended on the litigation multiplied by a

reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). This is

commonly referred to as the "lodestar" figure and there is a "strong presumption"

of its reasonableness. Perdue v. Kenny A. ex rel. Winn., 559 U.S. 542, 553–54

(2010). "[T]hat presumption may be overcome in those rare circumstances in

**Add. 126**

which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." Id.

In order to determine a reasonable hourly rate, the Court looks to "what lawyers of comparable skill and experience practicing in the area in which the litigation occurs would charge for their time." Case v. Unified School Dist. No. 233, 157 F.3d 1243, 1256 (10th Cir. 1998). The burden is on the requesting party to "provide evidence of the prevailing market rate for similar services by lawyers of reasonably comparable skill, experience, and reputation in the relevant community." Lippoldt v. Cole, 468 F.3d 1204, 1224–25 (10th Cir. 2006) (internal quotation omitted). This evidence may include "affidavits submitted by the parties and other reliable evidence of local market rates for [similar] litigation at the time fees are awarded." Case, 157 F.3d at 1256. A judge may also rely on her own "knowledge of prevailing market rates as well as other indicia of a reasonable market rate." Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1493 (10th Cir. 1994).

### 1.     Plaintiff United States

Plaintiff claims that it incurred legal fees totaling $1,943,666.17 in litigating this case. Pl.'s Fees and Costs Br. at 2–9. Plaintiff seeks to recover fees for two attorneys, Cathy McClanahan and Nolan Fields. Id. at 3. McClanahan recorded 4,989.70 hours at a rate of $204.51 per hour, totaling $1,001,842.22. Id. Fields

# Add. 127

Case 4:14-cv-00704-JCG-JFJ    Document 515 Filed in USDC ND/OK on 12/18/24    Page 80
Appellate Case: 25-5020    Document: 92    Date Filed: 04/16/2025    Page: 190

Case No. 4:14-cv-00704-JCG-JFJ                                              80

recorded 4,498.31 hours at a rate of $158.43 per hour, totaling $712,658.93.  Id.

Plaintiff also submitted that two paralegals assisted with this case, Michelle

Hammock and Sarah Coffey.  Id.  Hammock recorded 1,119.16 hours at a rate of

$127.36 per hour, totaling $142,536.86.  Id.  Coffey recorded 591.70 hours at a rate

of $146.41 per hour, totaling $86,628.16.  Id.  Plaintiff is not seeking to recover

fees for the work performed by four other federal employees who contributed work

on this matter.  Id. at 7–9.

Plaintiff's fees request is supported by the written declaration of Emma

Werlein, the Resource Management Officer for the U.S. Attorney's Office for the

Northern District of Oklahoma.  Id. at Ex. 1 ("Werlein Decl.") [Doc. 513-1].  In

preparing Plaintiff's submission, Werlein reviewed employee time records that

were submitted weekly into an internal record keeping and tracking computer

application.  Id. ¶¶ 3–4.  She also reviewed employee compensation information.

Id. ¶ 6.  For each of the four relevant attorneys and paralegals, an hourly salary was

calculated by dividing the employee's annual salary by 2,080 hours.  Id. ¶ 11.  An

hourly benefit rate was calculated by multiplying the hourly salary rate by 30%.

Id.  Using these amounts, an hourly fee rate was calculated as the sum of the

hourly salary rate, the hourly benefit rate, and a standard overhead rate of $93.64.

Id.  The Court finds this method of calculating hourly fee rates to be reasonable.

# Add. 128

The Court observes that the rates billed by McClanahan, Fields, Hammock, and Coffey are comparable, and generally less than, those charged by private counsel for Plaintiff-Intervenors.  Compare Pl.'s Fees and Costs Br. at 3 with Pl.-Interv.'s Fees and Costs Br. at Exs. A ("Fredericks Peebles & Morgan Invoices") [Doc. 498-1], B ("Pipestem Law Invoices") [Doc. 498-2], C ("Patterson Earnhart Invoices") [Doc. 498-3].  Plaintiff has also not sought to enhance a fee award or recovery for some members of its legal team.  Pl.'s Fees and Costs Br. at 7–9.  The Court finds the hourly rates claimed of $204.51 for McClanahan, $158.43 for Fields, $127.36 for Hammock, and $146.41 for Coffey to be reasonable.

The tracking system used by the Department of Justice allows for hours to be recorded in quarter-hour increments.  Id. ¶ 14.  It does not maintain detailed descriptions of work performed on an hourly basis.  Pl.'s Fees and Costs Br. at 4.  Recognizing that this case was filed more than a decade ago and has included multiple motions, an appeal, and a trial, and upon review of Plaintiff's submissions, the Court finds reasonable the 4,898.70 hours claimed for McClanahan, 4,498.31 hours claimed for Fields, 1,119.16 hours claimed for Hammock, and 591.70 hours claimed for Coffey.

Defendants raise multiple objections to Plaintiff's fee request and the supporting documentation.  Defendants argue that Plaintiff has not met its burden to provide the Court information necessary to distinguish between fee-bearing and

**Add. 129**

non-fee bearing claims.  Pl.-Interv.'s Fees and Costs Resp. at 3–5.  As discussed above, because all of the claims in this case are interrelated, all claims are fee-bearing.  There is no need for Plaintiff or the Court to distinguish between fee-bearing and non-fee-bearing claims in apportioning fees and costs.

Defendants also argue that Plaintiff's recovery should be denied or reduced because it is not supported by contemporaneous, meticulous documentation.  Id. at 5–7.  The party requesting that fees be awarded "has the burden of proving hours to the district court by submitting meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks."  Case, 157 F.3d at 1250.  A court may deny a claim for fees when contemporaneous records were not maintained.  See Anderson v. Sec'y Health and Hum. Servs., 80 F.3d 1500, 1506 (10th Cir. 1996).  In this case, Plaintiff is represented by the Department of Justice, which does not operate in the same manner as a private law firm with the need to track billable hours.  Plaintiff has explained that in the normal course of business, "[the Department of Justice] does not maintain records containing detailed descriptions of task performed on an hourly or sub-hourly basis."  Pl.'s Fees and Costs Br. at 4; Werlein Decl. ¶ 4.  Because Plaintiff's submission is based on data collected in the normal practice of the Department of

**Add. 130**

Justice, the Court does not find it necessary to deny or reduce recovery. Therefore, Plaintiff is awarded $1,943,666.17 as reasonable attorneys' fees.

### 2.    Plaintiff-Intervenor Osage Minerals Council

Plaintiff-Intervenor claims that it incurred legal fees totaling $2,297,044 in litigating this case. Pl.-Interv.'s Fees and Costs Br. at 4–7. Plaintiff-Intervenor was initially represented in this case by the law firm Fredericks Peebles & Morgan during the appeal to the Tenth Circuit Court of Appeals and in the response to the petition for a writ of certiorari before the U.S. Supreme Court. Id. at 4. During discovery, Plaintiff-Intervenor was represented by Pipestem Law, P.C. Id. Patterson Earnhart Real Bird & Wilson LLP ("Patterson Earnhart") represented Plaintiff-Intervenor for summary judgment, trial, and post-trial work. Id. For Fredericks Peebles & Morgan and Pipestem Law, Plaintiff-Intervenor provides figures based on records maintained by Plaintiff-Intervenor in the normal course of business. Id. at 4–5. For Patterson Earnhart, Plaintiff-Intervenor provides records obtained from invoices sent to Plaintiff-Intervenor and Patterson Earnhart's billing software. Id. at 5.

The records submitted to the Court reflect that seven professionals worked on this case on behalf of Fredericks Peebles & Morgan, LLP between September 2016 and December 2019: Chloe Bourne, Peter J. Breuer, Katie D. Frayer, Jeffrey Rasmussen, Rebecca Sher, Kamran Zafar, and TWF. Fredericks Peebles &

# Add. 131

Case 4:14-cv-00704-JCG-JFJ    Document 515 Filed in USDC ND/OK on 12/18/24    Page 84
Appellate Case: 25-5020    Document: 92    Date Filed: 04/16/2025    Page: 194

Case No. 4:14-cv-00704-JCG-JFJ                                                      84

Morgan Invoices.  Rasmussen and TWF billed at a rate of $300 per hour and the

other individuals billed at a rate of $200 per hour.  Id.  Rasmussen recorded 121.5

hours, Bourne recorded 36.1 hours, Breuer recorded 24.3 hours, Frayer recorded

13.4 hours, Sher recorded 39.7 hours, Zafar recorded 3.7 hours, and TWF recorded

2 hours.  Id.  The Court finds these hourly rates and the amount of work performed

reasonable.  Plaintiff-Intervenor is awarded $60,490 as reasonable attorneys' fees

for work performed by Fredericks Peebles & Morgan.

The invoices submitted by Plaintiff-Intervenor covering work performed by

Pipestem Law reflect that at least 11 individuals performed work on this case.

Pipestem Law Invoices.  Each of those individuals billed at a rate of either $100

per hour or $300 per hour.  Id.  The Court finds these rates to be reasonable.

Plaintiff-Intervenor has not provided the number of hours worked by each

individual or the total number of hours worked by Pipestem Law.  It is not the

Court's job to sort through 359 pages of invoices, covering a period of more than

three years, to determine how many hours were recorded and at what rate those

hours were billed.  It is possible for the Court to make a reasonable estimate of the

billed hours using the information provided by Plaintiff-Intervenor.  Of the 11

individuals reflected on the provided invoices, six billed at a rate of $300 per hour

(AF, JH, MN, RH, SB, and ST) and five billed at a rate of $100 per hour (Ashleigh

**Add. 132**

Fixico, AS, JC, WW, and ZL).  See id.  The average rate for this group of

individuals is $209.09 per hour.

Plaintiff-Intervenor contends that Pipestem Law's billing totaled $2,049,799.

Pl.-Interv.'s Fees and Costs Br. at 5–6.  In reviewing the invoices provided in

support of Plaintiff-Intervenor's request, the Court observes three discrepancies.

First, in its billing summary, Plaintiff-Intervenor represents that Pipestem Law

billed $17,420 for the month of April 2020.  Id. at 5.  Multiple pages of the

corresponding invoice were not provided to the Court for review.  Pipestem Law

Invoices at 11–13.  The invoice lines included on the pages provided to the Court

total $8,030.  Id.  Because only $8,030 is supported by the evidence before the

Court, the total amount recoverable is reduced by $9,390.  Second, for the month

of May 2020, Plaintiff-Intervenor represents that $81,010 was billed.  Pl.-Interv.'s

Fees and Costs Br. at 5.  The items invoiced in support of this billing total only

$79,680.  Pipestem Law Invoices at 15–22.  The total amount recoverable is

reduced by the difference of $1,330.  Third, the amount invoiced for March 2021 is

$127,250.  Pl.-Interv.'s Fees and Costs Br. at 6.  The items invoiced in support of

this billing total only $119,150.  Pipestem Law Invoices at 120–37.  The total

amount recoverable is reduced by the difference of $8,100.  With these

adjustments, the total recoverable amount for work performed by Pipestem Law is

$2,030,979.  This total divided by the average hourly rate of $209.09 per hour

# Add. 133

results in 9,713.4 hours.  The Court finds this to be a reasonable approximation of the hours worked by Pipestem Law.  The Court finds that Plaintiff-Intervenor is entitled to recover $2,030,974.81 as reasonable attorneys' fees for the work performed by Pipestem Law.

The records submitted to the Court reflect that six professionals worked on this case on behalf of Patterson Earnhart since September 2022: Jeffrey Rasmussen, Rollie Wilson, Michelle Long, Celene Olguin, Logan Big Eagle, and RTL.  Patterson Earnhart Invoices.  Jeffrey Rasmussen and Rollie Wilson billed at a rate of $300 per hour.  Id.  Long, Big Eagle, and RTL billed at a rate of $250 per hour.  Id.  Olguin billed at a rate of $100 per hour.  Id.  The Court finds these rates to be reasonable.

As with the records provided for Pipestem Law, Plaintiff-Intervenor has not provided a statement of the total hours worked by each attorney and paralegal or the total hours worked by Patterson Earnhart.  The provided invoices reflect that Patterson Earnhart billed 173.6 hours for the period of September 2022 through February 2024.  Patterson Earnhart Invoices at 1–22.  They also reflect 416.8 hours for the period of March 1, 2024 through July 12, 2024.[25]  Patterson Earnhart

---

[25] The invoice indicates 456.7 total billable hours.  Patterson Earnhart Invoices at 60.  This includes 39.9 hours marked as "unbilled."  Id. at 59–60.  The Court considers only the billed hours.

Invoices at 36–60.  The Court finds this to be a reasonable number of hours for the four-month period prior to and including trial.  The Court finds 590.4 hours to be a reasonable amount of time billed for the period of September 2022 through trial. The Court finds further that Plaintiff-Intervenor is entitled to recovery of $186,755 as reasonable attorneys' fees for the work performed by Patterson Earnhart.

The adjusted total amount billed by the three law firms is $2,278,219.81. Defendants contend that this amount should be reduced because the supporting invoices group multiple actions together as block bills, making it difficult to determine if specific billing lines are reasonable or duplicative.  Defs.' Fees and Costs Resp. at 8–9.  In determining reasonableness, a court considers "whether the attorney's hours were 'necessary' under the circumstances."  Robinson v. City of Edmond, 160 F.3d 1275, 1281 (10th Cir. 1998).  This task is frustrated when an invoice groups multiple discrete actions into a single billed item without delineating the amount of time spent on each specific task.  Okla. Nat. Gas. Co. v. Apache Corp., 355 F. Supp. 2d 1246, 1264 (N.D. Okla. 2004) ("[W]here block billing makes it difficult, if not impossible, for the Court to determine the amount of time spent on specific tasks, a general reduction in attorney fees may be warranted.")  Each of Plaintiff-Intervenor's law firms used block billing to a degree.  For example:

Research panel of judges assigned to the Tenth Circuit [Court of Appeals] oral arguments hearing next week and review Indian law cases they have authored opinion[s] in. Draft summary of finding[s] for J. Rasmussen. Research and read several Interion Board of Indian Appeals cases related to the prosecution of trespassers of mineral and forest resources on Indian lands. Review Osage Wind case file . . . .

Fredericks Peebles & Morgan Invoices at 3.

Conference call with Osage Minerals Council to prepare for upcoming settlement conference in Osage Wind litigation. Review newly released discovery documents from Defendants. Phone call with [a]ssociate regarding discovery and Osage Minerals Council's Fourt [sic] Privilege Log. Review correspondence from U.S. Attorney's Office to Settlement Judge in Osage Wind Litigation. Review documents sought by Defendants in January 20 letter regarding Osage Wind litigation. Begin drafting letter responding to Defendants' January 20 letter. Review privileged documents sought by Defendants and letter from Defendants requesting discovery supplementation. Draft response letter to Defendants' counsel.

Pipestem Law Invoices at 100.

Exchange numerous emails regarding Enel's further edits to draft pretrial order. Through emails and call, coordinate responses to same with the United States. Prepare and review emails regarding exchange of exhibits listed by parties in the pretrial order. Review and redact attorney billings and compute amount for firm billing. Prepare follow-up emails with Chief of staff regarding obtaining attorney billings for other firms from the Osage Minerals Council.

Patterson Earnhart Invoices at 21. The Court does not agree with Defendants that it is necessary to exclude all items from the invoices that might qualify as block billing. Defs.' Fees and Costs Resp. at 8–9. The Court does find that a reduction is appropriate to address any potentially unnecessary or redundant work grouped

**Add. 136**

Case 4:14-cv-00704-JCG-JFJ    Document 515 Filed in USDC ND/OK on 12/18/24    Page 89
Appellate Case: 25-5020    Document: 92    Date Filed: 04/16/2025    Page: 199

Case No. 4:14-cv-00704-JCG-JFJ                                                        89

with otherwise permissible billing.  Case, 157 F.3d at 1250 ("[A] general reduction

of hours claimed in order to achieve what the court determines to be a reasonable

number is not an erroneous method, so long as there is sufficient reason for its

use.").  Therefore, the Court applies a 20% reduction to Plaintiff-Intervenor's

recoverable fees.  Upon consideration of the documents submitted, the Court

awards Plaintiff-Intervenor $1,822,575.85 in attorneys' fee.

### C.    Costs and Expenses

#### 1.    Plaintiff United States

Plaintiff seeks to recover $32,554.08 in costs incurred in litigating this case

and $591,595.78 in expenses related to experts.  Pl.'s Fees and Costs Br. at 9–10.

Plaintiff's costs are associated with the preparation of transcripts and the

preparation of video evidence.  Id. at 9.  Plaintiff is not seeking to recover costs

associated with document production.  Id. at 10.  The Court has reviewed the

summary and invoices provided by Plaintiff and finds $32,554.08 to be a

reasonable amount for costs incurred in this prolonged litigation.

Plaintiff seeks to recover expert expenses in the amount of $591,595.78.  Id.

at 10.  Defendants contend that Plaintiff is not entitled to the recovery of expert

fees under any identified authority.  Defs.' Fees and Costs Resp. at 9–10.  As

discussed above, the Court concludes that recovery of expert expenses is not

permitted in this case because the experts were retained for the purpose of trial, not

# Add. 137

Case 4:14-cv-00704-JCG-JFJ    Document 515 Filed in USDC ND/OK on 12/18/24    Page 90
Appellate Case: 25-5020    Document: 92    Date Filed: 04/16/2025    Page: 200

Case No. 4:14-cv-00704-JCG-JFJ                                                    90

for the recovery of the converted property. The Court awards Plaintiff $32,554.08

in costs and expenses related to this litigation.

### 2.    Plaintiff-Intervenor Osage Minerals Council

Plaintiff-Intervenor seeks to recover $90,263.30 for costs incurred in this

litigation. Pl.-Interv.'s Fees and Costs Resp. at 4–7. Upon review of the

supporting invoices, the Court observes discrepancies in Plaintiff-Intervenor's

summary. Plaintiff-Intervenor identifies $1,171.52 in expenses for April 2020. Id.

at 5. No expense invoice for this amount or this date is included among the

documents submitted to the Court. Plaintiff-Intervenor claims $828.00 in expenses

for the month of October 2020. Id. The accompanying invoice includes only

$628.00 in expenses. Pipestem Law Invoices at 66. To account for these

discrepancies, the Court will decrease the amount of available expenses by

$1,371.52. The Court also observes that an invoice dated July 9, 2020 in the

amount of $333.50 and an invoice dated July 12, 2021 in the amount of $5,553.30

were included in Plaintiff-Intervenor's supporting documents but were not

included in the summary of expenses Plaintiff-Intervenor seeks to recover. Pl.-

Interv.'s Fees and Costs Br. at 5–6; Pipestem Law Invoices at 14, 139. Because

Plaintiff-Intervenor did not include the expenses in its summary, the Court will

exclude them from consideration. Upon consideration of the invoices provided by

# Add. 138

Case 4:14-cv-00704-JCG-JFJ    Document 515 Filed in USDC ND/OK on 12/18/24    Page 91
Appellate Case: 25-5020    Document: 92    Date Filed: 04/16/2025    Page: 201
of 92

Case No. 4:14-cv-00704-JCG-JFJ                                                    91

Plaintiff-Intervenor, the Court awards Plaintiff-Intervenor $88,891.78 in costs and

expenses related to this litigation.

## CONCLUSION

For the reasons discussed above, the Court holds that Plaintiff and Plaintiff-

Intervenor are entitled to damages on their conversion claim in the amount of

$242,652.28 and on their trespass claim in the amount of $66,780.00.  The Court

also grants injunctive relief in the form of ejectment of the wind towers on the

claim of continuing trespass.  Plaintiff is awarded attorneys' fees in the amount of

$1,943,666.17 and costs in the amount on $32,554.08.  Plaintiff-Intervenor is

awarded attorneys' fees in the amount of $1,822,575.85 and costs in the amount on

$88,891.78.  Plaintiff's and Plaintiff-Intervenor's requests for pre-judgment

interest and the trebling of damages are denied.

## ORDER

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

(1)     Defendants shall pay to Plaintiff and Plaintiff-Intervenor damages in

the amount of $242,652.28 on the claim of conversion.

(2)     Defendants shall pay to Plaintiff and Plaintiff-Intervenor damages in

the amount of $66,780.00 on the claim of trespass.

**Add. 139**

(3)     The Osage Wind Farm Defendants shall remove the wind farm from the Osage Mineral Estate and return the Osage Mineral Estate to its pre-trespass condition on or before December 1, 2025.

(4)     Defendants shall reimburse Plaintiff $1,943,666.17 for attorneys' fees and $32,554.08 for costs incurred in this litigation.

(5)     Defendants shall reimburse Plaintiff-Intervenor $1,822,575.85 for attorneys' fees and $88,891.78 for cost incurred with this litigation.

IT IS SO ORDERED this 18th day of December, 2024.

    /s/ Jennifer Choe-Groves    
Jennifer Choe-Groves
U.S. District Court Judge[*]

---

[*] Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.

**Add. 140**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>and<br><br>OSAGE MINERALS COUNCIL,<br><br>    Plaintiff-Intervenor,<br><br>v.<br><br>OSAGE WIND, LLC, ENEL KANSAS,<br>LLC, AND ENEL GREEN POWER<br>NORTH AMERICA, INC.,<br><br>    Defendants. | Court No. 4:14-cv-00704-JCG-JFJ |

<u>**JUDGMENT**</u>

    This matter came before the Court for consideration on the Complaint [Doc. 1] and

Amended Complaint [Doc. 20] filed by Plaintiff United States alleging that Defendants Osage

Wind, LLC ("Osage Wind"), Enel Kansas, LLC, and Enel Green Power North America, Inc.

(collectively, "Defendants") committed trespass, continuing trespass, and conversion in the

construction of a wind farm on Indian land.  Plaintiff and Plaintiff-Intervenor Osage Minerals

Council seek declaratory judgment that Defendants violated 25 C.F.R. §§ 211 and 214, monetary

damages, equitable relief in the form of ejectment of the wind farm, and attorneys' fees and

costs.  The Court granted summary judgment in favor of Plaintiff and Plaintiff-Intervenor on the

declaratory relief, conversion, trespass, and continuing trespass claims and held that Plaintiff and

Plaintiff-Intervenor are entitled to monetary damages on their conversion and trespass claims and

equitable relief in the form of ejectment on their continuing trespass claim.  Op. and Order [Doc.

**Add. 141**

386].  A trial was held to determine damages.  Min. Orders [Docs. 456–64, 491].  An opinion and order was entered by the Court on December 18, 2024, awarding damages, ejectment, and attorneys' fees and costs.  Op. and Order [Doc. 515].

**IT IS THEREFORE ORDERED, ADJUDICATED, AND DECREED** that judgment is entered in favor of Plaintiff and Plaintiff-Intervenor against Defendants and it is hereby ordered that:

1.  Defendants are declared to have been subject to and in violation of 25 C.F.R. §§ 211 and 214;

2.  Defendants are liable for conversion and shall pay to Plaintiff and Plaintiff-Intervenor damages in the amount of $242,652.28;

3.  Defendants are liable for trespass and shall pay to Plaintiff and Plaintiff-Intervenor damages in the amount of $66,780.00;

4.  Defendants are liable for continuing trespass and shall remove the wind farm from the Osage Mineral Estate and return the Osage Mineral Estate to its pre-trespass condition on or before December 1, 2025;

5.  Defendants shall reimburse Plaintiff $1,943,666.17 for attorneys' fees and $32,554.08 for costs incurred in this litigation; and

6.  Defendants shall reimburse Plaintiff-Intervenor $1,822,575.85 for attorneys' fees and $88,891.78 for cost incurred with this litigation.

**Entered** this 18th day of December, 2024.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves
U.S. District Court Judge[*]

---

[*] Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.

# Add. 142